FILED

2020 Oct-29  PM 06:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTH EASTERN DIVISION

| | |
|---|---|
| TUCKER OLIVER, SARAH ARIAUDO, MICHELLE WELCHER, LASHONDA WALTERS-KAYODE, SCOTT LUCAS, KENNETH KANSKY, DENESE COSPER, and DONALD HACKMAN, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>HONDA MOTOR COMPANY LIMITED, AMERICAN HONDA MOTOR CO., INC., DENSO CORPORATION, and DENSO INTERNATIONAL AMERICA, INC.,<br><br>      Defendants. | Case No.: 5:20-cv-00666-MHH<br><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

JURISDICTION AND VENUE ..........................................................14

THE PARTIES....................................................................................22

FACTUAL ALLEGATIONS ..............................................................45

I.   THE OPERATION OF CLASS VEHICLES' LOW-PRESSURE FUEL
     PUMP ..........................................................................................46

II.  THE CLASS VEHICLES SUFFER FROM A FUNDAMENTALLY
     DEFECTIVE FUEL PUMP...........................................................51

III. THE FUEL PUMP DEFECT REDUCES ENGINE POWER, CAUSES
     VEHICLE STALLING, AND CAN LEAVE THE CLASS VEHICLES
     COMPLETELY INOPERABLE COMPROMISING CONSUMER
     SAFETY ......................................................................................56

IV.  DEFENDANTS KNEW ABOUT THE FUEL PUMP DEFECT, BUT
     CONTINUED TO MANUFACTURE, MARKET, AND SELL CLASS
     VEHICLES ..................................................................................70

V.   HONDA CONTINUOUSLY TOUTED CLASS VEHICLES AS SAFE
     AND DEPENDABLE, CONCEALING THE FUEL PUMP DEFECT .......75

VI.  DEFENDANTS ADMITTED THE FUEL PUMP DEFECT WAS
     DANGEROUSLY DEFECTIVE, BUT ISSUED INADEQUATE
     RECALLS....................................................................................93

VII. APPLICABLE WARRANTIES .................................................125

VIII. HONDA RECEIVED NOTICE MULTIPLE TIMES AND WAYS .........126

i

IX.    FRAUDULENT OMISSION/CONCEALMENT ALLEGATIONS ......129

X.    TOLLING OF THE STATUE OF LIMITATIONS ................................133

CLASS ACTION ALLEGATIONS ......................................................................137

CLAIMS FOR RELIEF ......................................................................................145

   A. Claims Brought on Behalf of the Multi-State Classes ...................................145

   B. Claims Brought on Behalf of the Statewide Classes....................................161

   C. Claims Brought on Behalf of the Nationwide Class ....................................278

REQUEST FOR RELIEF .....................................................................................286

JURY TRIAL DEMANDED .................................................................................287

Plaintiffs Tucker Oliver, Sarah Ariaudo, Michelle Welcher, Lashonda Walters-Kayode, Scott Lucas, Kenneth Kansky, Denese Cosper, and Donald Hackman (collectively, "Plaintiffs") file this Second Amended Class Action Complaint, pursuant to Section III of with the Court's Initial Order (ECF 2) and the Court's Text Order dated October 8, 2020 (ECF 42),  on behalf of themselves and all others similarly situated against defendants Honda Motor Company Limited and American Honda Motor Co., Inc. (collectively, "Honda"), Denso Corporation and Denso International America, Inc. (collectively, "Denso").[1]  Based on personal knowledge as to matters relating to themselves, and on information and belief based on the investigation of counsel, including counsels' review of consumer complaints available on the database of the National Highway Traffic Safety Administration ("NHTSA") and other publicly available information, as to all other matters, Plaintiffs allege as follows:

## INTRODUCTION

1.     This class action lawsuit seeks redress for the misconduct of Denso, a $47.6 billion global company that claims to be a leading supplier of advanced automotive technology, systems and components, and Honda, one of the largest automobile manufacturers in the world, which knowingly exposed the purchasers

---

[1] Honda and Denso are collectively referenced as "Defendants."  Plaintiffs are in the process of serving Honda Motor Company Limited and Denso Corporation, both of which are located in Japan.

1

and lessees of at least hundreds of thousands of Honda vehicles, such as Plaintiffs and members of the proposed classes ("Class Members"), to a dangerous defect lurking in their vehicles' fuel pump. This defect causes Honda vehicles to stall, their engines to shut down and fail to accelerate, and creates a substantial risk of injury and death for any person operating or riding in a vehicle equipped with the defective fuel pump. Despite being aware of this problem for years, Honda and Denso failed to disclose it to Plaintiffs until May 2020 when Honda announced a recall (Denso issued a general recall of its fuel pumps in April 2020), and only began to offer a proposed repair to a tiny fraction of the affected vehicles beginning in July 2020. Unfortunately for Class Members, this supposed "repair" not only fails to adequately resolve the defect, it risks causing *additional* damage to the fuel pump module, rendering vehicles even *more* hazardous than they would have been absent the "repair."

2.     Denso is one of the largest suppliers of original equipment fuel pumps to vehicle manufacturers, including to Honda. According to Denso, its fuel "pumps are chosen as standard equipment by the world's most demanding OEMs, especially for their premium vehicles."

3.     On April 27, 2020, Denso issued a recall for defective low-pressure fuel pumps it manufactured between September 1, 2017 and October 6, 2018 (the "Denso

Recall"). The number of potentially affected vehicles across manufacturers is 2,020,000.

4.      The fuel pump in an automobile is critically important to the overall operation of a vehicle because it lifts gasoline from the fuel tank and delivers it to the engine where it is ignited in the combustion chamber and generates vehicle propulsion. A fuel pump is expected to last for the life of an automobile or a minimum of 200,000 miles.

5.      In its Part 573 Safety Recall Report ("Denso's April 27, 2020 Recall Report")[2] filed with NHTSA, Denso admitted its low-pressure fuel pumps contain a defective impeller that poses a risk to consumer safety:

> An impeller in some low pressure fuel pumps may become deformed under certain conditions which could render the fuel pump inoperable. . . . If an impeller deforms to a point that creates sufficient interference with the fuel pump body, the fuel pump becomes inoperative. According to vehicle manufacturer's system evaluation, an inoperative fuel pump may result in the illumination of the check engine light and/or master warning indicators, rough engine running, engine no start and/or vehicle stall while driving at low speed and, in rare instances, a vehicle stall could occur while driving at higher speeds, increasing the risk of a crash.

6.      Specifically, Denso stated its low-pressure fuel pumps could become inoperable if "an impeller is manufactured with a lower density, and contains a lower

---

[2] Denso's April 27, 2020 Recall Report is attached hereto as Exhibit A.

surface strength or is exposed to production solvent drying for a longer period of time, higher levels of surface cracking may occur which, when excessive fuel absorption occurs, may result in impeller deformation."[3] ("Fuel Pump Defect").

7.      On June 11, 2020, Denso expanded its recall by submitting a second Part 573 Safety Recall Report to NHTSA ("Denso's June 11, 2020 Recall Report"),[4] increasing the number of affected fuel pumps from 2,020,000 to 2,156,057.[5]

8.      The Denso Recall Reports listed various manufactures that "purchased this defective/noncompliant equipment," one of which is Honda.[6]

9.      Despite admitting responsibility for the Fuel Pump Defect, and that the Defect poses a risk to consumer safety, Denso failed to take any corrective action itself and said "[t]he remedy program, if any, will be determined by vehicle manufacturers."[7]

10.      On May 28, 2020, over a month after the initial Denso Recall, Honda finally issued its own recall of its vehicles equipped with the defective low-pressure Denso fuel pumps. Honda filed its own Part 573 Safety Recall Report ("Honda's

---

[3] *Id.*

[4] Denso's June 11, 2020 Recall Report is attached hereto as Exhibit B.

[5] Denso's April 27, 2020 Recall Report and June 11, 2020 Recall Report are collectively referenced as the "Denso Recalls."

[6] *See* Exhibit A at 3.

[7] *Id* at 2.

May 28, 2020 Recall Report")[8] with NHTSA confirming that at least 136,057 of its vehicles are equipped with the defective Denso fuel pumps.  Honda's May 28, 2020 Recall covers 2018-2019 Acura NSX, 2019 Acura RDX, 2019 Acura RLX and RLX Sport Hybrid, 2018-2019 Honda Accord, 2018-2019 Honda Civic Hatchback, 2018-2019 Honda Civic Type R, 2019 Honda Fit, 2018-2019 Honda HR-V, and 2019-2020 Honda Insight vehicles manufactured at various times between April 2018 and September 2019 ("Honda's 2020 Recalled Vehicles").

11.     Honda's May 28, 2020 Recall Report confirms the existence and seriousness of the Fuel Pump Defect:

> Affected vehicles may be equipped with a fuel pump module manufactured with low density impellers. If the surface of the lower density impeller is exposed to production solvent drying for longer periods of time, higher levels of surface cracking may occur. These cracks may lead to excessive fuel absorption, resulting in impeller deformation. Over time, if an impeller deforms to a point that creates sufficient interference with the fuel pump body, the fuel pump becomes inoperative, which may cause illumination of the Malfunction Indicator Lamp in the instrument panel.

12.     On June 23, 2020, Honda amended its recall by filing a second Part 573 Safety Recall Report with NHTSA ("Honda's June 23, 2020 Recall Report"),[9] narrowing the population of Recalled Vehicles from 136,057 to 135,995.  The recall

---

[8] Honda's May 28, 2020 Recall Report is attached hereto as Exhibit C.

[9] Honda's June 23, 2020 Recall Report is attached hereto as Exhibit D.

still covers the same model and model year vehicles, but Honda removed 62 vehicles that "were never available for retail sale nor introduced in the U.S. market."[10]

13.    On June 24, 2020, Honda filed a third Part 573 Safety Recall Report with NHTSA ("Honda's June 24, 2020 Recall Report"),[11] finally identifying July 22, 2020 as the date on which it intends to notify consumers of the Fuel Pump Defect and the potential safety hazards it poses.[12]

14.    Honda claims to have accurately identified the total population of vehicles equipped with the defective fuel pumps:

> The recall population was determined based on manufacturing records and supplier part production records. The manufacturing range reflects all possible vehicles that could potentially experience the problem. Vehicles being recalled are equipped with fuel pump modules containing impellers produced during specific periods under specific circumstances (lower density impellers exposed to production solvent drying for longer periods of time). Similar vehicles not included in the recall are equipped with fuel pump modules that were not subject to the above conditions.[13]

---

[10] *See* Honda's June 23, 2020 Defect Information Report, attached hereto as Exhibit E.

[11] Honda's June 24, 2020 Recall Report is attached hereto as Exhibit F.

[12] On July 13, 2020, Honda amended its recall again, but the amendments are not material supplementations. (Honda's July 13 Recall Report is attached hereto as Exhibit G.)  Honda's May 28, 2020, June 23, 2020, June 24, 2020, and July 13, 2020 Recall Reports are collectively referenced as "Honda's 2020 Recall."

[13] *See* Exhibit D at 1.

15.     However, Honda's 2020 Recall fails to include other 2013-2019 Honda manufactured vehicles equipped with the same defective Denso made low-pressure fuel pump with a part number prefix 17045 ("Class Vehicles") as those in the Recall.

16.     Further, The Denso Recall identifies two possible alternatives for the Fuel Pump Defect: a low-density impeller that either (1) "contains a lower surface strength _**or**_ [(2)] is exposed to production solvent drying for a longer period of time . . . ."[14]   Honda, however, limited its recall only to those vehicles whose fuel pump impellers were exposed to solvent for an excessive amount of time. As set forth below, the research and analysis conducted by Plaintiffs' independent automotive engineering consulting expert ("Plaintiffs' Expert") confirms that the low-density material of the Denso fuel pump impeller is the root cause of the Fuel Pump Defect. Thus, Honda's 2020 Recall improperly excludes impellers that contain a lower surface strength but that were not exposed to solvent drying for longer periods of time.   Honda has not explained why it limited its recall in this manner despite Denso's broader recall. Other manufacturers who recalled their vehicles because of the same Fuel Pump Defect have not excluded such impellers.

17.     Honda's 2020 Recall also improperly limits the recall by omitting earlier models of the Recalled Vehicles. While Honda's 2020 Recall includes only model year 2018-2019 vehicles that suffer from the Fuel Pump Defect, a recall by

---

[14] Exhibits A and B (emphasis added).

7

another manufacturer over the same Fuel Pump Defect covers model year 2013-2019 vehicles equipped with Denso's same defective fuel pumps.

18.   In its 2020 Recall, Honda admits it knew about the Fuel Pump Defect as early as February 2019.  Honda knew in 2019 that "it was confirmed that impeller swelling resulted in fuel pump module failure," and that the Fuel Pump Defect resulted in 183 warranty claims and 68 field reports.   Nevertheless, Honda failed to make public the existence of the Fuel Pump Defect until May 28, 2020, over a year later.  Moreover, Honda failed to notify consumers directly or instruct them to stop driving their dangerous vehicles until they are repaired.  Nor did Honda offer a timely remedy.

19.   Honda's knowledge of the existence and breadth of the Fuel Pump Defect goes back further than February 2019.   On January 29, 2019, Honda submitted a Part 573 Safety Recall Report (the "Honda's 2019 Recall Report")[15] to NHTSA voluntarily recalling approximately 437,032 Honda and Acura vehicles manufactured from September 17, 2013 through December 3, 2018 equipped with the same defective Denso made low-pressure fuel pumps ("Honda's 2019 Recall").  Honda admitted there was a dangerous defect in the low-pressure fuel pumps:

> Sodium particulates contained in low quality fuels can adhere to certain internal components in the fuel pump, increasing electrical and mechanical resistance and reducing fuel pump performance. . . . If a vehicle is

---

[15] Honda's 2019 Recall Report is attached hereto as Exhibit H.

operated in high ambient temperature, reduced fuel pump performance can restrict vehicle acceleration and/or cause an engine stall, which increases the risk of a crash.

20. Honda's 2019 Recall covered 437,032 2016-2018 Acura MDX, 2015-2019 Acura TLX, and 2015-2017 Honda Accord vehicles equipped with defective Denso made fuel pumps manufactured at various times between 2013 through 2018 ("2019 Recalled Vehicles").   As a remedy, Honda offered a software upgrade increasing the voltage input for the fuel pump from 10v of power to 13v.  However, this repair served as a band-aid and failed to fix the problem.  Rather than replacing the fuel pumps with ones capable of performing as intended, Honda merely increased the power output of the fuel pumps in the hope that they can fulfill their function by forcing fuel through the mechanical resistance.

21. In fact, based on Plaintiffs' experiences, consumer complaints submitted to NHTSA's website, and Plaintiffs' Expert's research to date, the 2019 Honda Recall is based on the exact same defect and causal mode of the 2020 Honda Recall—inadequate impeller material.  Indeed, in the 2019 Honda Recall Report, Honda admits the 2019 Honda Recall was the result of improper material that was porous, and would absorb fuel particles and swell, which would create mechanical resistance and cause partial or complete engine failure.

22. Honda's failure to adequately diagnose the defect in Honda's 2019 Recall and offer an adequate remedy exposed consumers to a serious safety risk.

Honda's culpability is compounded by its failure to correct its previous wrong. Although the root cause of the 2019 Recall is the same as the root cause of the 2020 Recall, Honda did not include the 2019 Recalled Vehicles in its 2020 Recall. Thus, the owners and lessees of the 2019 Recalled Vehicles will not be able to obtain any remedy offered under Honda's 2020 Recall, which will be free of charge.

23.     Despite admitting in both the 2019 and 2020 Honda Recalls that the Fuel Pump Defect could occur "while driving, increasing the risk of crash," egregiously, Honda did not direct the owners and lessees of the Recalled Vehicles to immediately cease driving their cars. Honda also did not offer owners and lessees loaner cars they could drive until an adequate remedy could be implemented.

24.     Indeed, despite announcing its 2020 Recall on May 28, Honda did not begin to implement the 2020 Recall Repair (defined below) until July 2020 at the earliest.  Unfortunately, the 2020 Recall Repair has been inadequate on multiple levels.

25.     Rather than following the industry standard and replacing the entire fuel pump module, the 2020 Recall Repair directs technicians to replace only the fuel pump *motor*, which is part of the module.  This is an extremely delicate and difficult procedure with a high risk of damaging the entire fuel pump module, which can result in gas leaking out of the fuel tank, creating hazardous conditions and exacerbating the Fuel Pump Defect instead of correcting it. As set forth in Section

VI, there are numerous reports from Class Members detailing the dangerous consequences of the 2020 Recall Repair.

26.     Thus, the 2020 Recall Repair has failed to adequately repair the Fuel Pump Defect, and often causes additional damage to the fuel pump module and the Vehicle.

27.     The 2020 Recall has also failed in its scope.  Not only does it fail to cover all of the Class Vehicles, but as of October 12, 2020, a mere 46% of the Honda 2020 Recalled Vehicles had actually received the 2020 Recall Repair. Many Vehicle owners reported that they were unable to obtain the 2020 Recall Repair because they were advised Honda had not yet provided the necessary parts.

28.     As a result, at least hundreds of thousands of Honda's customers in the United States are driving Honda and Acura vehicles that pose a serious safety risk. In June 2020, Honda Malaysia recalled 55,354 vehicles equipped with defective low-pressure fuel pumps.[16] One source states Honda recalled nearly 1.4 million vehicles worldwide due to the Fuel Pump Defect.[17]

29.     The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, even death. A vehicle that stalls or suffers engine shutdown

---

[16] https://autocarmalaysia.com/2020/06/19/honda-global-recall-for-fuel-pump/ (last visited July 22, 2020).

[17] https://www.caranddriver.com/news/a32757538/honda-acura-fuel-pump-recall/#:~:text=Honda%20has%20issued%20a%20worldwide%20recall%20for%20about,driving%2C%20the%20automaker%20said.%20In%20the%20U.S%20 (last visited July 22, 2020).

is at heightened risk for collision. A vehicle that stalls or suffers engine shutdown causes drivers to react to remove themselves from danger, typically by exiting the road. Drivers stranded on the side of the road experience a heightened risk of danger, whether it is from other vehicles, remoteness or weather elements.

30.     Fuel pump failure can also prevent the driver from accelerating at the necessary and anticipated pace.  Diminished acceleration ability creates unexpected hazards, startling drivers of the Class Vehicles and other drivers in their proximity. Finally, once a Class Vehicle fuel pump fails, the vehicle becomes totally inoperable and will not start.

31.     Despite Honda's indisputable knowledge of the danger posed by defective fuel pumps in its vehicles, Honda's 2019 and 2020 Recalls are woefully inadequate: (1) they fail to identify and include the full scope of Honda manufactured vehicles equipped with defective fuel pumps; (2) they fail to offer a timely or effective repair; (3) they fail to warn consumers about the serious safety hazards posed by the Fuel Pump Defect and recommend customers stop driving their vehicles until they are repaired; and (4) they fail to offer free loaner vehicles until Plaintiffs' and Class Members' vehicles are repaired.

32.     As described in Section V, throughout the relevant period, Honda's marketing of the Class Vehicles was and is replete with assurances about their safety and dependability. A vehicle that can suddenly stall and lose power during normal

operating conditions is inherently unsafe and not dependable, and renders Honda's marketing of the Class Vehicles untrue and materially misleading. Plaintiffs and other Class Members have been damaged as a result.

33.    Despite marketing and selling the Class Vehicles as safe and dependable, as alleged above, Honda has long known of the Fuel Pump Defect.  In Honda's 2019 Recall Report, it admitted to knowing of the Fuel Pump Defect in January 2016 when "Honda received the first report of an engine stall."   Its knowledge only grew from there, amassing to years of research, data gathering, and hundreds—if not thousands—of Fuel Pump Defect warranty claims.  Moreover, under the TREAD Act, 49 U.S.C. § 30118, Honda is duty-bound to, and does, monitor complaints from consumers that are posted on NHTSA's website. As set forth in Section III below, there were consumer complaints on NHTSA's website about the Fuel Pump Defect in Honda's vehicles that predate Honda's 2019 Recall by over five years.

34.    Denso is equally culpable because it designed, engineered, tested, validated, manufactured, and placed into the stream of commerce defective fuel pumps, which it knew would be installed the Class Vehicles.  As described in Section IV below, Denso indisputably had exclusive knowledge of the Fuel Pump Defect well before October 2016, when Denso filed a patent application seeking to improve the durability and absorption qualities of the defective fuel pump impeller.

However, at no time did Denso disclose to others what it knew about the Fuel Pump Defect nor was that information reasonably available to Plaintiffs and the public. Denso's knowing and intentional failure to disclose the Fuel Pump Defect was a direct and proximate cause of harm to Plaintiffs and Class Members.

35.     With or without a viable remedy for the Fuel Pump Defect, Honda's Recalls have decreased the intrinsic and resale value of the Class Vehicles. Plaintiffs and other Class Members have been damaged as a result. Additionally, Class Members must still honor their lease and loan payments (without proration), even while their vehicles are inoperable and devalued.

36.     Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated who own or lease a Class Vehicle equipped with a defective Denso fuel pump, and assert claims under state consumer protection statutes, as well as claims for breach of express warranty, breach of implied warranty, strict liability, negligent undertaking, and fraudulent omission.

## JURISDICTION AND VENUE

37.     Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(a) and (d), because Plaintiffs and Class Members are citizens of a state different than Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

38.     Subject matter jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiffs' Magnuson-Moss Warranty Act claim arises under federal law, and this Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

39.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of actions giving rise to these claims occurred in this District, Honda and Denso have caused harm to Plaintiffs in this District, and Honda and Denso are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District. Venue is also proper in this District pursuant to 18 U.S.C. § 1965.

40.     This Court has personal jurisdiction over Honda and Denso pursuant to Alabama Rule of Civil Procedure 4.2 for the following reasons.

**Honda Defendants**

41.     This Court has personal jurisdiction over Honda under Alabama Rule of Civil Procedure 4.2 because, as described below, Honda, at all relevant times, had minimum contacts with Alabama, Honda purposefully availed itself to the privilege of doing business in Alabama, and exercising jurisdiction over Honda does not offend traditional notions of fair play and substantial justice. As detailed below, Honda, itself and/or through its subsidiaries or agents, transacts business within the State of Alabama and/or contracts anywhere to supply goods or services in Alabama

15

while obtaining substantial revenue in Alabama, including by manufacturing, marketing, and selling the Class Vehicles and other products in Alabama and providing repair services related to the Recall and the Class Vehicles, and has injured Plaintiffs and Class Members in Alabama.

42.     Honda, itself and/or through its subsidiaries or agents, operated at all relevant times approximately 19 Honda branded and six Acura branded dealerships in Alabama at which agents marketed, sold, and serviced Class Vehicles to Plaintiff Oliver and other Class Members without disclosing material facts, made material misrepresentations/omissions and/or misleading statements and continue to do so, which damaged and continues to damage Plaintiffs and Class Members in Alabama and elsewhere, as alleged herein.

43.     Honda, itself and/or through its subsidiaries or agents, disseminated and continues to disseminate television, radio, print, social media, and other forms of promotional and marketing materials from and/or in Alabama, including material touting its Class Vehicles. Through these various media outlets, Honda, itself and/or through its subsidiaries or agents, disseminated statements that omitted material facts, made material misrepresentations and/or misleading statements and continues to do so, which damaged and continues to damage Plaintiffs and Class Members in Alabama and elsewhere, as alleged herein.

44.    Honda, itself and/or through its subsidiaries or agents, maintains an interactive website that is accessible in Alabama and from which it solicits business in Alabama, including by directing consumers to Honda and Acura dealerships in Alabama and throughout the United States, and markets its brand and sells its products in Alabama.

45.    Honda, itself and/or through its subsidiaries or agents, operates a manufacturing plant in Lincoln, Alabama which employs 4,900 people in a 4.2 million square foot facility that manufactures approximately 340,000 vehicles, including Class Vehicles, and V6 engines a year.  Honda's presence in Alabama is so large that it is "Honda's largest light truck production facility in the world, and we're the sole manufacturer of the Passport sport utility vehicle, Odyssey minivan, Pilot sport utility vehicle, Ridgeline pickup truck and the V-6 engines that power them."[18]  Honda has spent approximately $2.9 billion in capital investment in Alabama, and has made $11 million in philanthropic contributions in Alabama.[19]

46.    Not only does it operate a manufacturing plant and dealerships in Alabama, but Honda, itself and/or through its subsidiaries or agents, owns real estate in Alabama.  Specifically, Honda owns at least 1,350 acres of land in Lincoln, Alabama.

---

[18] https://www.hondaalabama.com/our-products (last visited July 29, 2020)

[19] https://www.hondaalabama.com/our-company (last visited July 18, 2020).

47.     Honda, itself and/or through its subsidiaries or agents, committed tortious acts within the State of Alabama by advertising the Class Vehicles in an unfair and deceptive way, and by failing to timely and effectively repair the Fuel Pump Defect.

48.     Honda, itself and/or through its subsidiaries or agents, serviced Plaintiffs' and other Class Members' Class Vehicles in Alabama and continues to do so. When Class Vehicles were and are presented for fuel pump diagnoses and repair, Honda, itself and/or through its subsidiaries or agents, failed or fail to disclose material facts, made or make material misrepresentations and/or misleading statements, which damaged and continues to damage Plaintiffs and Class Members in Alabama and elsewhere, as alleged herein.

49.     Honda also expected or should reasonably have expected that its actions that caused injury to persons or property within Alabama to have consequences in Alabama. Honda knew or should have reasonably known that Honda and Acura vehicles that were defectively designed and/or manufactured outside of Alabama would be marketed and sold in the State of Alabama and would have consequences there. Honda also knew its omissions, misrepresentations and misleading statements about the Class Vehicles would have consequences in Alabama. Honda derives substantial revenue from interstate and international commerce. Ala. Code § 18-9-

5. For the fiscal year ended March 2020, Honda Motor Company Limited had net revenues of $31 billion.[20]

50.    Honda, itself and/or through its subsidiaries or agents, has sufficient contacts with the State of Alabama such that exercising jurisdiction over Honda is reasonable and comports with due process. Thus, this Court has jurisdiction over Honda under Alabama Rule of Civil Procedure 4.2, which extends to the limits of the United States Constitution.

**Denso Defendants**

51.    This Court has personal jurisdiction over Denso under Alabama Rule of Civil Procedure 4.2 because, as described below, Denso, at all relevant times, had minimum contacts with Alabama, purposefully availed itself to the privilege of doing business in Alabama, and exercising jurisdiction over Denso does not offend traditional notions of fair play and substantial justice. As detailed below, Denso, itself and/or through its subsidiaries or agents, transacts business within the State of Alabama and/or contracts anywhere to supply goods or services in Alabama while obtaining substantial revenue in Alabama, including by manufacturing, marketing, and selling the defective fuel pump and other products in Alabama, and has injured Plaintiffs and Class Members in Alabama.

---

[20] https://www.macrotrends.net/stocks/charts/HMC/honda/revenue (last visited July 18, 2020).

52.     Denso, itself and/or through its subsidiaries, entered into an agreement with Honda for the sale of its fuel pumps, which it knew, and intended, would be installed in the Class Vehicles and sold in Alabama.

53.     Denso, itself and/or through its subsidiaries and/or agents, also independently sells and distributes its fuel pumps in Alabama to Honda dealerships, repair shops, and automotive parts stores to be used as service replacement parts.

54.     Denso, itself and/or through its subsidiaries or agents, maintains an interactive website that is accessible in Alabama and from which it solicits business in Alabama, and markets its brand and products in Alabama.

55.     Denso, itself and/or through its subsidiaries or agents, disseminated statements that omitted material facts, made material misrepresentations and/or misleading statements, which damaged Plaintiffs and Class Members in Alabama and elsewhere, as alleged in detail herein.

56.     Denso has derived substantial revenue from Alabama. On its website, Denso states it does business at over 31 locations throughout the United States, holds 1,900 U.S. Patents, employs over 23,000 U.S. citizens, and makes $10.9 billion in annual sales, including from Alabama.[21]

57.     Denso, by and through its subsidiaries and/or agents, is registered to do business in Alabama. Specifically, Denso International America, Inc., Denso

---

[21] https://www.denso.com/us-ca/en/about-us/at-a-glance/ (last visited July 18, 2020).

Manufacturing Tennessee, Inc., Denso Manufacturing Athens Tennessee, Inc., Denso Manufacturing Michigan, Inc., and Denso Personnel Service America, Inc., are all registered to do business in Alabama and have offices in Alabama.

58.    Denso, itself or through its subsidiaries or agents, owns, uses or possesses real property situated within Alabama. Denso owns and operates its Denso Manufacturing Michigan Alabama Plant in Montgomery, Alabama.[22]  Specifically, Denso has invested $2.2 million on doing business in Alabama, including purchasing, staffing, and managing a 103,000 square-foot facility to service Denso's North American customers.[23]

59.    Hundreds of thousands of Alabama citizens are operating vehicles equipped with Denso made fuel pumps, and Denso has derived millions of dollars in revenue from the sale of its fuel pumps in Alabama.

60.    Denso, itself and/or through its subsidiaries or agents, purposefully availed itself of the privileges of doing business in Alabama.

61.    Denso, itself and/or through its subsidiaries or agents, has sufficient contacts with the State of Alabama such that exercising jurisdiction over Denso is reasonable and comports with due process.

---

[22] https://www.densomedia-na.com/news/denso-celebrates-alabama-facility-grand-opening/ (last visited July 23, 2020).

[23] *Id.*

21

## THE PARTIES

**PLAINTIFFS**

### A. Alabama

62.     Plaintiff Tucker Oliver is a citizen of Alabama and resides in Huntsville, Alabama.

63.     Plaintiff Oliver owns a 2016 Honda Accord which he purchased used from Jerry Damson Honda in Huntsville, Alabama in approximately October 2018. Plaintiff Oliver's Accord is a 2019 Recalled Vehicle with a defective Denso Fuel Pump.

64.     Prior to purchasing his Honda, Plaintiff Oliver reviewed Honda's promotional materials, the Monroney sticker, and sales brochures, and interacted with at least one sales representative without Honda disclosing the Fuel Pump Defect.

65.     Through his exposure and interaction with Honda, Plaintiff Oliver was aware of Honda's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase his Class Vehicle. When he purchased the vehicle, he believed, based on Honda's marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Oliver purchased his vehicle did Honda disclose to him that his vehicle was not safe or dependable, or that it was equipped with a defective Denso fuel pump.

22

66.     Plaintiff Oliver's Honda suffers from the Fuel Pump Defect because the impeller in his vehicle started absorbing fuel and deforming the moment it was exposed to gasoline.

67.     The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiff Oliver, other occupants in his Class Vehicle, and others on the road. At no time did Honda inform Plaintiff Oliver of the seriousness of the Fuel Pump Defect or recommend that he discontinue use of his vehicle until there is a repair or a replacement fuel pump.

68.     Plaintiff Oliver leased his Class Vehicle with the Fuel Pump Defect as part of a transaction in which Honda did not disclose material facts related to the automobile's essential purpose – safe and dependable transportation. Plaintiff Oliver did not receive the benefit of his bargain. He leased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the value of Plaintiff Oliver's Class Vehicle.

69.     Had Honda disclosed the Fuel Pump Defect, Plaintiff Oliver would not have purchased his Class Vehicle, or would have paid less to do so.

70.     Plaintiff Oliver would purchase a Honda from Honda in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

## B. California

71.     Plaintiff Sarah Ariaudo is a citizen of California and resides in San Diego, California.

72.     Plaintiff Ariaudo leases a 2019 Acura RDX which she leased new from Acura of Escondido in Escondido, California on September 23, 2018. Plaintiff Ariaudo's Acura is a 2020 Recalled Vehicle equipped with a defective Denso fuel pump.

73.     Prior to leasing her Acura, Plaintiff Ariaudo reviewed Honda's promotional materials and interacted with at least one sales representative all without Honda disclosing the Fuel Pump Defect.

74.     Through her exposure to Honda's advertisements, promotional materials and other public statements, Plaintiff Ariaudo was aware of Honda's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase her Class Vehicle. When she leased the vehicle, she believed, based on Honda's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Ariaudo purchased her vehicle

did Honda disclose to her that her vehicle was not safe or dependable, or that it was equipped with a defective fuel pump.

75.     Plaintiff Ariaudo's Acura suffers from the Fuel Pump Defect because the impeller in her vehicle started absorbing fuel and deforming the moment it was exposed to gasoline.

76.     Plaintiff Ariaudo's Class Vehicle has experienced symptoms associated with the Fuel Pump Defect. On numerous occasions, she reported her Class Vehicle's issue to Acura of Escondido in Escondido, California; however, the dealer has not effectively repaired the defect. Specifically, on May 17, 2019 Plaintiff Ariaudo presented her vehicle to Acura of Escondido in Escondido California for service and requested the dealership inspect the vehicle due to Plaintiff's complaints of lag and hesitated acceleration. The dealership claimed Plaintiff's vehicle was operating as designed. In January 2020, while operating her vehicle under intended and foreseeable circumstances, Plaintiff Ariaudo's vehicle again experienced hesitated acceleration when the accelerator was depressed, at times would not accelerate at all, and ultimately stalled. On January 7, 2020, Plaintiff Ariaudo again presented her vehicle to Acura of Escondido with complaints of the Fuel Pump Defect. The dealership again failed to offer a repair. In fact, the dealership did not diagnose her vehicle with the Fuel Pump Defect until June 5, 2020, after she received

25

notice of Honda's 2020 Recall in the mail. Plaintiff Ariaudo was offered a loaner vehicle while her Acura was being serviced.

77.     The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff Ariaudo, other occupants in her Class Vehicle, and others on the road.

78.     Plaintiff Ariaudo initially learned of Honda's 2020 Recall when she received the Recall notice via mail. The fuel pump in Plaintiff Ariaudo's vehicle was replaced on June 5, 2020. Honda did not offer a free follow-up inspection of the replacement pump or an extended warranty for the part.

79.     Plaintiff Ariaudo did not receive the benefit of her bargain. She purchased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff Ariaudo's Class Vehicle. Plaintiff Ariaudo's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of Denso's Recall and Honda's 2020 Recall.

80.     Had Honda disclosed the Fuel Pump Defect, Plaintiff Ariaudo would not have leased her Class Vehicle, or would have paid less to do so. Specifically, Plaintiff Ariaudo would not have put a down payment of $6,000 on her Class

Vehicle, with intent to purchase at the end of her lease, had she known of the Fuel Pump Defect.

81.     Plaintiff Ariaudo would purchase an Acura from Honda in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

**C. Illinois**

82.     Plaintiff Michelle Welcher is a citizen of the State of Illinois and resides in Chicago, Illinois.

83.     Plaintiff Welcher owns a 2017 Honda Accord which she purchased new from Mapleton Honda in Chicago, Illinois on August 22, 2017. Plaintiff Welcher's Honda Accord is a 2019 Recalled Vehicle and is equipped with a defective Denso low-pressure fuel pump.

84.     Prior to purchasing her Honda, Plaintiff Welcher reviewed Honda's promotional materials, including Honda's website, and interacted with at least one sales representative all without Honda disclosing the Fuel Pump Defect.

85.     Through her exposure to Honda's advertisements, promotional materials and other public statements, Plaintiff Welcher was aware of Honda's marketing message that its vehicles are safe and dependable, which was material to her decision to purchase her Class Vehicle. When she purchased the vehicle, she believed, based on Honda's uniform and pervasive marketing message, that she

27

would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Welcher purchased her vehicle did Honda disclose to her that her vehicle was not safe or dependable, or that it was equipped with a defective fuel pump.

86.    Plaintiff Welcher's Honda suffers from the Fuel Pump Defect because the impeller in her vehicle started absorbing fuel and deforming the moment it was exposed to gasoline.

87.    The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff Welcher, other occupants in her Class Vehicle, and others on the road.

88.    Plaintiff Welcher was never made aware of the Recall by Honda.

89.    Plaintiff Welcher did not receive the benefit of her bargain. She purchased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff Welcher's Class Vehicle. Plaintiff Welcher's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Denso and Honda Recalls.

90.    The fuel pump in Plaintiff Welcher's Class Vehicle was never replaced, and Plaintiff continues to drive her vehicle to this day.

91.    Had Honda disclosed the Fuel Pump Defect, Plaintiff Welcher would not have purchased her Class Vehicle, or would have paid less to do so.

92.    Plaintiff Welcher would purchase a Honda from Honda in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

**D. Louisiana**

93.    Plaintiff Lashonda Walters-Kayode is a citizen of the State of Louisiana and resides in Keithville, Louisiana.

94.    Plaintiff Walters-Kayode owns a 2019 Honda CR-V which she purchased new from Holmes Honda in Shreveport, Louisiana on September 19, 2019. Plaintiff Walters-Kayode's Honda CR-V is an affected vehicle and is equipped with a defective Denso low-pressure fuel pump.

95.    Prior to purchasing her Honda, Plaintiff Walters-Kayode reviewed the Monroney Sticker on her Class Vehicle, and interacted with at least one sales representative all without Honda disclosing the Fuel Pump Defect.

96.    Through her exposure to Honda's promotional materials, such as the Monroney sticker, other public statements, and her previous ownership of Honda vehicles, Plaintiff Walters-Kayode was aware of Honda's marketing message that

29

its vehicles are safe and dependable, which was material to her decision to purchase her Class Vehicle. When she purchased the vehicle, she believed, based on Honda's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Walters-Kayode purchased her vehicle did Honda disclose to her that her vehicle was not safe or dependable, or that it was equipped with a defective fuel pump.

97.     Plaintiff Walters-Kayode's Honda suffers from the Fuel Pump Defect because the impeller in her vehicle started absorbing fuel and deforming the moment it was exposed to gasoline.

98.     Plaintiff Walters-Kayode's Class Vehicle has experienced symptoms associated with the Fuel Pump Defect. Specifically, in May of 2020, while operating her vehicle under intended and foreseeable circumstances, Plaintiff Walters-Kayode's vehicle experienced hesitated acceleration when the accelerator was depressed. In addition to the hesitated acceleration, Plaintiff Walters-Kayode occasionally experiences difficulty in starting her Class Vehicle. Plaintiff Walters-Kayode's vehicle exhibits the Fuel Pump Defect most frequently when driving during the initial 20-30 minutes of operating the vehicle. Plaintiff Walters-Kayode did not report the experience to her Honda dealer, and no repairs have been made.

99.    The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff Walters-Kayode, other occupants in her Class Vehicle, and others on the road.

100.    Plaintiff Walters-Kayode's vehicle was left out of both the January 29, 2019 and May 28, 2020 Honda Recalls, and she was never made aware of any recall by Honda.

101.    Plaintiff Walters-Kayode did not receive the benefit of her bargain. She purchased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff Walter-Kayode's Class Vehicle. Plaintiff Walters-Kayode's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Recall.

102.    The fuel pump in Plaintiff Walters-Kayode's Class Vehicle was never replaced, and Plaintiff continues to drive the vehicle to this day.

103.    Had Honda disclosed the Fuel Pump Defect, Plaintiff Walters-Kayode would not have purchased her Class Vehicle, or would have paid less to do so.

104.    Plaintiff Walters-Kayode would purchase a Honda from Honda in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

31

### E. Maryland

105.   Plaintiff Scott Lucas is a citizen of the State of Maryland and resides in Forest Hill, Maryland.

106.   Plaintiff Lucas owns a 2015 Acura TLX which he purchased used from Heritage Volkswagen and Subaru in Maryland in February 2018. Plaintiff Lucas's Acura TLX is a 2019 Recalled Vehicle and is equipped with a defective Denso low-pressure fuel pump.

107.   Prior to purchasing his Acura Plaintiff Lucas reviewed Honda's promotional materials, including Honda's website.

108.   Through his exposure to Honda's advertisements, promotional materials and other public statements, Plaintiff Lucas was aware of Honda's marketing message that its vehicles are safe and dependable, which was material to his decision to purchase his Class Vehicle. When he purchased the vehicle, he believed, based on Honda's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Lucas purchased his vehicle did Honda disclose to him that his vehicle was not safe or dependable, or that it was equipped with a defective fuel pump.

109.   Plaintiff Lucas's Acura suffers from the Fuel Pump Defect because the impeller in his vehicle started absorbing fuel and deforming the moment it was exposed to gasoline.

110.   Plaintiff Lucas's Class Vehicle has experienced symptoms associated with the Fuel Pump Defect. Specifically, six months after purchase in 2018, while operating his vehicle under intended and foreseeable circumstances, Plaintiff Lucas's vehicle experienced hesitated acceleration when the accelerator was depressed, and ultimately stalled. He reported the incident to Frankel Acura of Hunt Valley in Cockeysville, Maryland who diagnosed his vehicle with the Fuel Pump Defect and replaced the fuel pump under the Recall. Plaintiff Lucas was offered a loaner vehicle while his Acura was being repaired.

111.   The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff Lucas, other occupants in his Class Vehicle, and others on the road.

112.   Plaintiff Lucas learned of the Honda 2020 Recall when he received the recall notice via mail, and through his interaction with Frankel Acura.

113.   Plaintiff Lucas did not receive the benefit of his bargain. He purchased a vehicle of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the

intrinsic and resale value of Plaintiff Lucas's Class Vehicle. Plaintiff Lucas's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Honda and Denso Recalls.

114.   The Fuel Pump in Plaintiff Lucas's Class Vehicle was replaced by Honda on October 3, 2018. Honda did not offer a free follow-up inspection of the replacement pump or an extended warranty for the part.

115.   Had Honda disclosed the Fuel Pump Defect, Plaintiff Lucas would not have purchased his Class Vehicle, or would have paid less to do so.

116.   Plaintiff Lucas would purchase an Acura from Honda in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

**F. Massachusetts**

117.   Plaintiff Kenneth Kansky is citizen of Massachusetts and resides in Needham, Massachusetts.

118.   Plaintiff Kansky owns a 2015 Honda Accord which he purchased new from Colonial Honda in Dartmouth, Massachusetts in May 2015. Plaintiff Kanksy's Honda Accord is a 2019 Recalled Vehicle and is equipped with a defective Denso low-pressure fuel pump.

119.   Prior to purchasing his Honda, Plaintiff Kansky reviewed Honda's promotional materials, including Honda's website, and interacted with at least one sales representative all without Honda disclosing the Fuel Pump Defect.

120.   Through his exposure to Honda's advertisements, promotional materials and other public statements, Plaintiff Kansky was aware of Honda's marketing message that its vehicles are safe and dependable, which was material to his decision to purchase his Class Vehicle. When he purchased the vehicle, he believed, based on Honda's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Kansky purchased his vehicle did Honda disclose to him that his vehicle was not safe or dependable, or that it was equipped with a defective fuel pump.

121.   Plaintiff Kansky's Honda suffers from the Fuel Pump Defect because the impeller in his vehicle started absorbing fuel and deforming the moment it was exposed to gasoline.

122.   Plaintiff Kansky's Class Vehicle has experienced symptoms associated with the Fuel Pump Defect. Specifically, in December of 2015, while operating his vehicle under intended and foreseeable circumstances, Plaintiff Kansky's vehicle experienced hesitated acceleration when the accelerator was depressed.

35

Additionally, Plaintiff Kansky's Honda will occasionally not start at all. Plaintiff Kansky did not report the experience to his Honda dealer, and no repair was made.

123.    The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff Kansky, other occupants in his Class Vehicle, and others on the road.

124.    Plaintiff Kansky was never made aware of the recall by Honda.  Despite his vehicle being equipped with a defective low-pressure fuel pump, Boch Honda in Norwood, Massachusetts informed Plaintiff his vehicle was not included in the Recall.

125.    Plaintiff Kansky did not receive the benefit of his bargain. He purchased a vehicle of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff Kansky's Class Vehicle. Plaintiff Kansky's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Recall.

126.    The fuel pump in Plaintiff Kansky's Class Vehicle was never replaced.

127.    Had Honda disclosed the Fuel Pump Defect, Plaintiff Kansky would not have purchased his Class Vehicle, or would have paid less to do so.

128.   Plaintiff Kansky would purchase a Honda from Honda in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

**G. North Carolina**

129.   Plaintiff Denese Cosper is a citizen of the State of North Carolina and resides in Raleigh, North Carolina.

130.   Plaintiff Cosper owns a 2016 Honda Fit EXL which she purchased new from Leith Honda in Raleigh, North Carolina in 2016. Plaintiff Cosper's Honda is a Class Vehicle and is equipped with a defective Denso fuel pump.

131.   Prior to purchasing her Class Vehicle, Plaintiff Cosper viewed Honda's promotional materials, such as Honda's website, TV ads, and window sticker, and interacted with at least one sales representative all without Honda disclosing the Fuel Pump Defect.

132.   Through her exposure to Honda's advertisements, promotional materials and other public statements, Plaintiff Cosper was aware of Honda's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase her Class Vehicle. When she purchased the vehicle, she believed, based on Honda's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Cosper purchased her

vehicle did Honda disclose to her that her vehicle was not safe or dependable, or that it was equipped with a defective fuel pump.

133.   Plaintiff Cosper's Honda suffers from the Fuel Pump Defect because the impeller in her vehicle started absorbing fuel and deforming the moment it was exposed to gasoline.

134.   Plaintiff Cosper's Class Vehicle has experienced symptoms associated with the Fuel Pump Defect. Specifically, on June 10, 2020, Ms. Cosper's daughter was operating the vehicle under intended and foreseeable circumstances, when the vehicle stalled at a stop light and the dash lights illuminated. Plaintiff Cosper's daughter was unable to restart the vehicle, and it ultimately had to be pushed off the road by police officers and towed to a mechanic who diagnosed the fuel pump had failed. Plaintiff Cosper contacted Leith Honda who notified her a new fuel pump would not be available for several weeks. Plaintiff Cosper also contacted AutoPark Honda in Cary, North Carolina for a fuel pump replacement, but Honda was unable to provide Plaintiff with an estimated delivery date for the fuel pump, thereby leaving Plaintiff with no remedy. Moreover, Honda did not provide Plaintiff Cosper with a free loaner vehicle while she waited for repairs.

135.   The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff Cosper, other occupants in her Class Vehicle, and others on the road.

136.   Plaintiff Cosper was never notified of or included in the Honda Recalls.

137.   Due to Honda's failure to remedy the Fuel Pump Defect on Plaintiff Cosper's Class Vehicle, Plaintiff Cosper was forced to have her vehicle's fuel pump replaced with an aftermarket part on July 8, 2020 by a AAA mechanic at her own expense.

138.   Plaintiff Cosper did not receive the benefit of her bargain. She purchased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff Cosper's Class Vehicle. Plaintiff Cosper's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Honda and Denso Recalls.

139.   Had Honda disclosed the Fuel Pump Defect, Plaintiff Cosper would not have purchased her Class Vehicle, or would have paid less to do so.

140.   Plaintiff Cosper would purchase a Honda from Honda in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

**H. Ohio**

141.   Plaintiff Donald Hackman is a citizen of the State of Ohio and resides in Hartville, Ohio.

142.   Plaintiff Hackman owns a 2016 Acura TLX which he purchased used from Serra Acura d/b/a Park Acura in Akron, Ohio in March or April of 2016. Plaintiff Hackman's Acura TLX is a 2019 Recalled Vehicle and is equipped with a defective Denso low-pressure fuel pump.

143.   Prior to purchasing his Acura, Plaintiff Hackman reviewed Honda's promotional materials, including Honda's website, and interacted with at least one sales representative all without Honda disclosing the Fuel Pump Defect.

144.   Through his exposure to Honda's advertisements, promotional materials and other public statements, Plaintiff Hackman was aware of Honda's marketing message that its vehicles are safe and dependable, which was material to his decision to purchase his Class Vehicle. When he purchased the vehicle, he believed, based on Honda's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Hackman purchased his vehicle did Honda disclose to him that his vehicle was not safe or dependable, or that it was equipped with a defective fuel pump.

145.   Plaintiff Hackman's Acura suffers from the Fuel Pump Defect because the impeller in his vehicle started absorbing fuel and deforming the moment it was exposed to gasoline.

146. Plaintiff Hackman's Class Vehicle has experienced symptoms associated with the Fuel Pump Defect. Specifically, in March or April of 2016, shortly after purchasing his Class Vehicle, while operating his vehicle under intended and foreseeable circumstances, Plaintiff Hackman's vehicle experienced hesitated acceleration when the accelerator was depressed. He reported the incident to the Acura dealership who failed to diagnose the Fuel Pump Defect and stated nothing was wrong with the vehicle. The vehicle was not repaired.

147. The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff Hackman, other occupants in his Class Vehicle, and others on the road.

148. Plaintiff Hackman's vehicle has been recalled for an issue not related to the Fuel Pump Defect, and he has not been notified by Honda of the Recall.

149. Plaintiff Hackman did not receive the benefit of his bargain. He purchased a vehicle of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff Hackman's Class Vehicle. Plaintiff Hackman's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Denso and Honda Recalls.

150.   Had Honda disclosed the Fuel Pump Defect, Plaintiff Hackman would not have purchased his Class Vehicle, or would have paid less to do so.

151.   Plaintiff Hackman would purchase an Acura from Honda in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

**Defendants**

**A. Honda Motor Company, Ltd.**

152.   Defendant Honda Motor Company Limited ("HML") is a Japanese corporation with its principal place of business at 2-1-1, Minami-Aoyama Minato-Ku, 107-8556 Japan, and the parent company of American Honda Motor Company, Inc. ("HMA"). HML has substantial control over HMA, and HMA acts for the benefit of HML.

153.   At all relevant times, HML acted in the United States by itself and through HMA and its various entities including in Alabama. HML, itself and through HMA and its various entities, is in the business of designing, engineering, testing, validating, manufacturing, marketing, and selling Honda and Acura branded vehicles throughout the United States, including within Alabama.

**B. American Honda Motor Company, Inc.**

154.   Defendant HMA, is incorporated in California with its principal place of business in Torrance, California.

42

155.   HMA is a holding company of sales, manufacturing, engineering, and research and development strategies of Honda Motor Company Limited in the United States, and is wholly owned by, Honda Motor Company Limited. HMA is in the business of designing, engineering, testing, validating, manufacturing, distributing, marketing, selling, and servicing Honda and Acura branded vehicles in the United States, including within Alabama.

156.   HMA, through its various entities, designs, manufactures, markets, distributes and sells Honda automobiles through its hundreds of dealerships in the United States, including within Alabama.

## C. Acura

157.   Acura is a brand and/or division of HML and/or HMA.  HML and HMA employ engineering, legal, compliance, and regulatory personnel to make decisions regarding Acura vehicles.   These employees, on behalf of HML and HMA, ultimately made or ratified the decisions that allowed the subject Acura vehicles to be fraudulently designed, manufactured, marketed, and sold.

## D. Denso Corporation

158.   Defendant Denso Corporation ("DC") is a Japanese corporation located at 1-1, Showa-cho, Karlya, Alchi 448-9661, Japan.  DC is the parent company of Denso International America, Inc. ("DIAM").

159.   DIAM is a wholly owned subsidiary of DC. DIAM acts for the benefit and at the discretion of DC.

160.   DC, itself, and through DIAM and its various subsidiaries and agents, designed, engineered, tested, and validated the low-pressure fuel pump that is equipped in Honda vehicles sold/leased in the United States, including in Plaintiffs' states.

### E. Denso International America, Inc.

161.   DIAM is incorporated in Delaware and has its principal place of business at 2477 Denso Drive Southfield, Michigan 48033.  DIAM is a holding company of sales, manufacturing, engineering, and research and development subsidiaries of Denso Corporation located in the United States. DIAM is in the business of designing, engineering, testing, validating, manufacturing, selling, among other things, fuel pumps throughout the United States, including within Alabama.

162.   DIAM is "Denso's North American regional headquarters and parent company for its North American operations, including design and production engineering, technical support, sales and finance."[24]

---

[24] https://www.denso.com/us-ca/en/about-us/company-information/diam/ (last visited July 14, 2020).

163.   DIAM, through its various entities and on behalf of DC, designed, engineered, tested, and validated the low-pressure fuel pump that is equipped in Honda and Acura Vehicles across the Unites States, including in Plaintiffs' states.

## FACTUAL ALLEGATIONS

164.   Honda manufactures, markets, and sells vehicles all over the United States, including Alabama.

165.   Honda has branded itself as the maker of safe and dependable vehicles and has spent millions of dollars on extensive marketing and advertising campaigns to cement the association of safety and reliability with its Honda and Acura brands, including the Class Vehicles.  Through its investment marketing, Honda sought to portray itself as the safest vehicle brand on the market.

166.   In 2019, Honda sold approximately 1,450,785 Honda and Acura branded vehicles in the United States, including in Alabama.[25]

167.  Denso is the world's second largest Tier1 Original Equipment Manufacturer ("OEM"), producing parts and products for Honda and other manufacturers.  According to its website, Denso records nearly $10.9 billion in annual sales in the United States, including in Alabama.[26]

---

[25] https://carsalesbase.com/us-honda/ (last visited July 18, 2020).

[26] https://www.denso.com/us-ca/en/about-us/at-a-glance/ (last visited July 18, 2020).

168.   According to Denso itself, when designing, engineering, testing, and manufacturing its products, Denso aims to "[c]ontribute to future mobility that is safer, more comfortable and convenient for everyone."[27]   The defective fuel pumps fails to meet Denso's published standard.

169.   The Defendants collectively designed, engineered, tested, validated, manufactured and placed in the stream of commerce Class Vehicles equipped with defective fuel pumps, thereby subjecting Plaintiffs and Class Members to an unreasonable risk of death or injury, and damaging Plaintiffs and Class Members as further detailed below.  Nonetheless, Honda marketed and sold the Class Vehicles, and has, at all times, uniformly branded the Class Vehicles as safe and dependable.

## I.  THE OPERATION OF CLASS VEHICLES' LOW-PRESSURE FUEL PUMP

170.   The Class Vehicles are equipped with Denso made low-pressure fuel pumps (the "Fuel Pump").

171.   All Class Vehicles are equipped with the same or substantially similar defective Fuel Pumps.

172.    Fuel Pumps serve a critical role in the function of combustion engines. In simple terms, the fuel pump lifts gasoline out of the fuel tank and sends it to the engine where it is injected into the combustion chamber and ignited, driving the

---

[27] https://www.denso.com/us-ca/en/about-us/philosophy-and-vision/long-term-policy/ (last visited July 22, 2020).

pistons and creating propulsion.  Denso explains the role of the electric fuel pump as "deliver[ing] fuel from the tank to the engine, under high pressure, depending on the vehicle application's specific requirements. The fuel is transported to fuel injectors, which spray the fuel into the engine cylinders."[28]

173.   The Fuel Pump assembly is mounted inside of the fuel tank.  The Fuel Pump assembly consists of a fuel intake strainer at one end and a fuel output line at the other.  At the heart of the Fuel Pump assembly is an electric motor with a plastic impeller attached to a rotating shaft.  The impeller is a plastic disk that rotates and draws in fuel and pushes it up through the pump.[29]  The impeller is equipped with vanes—or blades—that, when spun, creates negative pressure which lifts the gasoline out of the fuel tank and sends it to the engine. Protruding from the side of the Fuel Pump assembly is a fuel level float and a fuel level sender.  Figure One illustrates the parts of the Fuel Pump assembly.  Figure Two illustrates the internal components of the Denso Fuel Pump's electric motor.

---

[28] https://www.denso-am.eu/products/automotive-aftermarket/ignition/fuel-pumps/ (last visited July 29, 2020).

[29] https://www.denso-am.co.uk/products/automotive-aftermarket/ems-lambda-sensor/fuel-pumps/how-they-work/ (last visited July 29, 2020).



*Figure 1 Fuel Pump Assembly Diagram*[30]



*Figure 2 Electric Motor Internal Components*[31]

174.   As the electric motor rotates, the impeller spins generating negative

pressure.  The negative pressure pulls fuel into the pump housing where it passes

---

[30] http://www.agcoauto.com/content/news/p2_articleid/195 (last visited May 11, 2020).

[31] https://aftermarket.denso.com.sg/product_info/?cat_id=194 (last visited July 29, 2020).

through the electric motor assembly and exits through the output, into the fuel line and forward to the fuel filter. After exiting the fuel filter, the fuel flow is accelerated via a high-pressure pump which delivers pressurized fuel to injectors mounted in the engine. Denso describes the operation of its in-take fuel pump as "[w]hen the impeller of an in-tank [f]uel [p]ump rotates, the blade moves around the impeller, creating a swirling motion inside the pump to deliver fuel. The fuel then passes around the motor, forcing the check valve upwards to supply fuel to the fuel pipe."[32] Figures Three and Four, below, illustrates this sequence.



*Figure 3 Fuel Pump Sequence*[33]

---

[32] https://www.denso-am.eu/media/966284/dems180001mm-lr.pdf (last visited July 29, 2020).

[33] https://www.autoplusdubai.net/blog/fuel-pumps-common-causes-and-how-to-identify-it/ (last visited May 11, 2020).



*Figure 4 Impeller Rotation Operation[34]*

175.   At all times, by design, the Fuel Pump assembly and all its components are exposed to gasoline within the tank. Fuel pumps are designed to survive the harsh environment for at least 200,000 miles.[35]   Denso claims its fuel pumps "offer more than triple the lifetime . . . ."[36]

---

[34] https://aftermarket.denso.com.sg/product_info/?cat_id=194 (last visited July 29, 2020)

[35] https://www.autoblog.com/2015/11/24/how-long-does-a-fuel-pump-usually-last/ (last visited May 11, 2020).

[36] https://densoautoparts.com/fuel-pumps.aspx (last visited July 27, 2020).



*Figure 5*

## II.   THE CLASS VEHICLES SUFFER FROM A FUNDAMENTALLY DEFECTIVE FUEL PUMP

176.   As described herein, the Class Vehicles' Fuel Pumps suffer from a fundamental defect causing them to prematurely fail.  Engines operate within a narrow and precisely calibrated air fuel mixture range, which means they are very sensitive to fuel pressure and delivery requirements. Partial, intermittent, or complete fuel pump failure disturbs the calculated precision and results in engine stalling or hesitancy.

177.   Based on Honda's and Denso's own admissions, and the findings of Plaintiffs' Expert to date, the failure results from a defectively designed plastic impeller in the Fuel Pump.

178.   A manufacturer's goal in designing and manufacturing a fuel pump must be to design and create one that operates safely and dependably for the life of the vehicle.  According to the analysis of Plaintiffs' Expert to date, and by Honda's and Denso's admissions, the Fuel Pump assembly in the Class Vehicles was poorly designed and/or manufactured.

179.   As Defendants admit, the subject Fuel Pumps contain an impeller that could deform due to excessive fuel absorption.[37] The Denso Fuel Pump impeller's material is unsuitable for its environment due to its excessive fuel absorption propensity, which causes swelling and premature and unexpected Fuel Pump failure.[38]

180.   Plaintiffs' Expert's research to date indicates that the Denso impeller uses an unsuitable material for its intended use. The impeller's material has an inferior long-term dimensional instability (it deforms, swells and changes shape), resulting in premature and unexpected failure due to component distortion and the resultant swelling induced friction.

_____

[37] Compare Exhibits A-B, with Exhibits C-G.

[38] *See* Exhibits A at 1-2.

181. The Denso impeller's material has inadequate heat resistance, potentially resulting in dimensional distortion and loss of structural integrity when exposed to high temperatures or repeated temperature cycling (i.e., the intended and repeated temperature changes of operation).

182. The impeller's material is also highly porous, which may lead not only to absorption of gasoline, but also fuel contaminants may become lodged in the impeller's pores, leading to Fuel Pump failure.

183. Plastics absorb liquids, typically. However, the degree of absorption varies depending on the type of plastic and its environmental conditions. When plastics absorb liquid, such as gasoline, the plastic pieces' intended dimensions change. Therefore, manufacturers like Denso and Honda must adequately design and validate plastic materials exposed to liquids to ensure that they remain dimensionally stable.[39] Here, Honda and Denso clearly failed to do that with respect to the Fuel Pumps in the Class Vehicles.

184. Honda hypothesizes that other factors such as excessive solvent exposure, gasoline formulas and contaminants can cause or are the source of the Fuel Pump Defect. But Honda ignores what Denso admits, and Plaintiffs' Expert's

---

[39] *See generally* https://www.ensingerplastics.com/en-us/shapes/plastic-material-selection/dimensionally-stable (last visited July 18, 2020).

research to date indicates, to be the underlying cause: the impeller's lower density material is susceptible to fuel absorption and deformation.[40]

185.   Moreover, according to Plaintiffs' Expert's research to date, Denso's further hypothesis that lower surface strength of the impeller contributes to the Fuel Pump Defect is an obvious and expected correlation rather than a separate issue. Notably, it is typical and expected for a low-density material to exhibit lower surface strength when compared to a higher density material. It is also expected that low density materials would have higher porosity and absorption propensity compared to higher density materials.

186.   Honda and Denso admitted the impeller was poorly designed to the point that it cannot remain dimensionally stable under its intended conditions. Specifically, Honda admitted in the May 28, 2020 Recall Report that "if [Denso's] impeller deforms to a point that creates sufficient interference with the fuel pump body, the fuel pump becomes inoperative . . . [this] [f]uel pump inoperability could prevent an engine from starting or stall an engine while driving, increasing the risk of a crash."[41]   Moreover, Denso admitted in the Denso Recalls that the impeller "may become deformed" and cause the Fuel Pump to fail and become inoperable.[42]

---

[40] Exhibits A and B.

[41] Exhibit C.

[42] Exhibit A.

187.   The Fuel Pump Defect manifests from the moment the Fuel Pump is installed in the fuel tank and submerged in gasoline. Once exposed to gasoline, the impeller begins to absorb fuel, swell, and deform.

188.   The Fuel Pump and/or the Fuel Pump impeller was not designed and/or manufactured with the necessary robustness to operate safely under normal operating conditions.

189.   At the time the Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce by Defendants, Defendants were aware of, and had access to, reasonable alternative designs.  Such designs would mitigate or eliminate the Fuel Pump Defect.

190.   For example, Defendants could have mitigated or eliminated the Fuel Pump Defect by using different designs and/or materials where:

    a.    The impeller was not fuel permeable under intended and foreseeable purposes;

    b.    The impeller would not deform when exposed to operating temperatures under intended and foreseeable purposes;

    c.    The impeller would not prematurely age under intended and foreseeable purposes;

    d.    The impeller would not lose its dimensional stability under intended and foreseeable purposes; and/or

e.    The impeller would not contact the fuel pump body under

intended and foreseeable purposes; and/or

f.     The Fuel Pump would not overheat under intended and

foreseeable purposes.

191.   Nevertheless, Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce Class Vehicles equipped with the defective Fuel Pumps that cause an unreasonable risk of injury or death to the Plaintiff, Class Members, and others.

## III.   THE FUEL PUMP DEFECT REDUCES ENGINE POWER, CAUSES VEHICLE STALLING, AND CAN LEAVE THE CLASS VEHICLES COMPLETELY INOPERABLE COMPROMISING CONSUMER SAFETY

192.   The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, even death.  In fact, Honda and Denso tacitly admitted as much in their respective recalls, stating that the Fuel Pump Defect can "increas[e] the risk of a crash."[43]

193.   The Fuel Pump is an integral component of safe vehicle operation.  But as described herein, the Class Vehicles suffer from a fundamental design flaw that causes the Fuel Pump to prematurely fail.  As Honda admitted in its 2020 Recall, the deformed impeller comes in contact with the Fuel Pump body, creating excess

---

[43] Compare Exhibits A-B, with Exhibits C-G.

running resistance, causing "illumination of the Malfunction Indicator Lamp in the instrument panel" and "prevent[ing] an engine from starting or stall an engine while driving, increasing the risk of a crash." In the Denso Recalls, Denso admitted the deformed impeller contacts the Fuel Pump body, creating excess running resistance and causing reduced engine performance or complete engine failure:

> If an impeller deforms to a point that creates sufficient interference with the fuel pump body, the fuel pump becomes inoperative. According to vehicle manufacturer's system evaluation, an inoperative fuel pump may result in the illumination of the check engine light and/or master warning indicators, rough engine running, engine no start and/or vehicle stall while driving at low speed and, in rare instances, a vehicle stall could occur while driving at higher speeds, increasing the risk of a crash.[44]

194. Engines necessarily require steady gasoline supply to function properly. The Fuel Pump's primary purpose is to transfer gasoline from the tank to the engine. But when the Fuel Pump fails, gasoline is not supplied to the engine, causing reduced engine power, stalling, and/or engine shutdown.

195. Compounding the problem, Fuel Pump Defect occurs spontaneously with no advance warning to the consumer, thereby creating an extremely dangerous condition for drivers, including those on the road who may be left helpless and unable to take action to get out of the way of oncoming traffic or reach safety.

---

[44] *See* Exhibits A and B.

196.   Class Members' complaints set forth below exemplify the real-world dangers caused by the Fuel Pump Defect.

197.   Vehicle manufacturers like Honda monitor NHTSA and other databases for consumer complaints as part of their ongoing obligation to uncover and report potential safety-related defects. Accordingly, Honda knew, or should have known, of the many complaints lodged with NHTSA and elsewhere about the specific safety hazard that is the subject of the Recalls.

198.   By way of example, the consumer complaints set forth below demonstrate the seriousness of the Fuel Pump Defect and further show that Honda knew or should have known of them as early as 2013, or was reckless in not knowing of them.  These consumer complaints represent a small fraction of the hundreds of similar complaints submitted to NHTSA by owners and lessees of the Class Vehicles regarding the Fuel Pump Defect.

199.   On August 1, 2013, the owner of a 2013 Honda Accord filed the following complaint with NHTSA:

> THERE IS A HESITATION/JERK/SHUDDER WHEN ACCELERATING AT VARIOUS SPEEDS. *TR[45]

200.   For example, on February 4, 2014, the owner of a 2013 Honda Accord filed the following complaint with NHTSA:

---

[45] NHTSA ID No. 10533047.

> SINCE I FIRST PURCHASED MY 2013 HONDA
> ACCORD, THE HONDA HAS INTERMITTENT
> HESITATIONS AFTER STOPPING AT TRAFFIC
> LIGHTS, STOP SIGNS, PARKING AND SO FORTH.
> FOR INSTANCE, FOR THE SECOND TIME IN THE
> LAST FIVE DAYS, I STOPPED, WENT INTO A
> STORE, RETURNED, CRANKED HONDA ACCORD,
> BACKED OUT, AND THE CAR WOULD NOT "GO."[46]

201.   On November 7, 2015, the owner of a 2014 Honda Accord filed the

following complaint with NHTSA:

> MY 2014 HONDA ACCORD COUPE HAS 33,900+
> MILES AND FOR THE PAST YEAR, I HAVE HAD IT
> IN TO FOX HONDA IN GRAND RAPIDS FOUR
> TIMES FOR THE SAME PROBLEM. THE PROBLEM
> IS, THAT IT STUTTERS OFTEN WHEN
> ACCELERATING AND TWICE, THE ENGINE HAS
> STALLED OUT AND HAD TO BE RESTARTED.[47]

202.   On December 1, 2014, the owner of a 2014 Honda Accord filed the

following complaint with NHTSA:

>  SIMILAR TO NHTSA COMPLAINTS #10619205,
> #10607907, #10655300, #10630708, AND #10628501.
> DRIVING MY VEHICLE ON INTERSTATE, GOING
> APPROXIMATELY 70 MPH. THE VEHICLE CAME
> TO A LARGE INCLINE AND BEGAN
> ACCELERATING, AND ALL OF A SUDDEN, THE
> ENTIRE VEHICLE SHUDDERED VIOLENTLY AND
> LOST ALL ACCELERATION, AND THE
> MALFUNCTION INDICATOR LAMP CAME ON AND

---

[46] NHTSA ID No. 10562814.

[47] NHTSA ID No. 10788979.

> WAS BLINKING. IT FELT LIKE THE VEHICLE HAD
> SHIFTED OUT OF GEAR, AND IT COULD NOT GET
> BACK IN GEAR. AFTER OVER 10 MINUTES, I
> RESTARTED THE VEHICLE, AND THE LIGHT DID
> NOT COME BACK ON. ALTHOUGH I COULD FEEL
> THAT PUSHING ON THE GAS PEDAL DID NOT
> FEEL THE SAME, AND IT FELT AS IF THE VEHICLE
> WAS HESITATING AND STRUGGLING TO SWITCH
> GEARS UP AND ACCELERATE.[48]

203.   On February 14, 2017, the owner of a 2014 Honda Accord filed the

following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2014 HONDA
> ACCORD. WHILE DRIVING VARIOUS SPEEDS, THE
> VEHICLE HESITATED AND THEN LUNGED
> FORWARD WHEN THE ACCELERATOR PEDAL
> WAS DEPRESSED THE DEALER COULD NOT
> DETERMINE THE CAUSE OF THE FAILURE. THE
> FAILURE RECURRED INTERMITTENTLY. THE
> MANUFACTURER WAS MADE AWARE OF THE
> FAILURE. THE FAILURE MILEAGE WAS 14,000.
> THE VIN WAS NOT AVAILABLE. UPDATED
> 05/17/17*LJ.[49]

204.   On August 3, 2016, the owner of a 2014 Honda Accord filed the

following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2014 HONDA
> ACCORD. WHILE DRIVING VARIOUS SPEEDS, THE
> VEHICLE ACCELERATED INDEPENDENTLY
> WITHOUT WARNING. THE CONTACT MENTIONED
> THAT THE VEHICLE WAS BRAKING
> INDEPENDENTLY WITHOUT WARNING. IN

---

[48] NHTSA ID No. 10661422.

[49] NHTSA ID No. 10954427.

> ADDITION, THE STEERING WHEEL STIFFENED AND TURNED RIGHT AND LEFT INDEPENDENTLY. THE VEHICLE WAS TAKEN TO THE DEALER WHERE THE CAUSE OF THE FAILURE WAS UNDETERMINED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 18,000.[50]

205.   On March 9, 2016, the owner of a 2015 Honda Accord filed the following complaint with NHTSA:

> WHEN YOU PRESSURE [sic.] ON THE ACCELERATOR PEDAL TO POWER THE VEHICLE (LIKE PULLING OUT INTO TRAFFIC OR CHANGING LANES IN TRAFFIC, THE CAR STALLS AND PUT YOU AT RISK OF GETTING INTO AN ACCIDENT. IT HAPPENS SITTING AT A TRAFFIC LIGHT OR DRIVING 55 MPH AND TRYING TO CHANGE LANES. DOES NOT MATTER IF THE CAR IS WARM OR COLD, BUT OCCURS LESS WHEN COLD.[51]

206.   On July 30, 2016, the owner of a 2013 Honda Civic filed the following complaint with NHSTA:

> VEHICLE HESITATES UNDER ACCELERATION. SOMETIMES ALMOST STALLING. I FEEL THIS IS NOT SAFE FOR MY SON AT TIMES. MERGING ETC.[52]

---

[50] NHTSA ID No. 10892728.

[51] NHTSA ID No. 10854846.

[52] NHTSA ID No. 10891787.

61

207.   On April 22, 2015, the owner of a 2013 Honda Civic filed the following complaint with NHTSA:

> WTHILE DRIVING AND SLOWING TO MAKE A LEFT TURN AT A FLASHING YELLOW LIGHT INTERSECTION AND BEING AN AUTOMATIC TRANSMISSION, I DRIVE TWO FOOTED, FOR QUICKER RESPONSE TIME. UPON STEPPING ON ACCELERATOR THE VEHICLE HESITATES FOR 3-4 SECONDS BEFORE PICKING UP SPEED. WHEN TAKEN TO THE DEALER, I AM TOLD IT IS A 2 FOOTED DRIVER ISSUE AND NOTHING THEY CAN BE DONE. I HAVE LEFT IT 24 HOURS AND BEEN TOLD, 'NO PROBLEM FOUND'.[53]

208.   On October 19, 2017, the owner of a 2014 Honda Civic filed the following complaint with NHTSA:

> HESITATION WHEN PRESS ON ACCELERATOR. THEY IS VERY DANGEROUS WHEN GETTING OUT INTO TRAFFIC AND WHEN YOU PRESS ON ACCELERATOR THERE IS A LONG HESITATION. I HAVE REPORTED THIS TO HONDA SERVICE NUMEROUS TIMES AND THEY SAY THIS IS NORMAL AND CAN'T DUPLICATE THE ISSUE.[54]

209.   On November 28, 2014, the owner of a 2014 Honda CR-V filed the following complaint with NHTSA:

> CAR HESITATES RANDOMLY FROM DEAD STOP. STARTS OFF AT ABOUT 2 MPH AND DOES NOT ACCELERATE UNTIL 5 TO 10 SECONDS EVEN THOUGH YOU ARE PRESSING ON GAS PEDAL.

---

[53] NHTSA ID No. 10758502.

[54] NHTSA ID No. 11034722.

> HONDA HAS NO EXPLANATION FOR THE RANDOM OCCURRENCE. THIS HAS HAPPENED TO ME AT LEAST 20 TIMES. DOES NOT SHOW UP ON COMPUTER DIAGNOSTICS. REPLACED 2014 CR-V AFTER 10 WEEKS WITH 2015 CR-V. 2015 MODEL HAS DIFFERENT ISSUES. NO MORE HONDAS!!! TOOK A BIG FINANCIAL HIT ON REPLACING A 2014 CR-V AFTER 10 WEEKS WITH A 2015 CR-V. CAR TOO DANGEROUS TO DRIVE. *TR[55]

210.  On October 5, 2016, the owner of a 2015 Honda CR-V filed the following complaint with NHTSA:

> VEHICLE WILL NOT RESPOND WHEN FOOT IS PLACED ON THE ACCELERATOR. WHEN ATTEMPTING TO MOVE THE CAR FORWARD FROM A STOP SIGN OR SIGNAL LIGHT THE VEHICLE WILL NOT RESPOND TO THE GAS PEDAL FOR UP TO 5 SECONDS. BASICALLY THERE IS A DELAY FROM WHEN THE GAS PEDAL IS PRESSED UNTIL THE VEHICLE RESPONDS. THIS HAS HAPPENED 5 TIMES IN PAST 6 TO 7 WEEKS. THIS ACTION HAS HAPPENED WHEN ATTEMPTING TO MOVE FROM A COMPLETE STOP OR WHEN THE VEHICLE IS MOVING AT A VERY SLOW SPEED. I ESCAPED A NEAR REAR END COLLISION WHEN I REMOVED MY FOOT FROM THE BRAKE, PRESSED ON THE GAS PEDAL AND THE CAR DID NOT RESPOND.[56]

211.  On September 5, 2018, the owner of a 2016 Honda CR-V filed the following complaint with NHTSA:

---

[55] NHTSA ID No. 10661194.

[56] NHTSA ID No. 10779918.

> HESITATION WHEN TRYING TO ACCELERATE.
> HAPPENS ANYTIME- STEP ON THE GAS AND IT
> TAKES A FEW SECONDS BEFORE THE
> ACCELERATION STARTS.[57]

212.   On January 17, 2017, the owner of a 2016 Honda CR-V filed the

following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2016 HONDA CR-V.
> WHILE DRIVING VARIOUS SPEEDS, THE
> ACCELERATOR PEDAL WAS DEPRESSED. THE
> VEHICLE FAILED TO RESPOND WITHOUT
> WARNING. THE VEHICLE WAS NOT DIAGNOSED
> OR REPAIRED. THE CONTACT STATED THAT THE
> FAILURE RECURRED SEVERAL TIMES. THE
> MANUFACTURER WAS MADE AWARE OF THE
> FAILURE. THE APPROXIMATE FAILURE MILEAGE
> WAS 4,000. ...UPDATED 02/22/17 *BF[58]

213.   On October 15, 2018, the owner of a 2017 Honda CR-V filed the

following complaint with NHTSA:

> I BOUGHT MY CR-V IN FEB 2017. SINCE 6TH OCT
> 2018 I HAVE BEGUN TO NOTICE HESITANCY
> PROBLEMS WITH ACCELERATION AFTER
> COMING TO A COMPLETE STOP AND IN SOME
> CASES THE ENGINE HAS ALSO STALLED. CAR
> WAS NOT IN ECON MODE, BEING DRIVEN ON 'D'
> MODE ON A CITY STREET. FACED SIMILAR ISSUE
> ON A HIGHWAY WHILE IN TRAFFIC. TODAY
> (15TH OCT) IT HAPPENED THRICE BACK TO BACK
> IN A 20 MINUTE DRIVE ON A CITY STREET.[59]

---

[57] NHTSA ID No. 11124554.

[58] NHTSA ID No. 10945745.

[59] NHTSA ID No. 11140320.

214.   On December 10, 2018, the owner of a 2018 Honda CR-V filed the

following complaint with NHTSA:

> I WAS FIRST IN LINE IN THE LEFT LANE ON A
> CROSS OVER TO A ONE WAY STREET THAT GOES
> FROM RIGHT TO LEFT. I WAS AT A STOP WAITING
> FOR A TIME I COULD TURN AND TRY TO GET
> OVER 4 LANES OF TRAFFIC. THERE ARE 4 LANES
> ON THE ONE WAY STREET WHICH IS M-59 ALSO
> KNOW AS HALL ROAD AND I WAS GOING TO
> HAVE TO GO FAST AS I WAS GOING TO HAVE TO
> FIRST GET IN THE FAR LEFT LANE AND THEN
> CROSS OVER THE OTHER 3 LANES TO THE RIGHT
> AND EXIT AT A DRIVE TO WHERE I WAS TRYING
> TO GET TO. I KNEW IT WAS GOING TO TAKE
> MAXIMUM ACCELERATION AND A DEFT TOUCH
> TO GET OVER THERE SAFELY. AS I TRIED TO DO
> THIS AND AS I MADE MY FIRST MOVE INTO THE
> LEFT LANE, MY CAR HESITATED AND DID NOT
> GIVE ME THE FULL ACCELERATION I WAS
> EXPECTING. THIS CAUSED ALL THE TIMING I
> NEEDED TO MAKE THIS MANEUVER SAFELY GO
> OUT THE WINDOW AND PUT ME IN A
> PRECARIOUS SITUATION. I HAD TO MAKE IN MY
> OPINION A VERY DANGEROUS MOVEMENT TO
> THE RIGHT TO AVOID A CAR THAT WAS CLOSING
> IN FAST FROM BEHIND BECAUSE I COULD NOT
> GET THE SPEED UP. THIS IS THE FIRST TIME THIS
> HAS HAPPENED ON THIS CAR. I WAS ABLE TO
> GET WHERE I WANTED TO GO BUT NOW HAVE
> NO CONFIDENCE IN THE RELIABILITY OF
> TRYING TO MAKE THIS MANEUVER AGAIN.[60]

215.   On July 20, 2020, the owner of a 2017 Honda Pilot filed the following

complaint with NHTSA:

---

[60] NHTSA ID No. 11160559.

> WHILE DRIVING ON THE STREET, THE ENGINE STALL IN THE MIDDLE OF THE ROAD. I HAD TO START THE ENGINE AGAIN. IMAGINE IF I WERE DRIVING ON THE HIGHWAY AND IT HAPPENED LIKE THIS. IT WOULD CAUSE A MAJOR ACCIDENT. IT HAS BEEN HAPPENED TWICE ALREADY.[61]

216.   Om July 16, 2020, the owner of a 2016 Honda Pilot filed the following complaints with NHTSA:

> ENGINE STALLING ON HIGHWAY AND FREEWAYS DURING STOPS. EXTREMELY DANGEROUS SITUATION ON FREEWAY WHEN WE HAD TO STOP DUE TO FRONT TRAFFIC AND CAR COMPLETELY STALLED AND COULD NOT RESTART THE CAR. ENTIRE FAMILY WAS INSIDE.[62]

217.   On March 27, 2017, the owner of a 2014 Acura MDX filed the following complaint with NHTSA:

> VEHICLE HESITATES WITH ACCELERATION AND DOES NOT MAINTAIN CONSTANT SPEED. WITH ACCELERATION, THE VEHICLE HESITATES AND THEN LURCHES SUDDENLY. THE VEHICLE FAILS TO MAINTAIN A CONSTANT VELOCITY, ESPECIALLY GOING UP A SLIGHT GRADE, MOST NOTICEABLY AT 35MPH AND 45MPH.[63]

---

[61] NHTSA ID No. 11340265.

[62] NHTSA ID No. 11339748.

[63] NHTSA ID No. 10968675.

218.   On June 22, 2014, the owner of a 2014 Acura MDX filed the following complaint with NHTSA:

> WHILE TRYING TO ACCELERATE DURING A LEFT TURN, THE ENGINE COMPLETELY LOST POWER AND THE ACCELERATOR WOULD NOT WORK. ALL ENGINE WARNING LIGHTS CAME ON. WE NEARLY AVOIDED AN ACCIDENT BY COASTING INTO THE CENTER LANE. I HAD TO TURN OFF THE CAR AND RESTART IN ORDER TO GAIN THE ABILITY TO ACCELERATE AGAIN, BUT ALL THE WARNING LIGHTS REMAINED ON. DROVE IT TO THE DEALER, BUT THEY HAVE YET TO BE ABLE TO DETERMINE WHAT THE PROBLEM IS. THIS IS THE 3RD TIME THIS HAS HAPPENED - ALL DURING THE FIRST 5 MINUTES OF DRIVING DURING THE MORNING. THE LAST INCIDENT COULD HAVE RESULTED IN A SERIOUS CRASH. *TR[64]

219.   On April 12, 2019, the owner of a 2017 Acura MDX filed the following complaint with NHTSA:

> DANGEROUS LOSS OF POWER WHILE ACCELERATING ON THE HIGHWAY! THERE HAVE BEEN THREE SEPARATE INCIDENCES OVER THE LAST 2 YEARS. WHILE I WAS TRYING TO ACCELERATE ON THE HIGHWAY, THE CAR SEVERELY LOST POWER AND THE "CHECK ENGINE" LIGHT STARTED FLASHING. THE CAR SEEMED TO OPERATE NORMALLY AFTER TURNING OFF AND ON THE ENGINE. THE DEALERSHIP CLAIMED THAT THERE WAS NO COMPUTER RECORDS OF PROBLEMS AFTER EACH INCIDENCE. ACURA JUST ISSUED A RECALL OF THE FUEL PUMP ON THIS MODEL

---

[64] NHTSA ID No. 10605016.

YEAR MDX. HOWEVER, ACURA AND THE LOCAL ACURA DEALERSHIP REFUSED THE REPAIR DUE TO THE LACK OF COMPUTER RECORD OF FAILURE.[65]

220. On April 10, 2015, the owner of a 2015 Acura TLX filed the following complaint with NHTSA:

TL* THE CONTACT OWNS A 2015 ACURA TLX. THE CONTACT STATED THAT WHILE SLOWING TO SPEEDS BETWEEN 3-5 MPH, THE VEHICLE HESITATED TO ACCELERATE WHEN ENGAGING THE ACCELERATOR PEDAL. THE CONTACT INDICATED THAT THE FAILURE WAS INTERMITTENT AND OCCURRED ON SEVERAL OCCASIONS. THE CAUSE OF THE FAILURE WAS NOT DIAGNOSED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 200.[66]

221. On November 7, 2019, the owner of a 2016 Acura TLX filed the following complaint with NHTSA:

FROM A STOPPED POSITION, MOVING FORWARD MY VEHICLE HESITATED AND DECREASED IN POWER AND THE GAS PEDAL DID NOT HELP MOVING THE VEHICLE FORWARD. THIS HAPPENED IN THE MIDDLE OF THE INTERSECTION FOR SEVERAL SECONDS 10-15 BEFORE THE VEHICLE STARTED MOVING FORWARD AGAIN.[67]

---

[65] NHTSA ID No. 11195860.

[66] NHTSA ID No. 10704864.

[67] NHTSA ID No. 11278642.

222.   On August 6, 2019, the owner of a 2016 Acura TLX filed the following complaint with NHTSA:

> TL\* THE CONTACT OWNS A 2016 ACURA TLX. THE CONTACT STATED THAT THE VEHICLE SUDDENLY STALLED AND VARIOUS UNKNOWN INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN TO FRESNO ACURA (7250 N PALM AVE, FRESNO, CA 93711, (559) 431-3400) WHERE IT WAS DIAGNOSED THAT THE FUEL PUMP FAILED. THE VEHICLE WAS NOT REPAIRED AND THE MANUFACTURER WAS NOT CONTACTED. THE FAILURE MILEAGE WAS 86,000.[68]

223.   As demonstrated above, Class Vehicles suffer from a uniform defect that causes the Fuel Pump to malfunction and fail prematurely. Compounding the issue, drivers often are not protected from these safety risks by a warning prior to Fuel Pump failure. The above complaints are mere examples of the ones lodged with NHTSA regarding the Fuel Pump Defect.  All the complaints above experienced symptoms associated with the Fuel Pump Defect.[69]

224.   Honda knew that the Fuel Pump Defect was present in all Class Vehicles equipped with the defective Denso Fuel Pump, as demonstrated above, but it failed to include them in the Recall.  Honda's unconscionable act deprives those

---

[68] NHTSA ID No. 11242131.

[69] *See, e.g.,* Exhibits A and C.

Class Members not included in the Recall a free and adequate repair, if one is devised and implemented.

225.   As demonstrated, the Fuel Pump Defect affects all Class Vehicles, and not just the vehicles that were part of Honda's 2019 and 2020 Recalls.  Additionally, the Fuel Pump Defect creates an unreasonable risk of injury or death to Plaintiffs, Class Members, and others.

226.   The Fuel Pump Defect causes Class Vehicles to become dangerous and inoperable while on the road and therefore they are not fit for their ordinary purpose.

## IV.   DEFENDANTS KNEW ABOUT THE FUEL PUMP DEFECT, BUT CONTINUED TO MANUFACTURE, MARKET, AND SELL CLASS VEHICLES

227.   Honda knew, should have known, or were reckless in not knowing about the Fuel Pump Defect, but concealed or failed to disclose the defect and continued to manufacture, market, and sell its popular Class Vehicles – including the Recalled Vehicles – equipped with the defective Denso Fuel Pump.  Specifically, Honda knew, should have known, or was reckless in not knowing the defective Fuel Pumps in the Class Vehicles exposed Class Members to extreme danger and, in order to render them safe, the Class Vehicles needed new or enhanced Fuel Pumps that functioned safely and as intended. Nonetheless, Honda failed to take corrective action.

228.   In fact, Honda knew, should have known, or was reckless in not knowing about the Fuel Pump Defect since the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles.  During these phases, Honda would have gained comprehensive and exclusive knowledge about the Fuel Pumps, particularly the basic engineering principles behind the construction and function of the Fuel Pumps such as their impellers' susceptibility to fuel absorption and deformation.  However, Honda failed to act on that knowledge and instead installed the defective Fuel Pumps in the Class Vehicles, and Honda subsequently marketed and sold the vehicles to unsuspecting consumers without disclosing the safety risk or warning Class Members.

229.   Moreover, Honda's 2019 Recall Report admits that Honda knew of the Fuel Pump Defect in January 2016, and, for the years that followed, learned of at least one thousand warranty claims and hundreds of field reports related to the Fuel Pump Defect.  But due to Honda's treatment of the Fuel Pump Defect and the limited scope of the Honda Recalls, it is likely and expected there are thousands more warranty claims and hundreds more field reports related to the Fuel Pump Defect.

230.   Further, as set forth above, the TREAD Act requires automakers like Honda to be in close contact with NHTSA regarding potential defects, and therefore Honda should (and does) monitor NHTSA databases for consumer complaints regarding their automobiles.  From its monitoring of the NHTSA databases, Honda

knew or should have known of the many Fuel Pump Defect complaints lodged as early as 2013, such as those quoted in Section III above.  However, Honda failed to act on that knowledge by taking action, including recalling the vehicles with the Fuel Pump Defect.

231.   Despite Honda's extensive knowledge, Honda failed to act on that knowledge by warning Class Members. Sacrificing consumer safety for profits, Honda instead chose to enrich itself by using false and misleading marketing to sell the Class Vehicles as safe and durable at inflated prices.

232.   Like Honda, Denso knew of the Fuel Pump Defect since long before it recalled its defective Fuel Pumps on April 27, 2020.  Denso tells customers "[b]ecause DENSO's rigorous manufacturing and testing process produces each fuel pump, you can be sure it meets our high standards for fit and performance." As part of its rigorous testing of fuel pumps and its ongoing relationships with manufacturer customers, Denso knew or should have known about the Fuel Pump Defect months, if not years, before it initiated a recall on April 27, 2020.

233.   Evidencing its extensive knowledge, Denso knew as early as 2016 about the Fuel Pump Defect. In 2016, Denso filed a patent application with the United States Patent and Trademark Office to change the chemical composition of its impeller for greater resistance to swelling. As Denso stated in the application:

> The housing includes an inner wall defining a pump
> chamber into which a fuel flows. The impeller is made of

resin and housed in the housing. The impeller is positioned such that a clearance having a specified dimension is secured between the inner wall and the impeller. ***The impeller may be swelled due to the fuel and water contained in the fuel, therefore a rotation of the impeller may be stopped when the impeller is swelled and comes in contact with the housing.*** Thus, the dimension of the clearance is set to prevent the impeller from coming in contact with the housing. However, when the dimension of the clearance is too large, an abnormality, e.g., an increase of an output loss of the fuel pump or an increase of a power consumption of the fuel pump, may occur because the fuel leaks through the clearance. ***Therefore, it is required to find a resin material to suppress a dimensional change of the impeller, which is mounted to the fuel pump, due to the fuel and the water contained in the fuel. The dimensional change will be referred to as a swelling amount hereinafter.***[70]

234.  Denso's knowledge of the Fuel Pump Defect reasonably predates the filing of the patent because Denso must have discovered the need for improved impeller material well before it filed the patent. Specifically, Denso must have learned of the Fuel Pump Defect since the original design, engineering, testing, and validation of the Fuel Pump and impeller, but at the very least from continued product improvement, testing, and validation of the Fuel Pump and impeller.

---

[70] U.S. Patent Application No. 15767375, *Impeller for Fuel Pump*, (application date Oct. 26, 2016) (Denso Corporation, et al. applicants), *available at* https://patentscope.wipo.int/search/en/detail.jsf?docId=US231859533 (last visited April 19, 2020).

235. Additionally, on August 28, 2020, Plaintiff Tucker Oliver submitted a letter to Denso advising Denso that his 2016 Honda Accord suffered from the Fuel Pump Defect, and Denso's registered agent received this letter on August 31, 2020.

236. Thus, between 2016, when Denso first learned of the Fuel Pump Defect, and April 27, 2020, when Denso issued the recall to Honda and other automobile manufacturers, Denso had *exclusive* knowledge of the Fuel Pump Defect, and yet Denso failed to disclose the Defect to Plaintiffs and other Class Members.

237. Alternatively, Denso actively concealed, and continues to conceal, the Fuel Pump Defect. Denso long knew of the Fuel Pump Defect, but in order to capitalize its economic gains, it intentionally failed to disclose it to Honda or the Class Members. The Fuel Pump Defect is a serious safety defect that places Plaintiffs and Class Members at an increased risk for injury or death, as Denso admitted.[71] Honda and Class Members did not know of the Fuel Pump Defect, and they couldn't have discovered it through reasonable diligence. Plaintiff and other Class Members were damaged by Denso's failure to disclose the Fuel Pump Defect, and had Denso disclosed it, they would not have purchased their Class Vehicles equipped with the Fuel Pump, or certainly would have paid less to do so.

238. Denso could have, but failed to, disclose the Fuel Pump Defect to Honda. Additionally, Denso could have, but failed to, disclose the Fuel Pump Defect

---

[71] Exhibits A and E.

to Plaintiffs and the Class Members by publishing it on its website, issuing a press release, or issuing an equipment recall, like it ultimately did.

239.    The Defendants, at all material times, regularly met and collaborated, and continue to meet and collaborate, regarding product quality and trends.  Through these regular discussions, each Defendant knew, should have known, or were reckless in not knowing what the other knew about the Fuel Pump Defect or the Fuel Pump in general.

240.    Despite Defendants' extensive knowledge, they failed to act on that knowledge by warning Class Members.  Sacrificing consumer safety for profits, Defendants instead chose to enrich themselves by using false and misleading marketing to sell the Fuel Pumps and Class Vehicles as safe and durable at inflated prices.

## V.    HONDA CONTINUOUSLY TOUTED CLASS VEHICLES AS SAFE AND DEPENDABLE, CONCEALING THE FUEL PUMP DEFECT

241.    Honda's overarching marketing message for the Class Vehicles was and is that the vehicles are safe and dependable and that their engines can be relied on to perform well.  This marketing message is false and misleading given the propensity of the Fuel Pumps in the Class Vehicles to fail, causing the vehicles' engines to run rough, stall and become inoperable which, as Honda admits, creates an unreasonable risk of a crash.

242.   For example, Honda dedicates a page on its website entitled "safety," where Honda touts the safety of its vehicles, as the screenshots below indicate:[72]





243.   Honda's long term, uniform, and pervasive marketing message goes back as far as 2010, when Honda similarly dedicated a portion of its website touting the safety of its vehicles, as the screenshot below indicates:[73]

---

[72] https://www.honda.com/safety (last visited May 10, 2020).

[73] http://web.archive.org/web/20100910233536/http://corporate.honda.com/safety/ (last visited May 10, 2020).



244.   Honda made similar representations on its website throughout the class period, as the screenshots below indicate:[74]

---

[74] **2013:** http://web.archive.org/web/20130518073455/http://corporate.honda.com/safety/ (last visited May 10, 2020); **2015:** http://web.archive.org/web/20150322031420/http://corporate.honda.com/safety/ (last visited May 10, 2020); **2019:** http://web.archive.org/web/20191231113751/https://www.honda.com/safety (last visited May 10, 2020).







245.   In addition to its general marketing message of safety, Honda made representations specifically about the safety of the Class Vehicles.  For example, below is a screen shot from a 2013 Honda Accord sales brochure:[75]



246.   Below is a screenshot of a 2013 Honda CR-V:[76]

---

[75] https://cdn.dealereprocess.org/cdn/brochures/honda/ca/2013-accord.pdf (last visited May 10, 2020).

[76] https://cdn.dealereprocess.org/cdn/brochures/honda/2013-crv.pdf (last visited May 10, 2020).



247.   Below is a screenshot of a 2013 Acura MDX:[77]

---



248. Honda made similar representations throughout the class period.  For example, below is a screenshot from a 2015 Honda Accord:[78]

---

[78] https://cdn.dealereprocess.net/cdn/brochures/honda/2015-accord.pdf (last visited May 10, 2020).



249.   Below is a screenshot from a 2015 Honda Civic sales brochure:[79]

---

[79] https://cdn.dealereprocess.net/cdn/brochures/honda/2015-civic.pdf (last visited May 10, 2020).



250.   Below is a screenshot from a 2015 Acura MDX sales brochure:[80]

---



251.   Below is a screenshot of a 2018 Honda Accord sales brochure:[81]

---



252.   Below is a screenshot of a 2018 Acura MDX sales brochure:[82]



253.   As demonstrated, Honda employed and continues to employ a long term and uniform marketing message that its vehicles are of the utmost safety and dependability.

254.   Despite Honda's knowledge and uniform and pervasive marketing message of safety and dependability, nowhere does Honda disclose the Fuel Pump Defect or the unreasonable risk to safety it poses, as admitted in the Recall Report.

255.   A car with a defective fuel pump that can cause the engine to studder or stall while the vehicle is in motion, as do the Class Vehicles, and thereby exposes occupants to an unreasonable risk of injury or death *is not a safe car*.  Thus, Honda's marketing of the Class Vehicles as safe and dependable is false and misleading and omits facts that would be material to consumers such as Class Members who purchased or leased Class Vehicles because they were consistently marketed as having the utmost safety on the road.

256.   Honda marketed the Class Vehicles as safe and dependable, but failed to disclose the existence, impact, and danger of the Fuel Pump Defect, despite its knowledge.  Specifically, Honda:

      a. Failed to disclose, at and after the time of purchase, lease, service, or thereafter, any and all known material defects of the Class Vehicles, including the Fuel Pump Defect, despite its knowledge;

b. Failed to disclose, at and after the time of purchase, lease, service, or thereafter, that the Class Vehicles' Fuel Pumps were defective and not fit for their ordinary purpose, despite its knowledge; and

c. Failed to disclose and actively concealed the existence and pervasiveness of the Fuel Pump Defect, despite its knowledge.

257. Honda's deceptive marketing and willful and knowing failure to disclose the Fuel Pump Defect damaged, and continues to damage, Plaintiff and Class Members.  If Plaintiff and Class Members had known of the Fuel Pump Defect and/or that the Class Vehicles were not safe and durable, they would not have purchased or leased the Class Vehicles or certainly would have paid less to do so.

258. Moreover, Denso has also associated itself with safety and quality. On its website, Denso represented that it is committed to making high-quality products that contribute to a higher quality of life for all people.[83]

---

[83] https://www.denso.com/global/en/about-us/our-strengths/ (last visited July 18, 2020).



**The pursuit of world firsts**

DENSO is committed to creating technologies that contribute to a better quality of life for all people. Our world-first advances range from common rail systems that dramatically improve diesel engine performance to night view technology that detects pedestrians at night.

259.   Denso also stated that it focuses on "Meticulous quality control," and that "DENSO focuses on safety because cars carry people."[84]

---

[84] *Id.*



## Manufacturing

Innovative products and components can only be realized if they can be manufactured. At DENSO, our technicians and engineers painstakingly refine every detail of our manufacturing systems to enable the creation of the best technologies and products.

**Meticulous quality control**

DENSO focuses on safety because cars carry people. We were one of the first parts manufacturers to build our own test courses to evaluate our products, ensuring that people could confidently drive cars using our components. Our advanced test facilities are comparable with those of major carmakers and include such advances as high-low temperature wind tunnel laboratories and anechoic chambers that simulate the diverse conditions drivers encounter every day.

260.   In its corporate brochure, Denso stated that it seeks to create a world that is accident free, a goal that obviously cannot be reached when it produced the Fuel Pumps with the Fuel Pump Defect.[85]

---

[85] https://www.denso.com/-/media/global/en/about-us/download/files/DENSO_brochure_en.pdf (last visited July 18, 2020).



261.   Additionally, on its aftermarket website, Denso stated its products are of high quality, reliable, and valuable.[86]

Home
# WHY DENSO

## Quality, Reliability and Value

Quality, Reliability and Value. At DENSO we've taken everything we have learned as an OE manufacturer and applied it to our aftermarket product lines. Every component that leaves our factories has been designed with precision, manufactured to OE standards and subjected to rigorous safety and performance tests.

DENSO factories are QS9000 and ISO9000 certified worldwide, just one of the many reasons why zero defects for parts produced in the millions is a reality for DENSO. A recipient of the prestigious Deming Award for quality in 1961, we've spent over five decades perfecting our technology and processes, a claim that few automotive manufacturers can make.

The OE-standard quality and reliability of DENSO aftermarket components add up to a tremendous value for our customers.

---

[86] https://densoautoparts.com/why-denso.aspx (last visited July 18, 2020).

262.   Denso made specific remarks about its Fuel Pumps, claiming "not all fuel pumps are created equal" and that its Fuel Pumps "offer more than triple the lifetime . . . ."[87]

263.   Defendants marketed the Class Vehicles and Fuel Pumps as safe, dependable, and made of high-quality materials and innovation, but failed to disclose the existence, impact and danger of the Fuel Pump Defect and/or that the Class Vehicles were not safe or dependable. Specifically, Defendants:

     a.   Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Fuel Pump Defect, despite its knowledge;

     b.   Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles' Fuel Pumps were defective and not fit for their ordinary purpose, despite its knowledge; and

     c.   Failed to disclose and actively concealed the existence and pervasiveness of the Fuel Pump Defect, despite its knowledge.

264.   Defendants' deceptive marketing and willful and knowing failure to disclose the Fuel Pump Defect damaged, and continues to damage, Plaintiffs and Class Members. If Plaintiffs and Class Members had known of the Fuel Pump Defect

---

[87] https://densoautoparts.com/fuel-pumps.aspx (last visited July 27, 2020).

and/or that the Class Vehicles were not safe and durable, they would not have purchased or leased the Class Vehicles or certainly would have paid less to do so.

## VI.  DEFENDANTS ADMITTED THE FUEL PUMP DEFECT WAS DANGEROUSLY DEFECTIVE, BUT ISSUED INADEQUATE RECALLS IN 2019 AND 2020

### A.    The 2019 Recall Was Inadequate

265.  Honda's 2019 Recall, initiated on January 29, 2019, covered approximately 437,032 vehicles for a defect in the Denso-made low-pressure Fuel Pump that can cause mechanical resistance, which can result in hesitated acceleration or stalling events.[88]

266.  Honda's 2019 Recall failed to warn consumers to quit driving their vehicles or offer them free loaners until their vehicle is repaired.  Rather, Honda's 2019 Recall offered a software upgrade increasing the power input for the Fuel Pump.  Honda's 2019 Recall repair fails to repair or  otherwise remedy the Fuel Pump Defect, as Honda failed to repair the underlying issue and replace the defective impeller with an adequate one.  Moreover, Honda did not offer a free follow-up inspection of fuel pump performance or an extended warranty for the part.

267.  Despite the fact Honda's 2019 Recall blames fuel impurities and Honda has never made a connection between the 2019 and 2020 Recalls, Plaintiffs' Expert's research and findings to date indicate both recalls suffer from the same root cause—

---

[88] Exhibit H.

inadequate impeller material—and will benefit from the same repair.  As a result, Class Members whose vehicles were included in Honda's 2019 Recall did not receive a fix that actually remedied the dangerous Fuel Pump Defect in those vehicles.

268.  Evidencing the inadequacy of Honda's 2019 Recall are consumer complaints lodged with NHTSA stating their vehicle suffers from the Fuel Pump Defect but (1) were not included in the 2019 Honda Recall, or (2) the repair failed to remedy the issue.  For example, on June 24, 2019, the owner of a 2016 Honda Accord filed the following complaint with NHTSA:

> I NEEDED TO CHANGE FUEL PUMP AND MY FUEL SYSTEM CLEANED BECAUSE MY CAR WAS STALLING AND NOT RESPONDING TO ACCELERATION ON THE ROAD BUT RESPOND WHEN I DIDN'T EVEN ACCELERATE WHICH WAS VERY DANGEROUS. I DID SEE HONDA RECALLED V6 MODELS BUT THEY SHOULD RECALL V4 MODELS TOO AS IT CAN CAUSE SERIOUS ACCIDENTS. [89]

269.  On July 26, 2019, the owner of a 2015 Honda Accord filed the following complaint with NHTSA:

> THERE HAS BEEN AN ISSUE RECALLED FOR 2015 HONDA ACCORDS AND THEIR FUEL PUMP. I WAS ALMOST IN A CAR ACCIDENT WHILE IN A MAJOR HIGHWAY. WHY CAN'T THINS ISSUE BE FIXED, OR WHY ISN'T THERE  A RECALL AVAILABLE

---

[89] NHTSA UD No. 11222192.

FOR MY VIN? WHEN THERE IS AN
ACTUAL RECALL ON THIS ISSUE.[90]

270. On January 23, 2019, the owner of a 2015 Honda Accord filed the

following complaint with NHTSA:

MY 2015 HONDA ACCORD HAD FUEL PRESSURE
PROBLEM 2 MONTHS AGO. I HAD IT FIXED AT AN
AUTO REPAIR. REPLACED FUEL PUMP, FUEL
LINE, THROTTLE GASKETS FOLLOWING BY
HONDA BULLETIN . IT COSTED ME $1200 FOR
THIS REPAIR. TODAY, MARCH 20TH, 2019, I
FOUND OUT HONDA PUBLICED A RECALL ON
THIS FUEL PUMP ISSUES BUT MY VEHICLE WAS
NOT ON THE LIST OF RECALL. TODAY MY
VEHICLE HAD SAME ISSUES. CANNOT START.[91]

271. On October 18, 2019, the owner of a 2016 Acura MDX filed the

following complaint with NHTSA:

MY 2016 MDX HAS A FUEL PUMP FAILURE WHICH
HAS CAUSED MY MDX TO STALL AND LED TO
PROBLEMS WITH MY FUEL INJECTORS. THERE IS
A RECALL BUT MY ACURA DEALER REFUSES TO
HONOR IT. ON 10/18 MY WIFE WAS DRIVING THE
CAR ON THE FREE WAY AND IT SLOWED TO A
STALL. THIS IS A KNOWN ISSUE. I HAVE PASTED
A URL TO THE RECALL BELOW. THE DEALER
REFUSED TO FIX MY FUEL INJECTORS OR
REPLACE MY FUEL PUMP. THE ARE OFFERING A
FREE FUEL PUMP SOFTWARE UPGRADED BUT
THEY WANT ME TO PAY TO REPLACE THE FUEL
PUMP AND          FUEL          INJECTORS.

---

[90] NHTSA ID No. 11241825.

[91] NHTSA ID No. 11190330.

> HTTPS://WWW.CONSUMERREPORTS.ORG/CAR-RECALLS-DEFECTS/HONDA-ACURA-RECALL-POTENTIAL-STALLING-ISSUE-ACCORD-MDX-TLX/[92]

272. On February 18, 2019, the owner of a 2016 Acura MDX filed the following complaint with NHTSA:

> 2016-2018: NOTICED CAR OCCASIONALLY HESITANT LIKE NOT "GETTING" INTO GEAR BUT NO STALLING. WIFE DRIVING CAR AND STALLS WHILE STOPPED AT A LIGHT. SIMPLY RESTARTS CAR WITH NO ISSUE.
>
> FEBRUARY 2019: WIFE DRIVING CAR AND STALLS BUT WHEN RESTARTED, ALL LIGHTS IN DASH ARE ON AND CAR WILL ONLY MOVE FORWARD AT IDLE SPEED AND THROTTLE COMPLETELY NOT RESPONSIVE (E.G., CAN PRESS GAS PEDAL TO FLOOR WITH NO ACCELERATION).
>
> REGAL ACURA (2615 LAKELAND HILLS BLVD BLDG 2, LAKELAND, FL 33805, (863) 262-4238)) VISIT 1 (MARCH 2019): MATTHEW IN SERVICE. REGAL SERVICE DOES FULL CHECK AND REPORTS "NOTHING WRONG."
>
> MARCH 2019: VEHICLE CONTINUES WITH HESITANCY AND STALLS.
>
> REGAL ACURA VISIT 2 (MARCH 2019): BRING BACK TO MATTHEW AND THEY REPEAT CHECK AND FINDING NOTHING WRONG. I INSIST ON FUEL LINE FLUSH WHICH I PAY FOR.
>
> APRIL 2019: VEHICLE CONTINUES WITH

---

[92] NHTSA ID No. 11271772.

HESITANCY AND STALLS. I CALL MATTHEW IN REGAL ACURA SERVICE AND LET HIM KNOW THAT THERE IS A RECALL (P3W MDX) ON THIS ISSUE. REGAL ACURA PERFORMS SOFTWARE UPDATE. VEHICLE CONTINUES TO EXHIBIT HESITANCY WHILE DRIVING.

APRIL 2019: I RECEIVE LETTER FROM ACURA AUTOMOBILE DIVISION OUTLINING THE RECALL:

1. SAFETY CONSEQUENCE PER RECALL: "REDUCED FUEL FLOW TO THE ENGINE COMBINED WITH VEHICLE OPERATION IN HIGH TEMPERATURE CONDITIONS CAN RESTRICT VEHICLE ACCELERATION AND/OR CAUSE AN ENGINE STALL, WHICH INCREASES RISK OF CRASH."

2. WHAT WILL ACURA DO? "THE DEALER WILL UPDATE THE SOFTWARE FOR THE ENGINE CONTROL UNIT…. IF THE DIAGNOSTIC SCAN CONFIRMS A PREVIOUS OCCURRENCE OF ENGINE STALLING, THE FUEL PUMP WILL BE REPLACED FOR FREE."

I HAVE HAD MULTIPLE CALLS WITH REGAL ACURA AND ACURA NATIONAL AND THEY WILL NOT REPLACE FUEL PUMP NOR WILL THEY LET ME PURCHASE A NEW FUEL PUMP BECAUSE THERE ARE NONE AVAILABLE DUE TO THE RECALL!!! I FEEL THIS CAR IS UNSAFE TO DRIVE WITH CURRENT FUEL PUMP AS OUTLINED IN THE ATTACHED RECALL LETTER. [93]

---

[93] NHTSA ID No. 11206946.

273.   On June 29, 2018, the owner of a 2017 Acura MDX filed the following complaint with NHTSA:

> DANGEROUS LOSS OF POWER WHILE ACCELERATING ON THE HIGHWAY! THERE HAVE BEEN THREE SEPARATE INCIDENCES OVER THE LAST 2 YEARS. WHILE I WAS TRYING TO ACCELERATE ON THE HIGHWAY, THE CAR SEVERELY LOST POWER AND THE "CHECK ENGINE" LIGHT STARTED FLASHING. THE CAR SEEMED TO OPERATE NORMALLY AFTER TURNING OFF AND ON THE ENGINE. THE DEALERSHIP CLAIMED THAT THERE WAS NO COMPUTER RECORDS OF PROBLEMS AFTER EACH INCIDENCE. ACURA JUST ISSUED A RECALL OF THE FUEL PUMP ON THIS MODEL YEAR MDX. HOWEVER, ACURA AND THE LOCAL ACURA DEALERSHIP REFUSED THE REPAIR DUE TO THE LACK OF COMPUTER RECORD OF FAILURE.[94]

274.   On February 27, 2019, the owner of a 2015 Acura TLX filed the following complaint with NHTSA:

> THE CAR NEARLY STALLS, ROLLED BACK 3-4 FEET PRIOR TO RESTARTING AFTER THE IDLE STOP HAD IN- GAUGED. THE TRANSMISSION SHIFTS FROM 1-4 LIKE SOMEONE WHO NEVER DROVE WITH A CLUTCH, EVEN THOUGH IT IS AN AUTOMATIC. IT HESITATES AND NEARLY STALLS WHEN DOING SLOW MANEUVERING IN AND AROUND PARKING LOTS AND SLOW TRAFFIC. I HAVE NEARLY HAD ACCIDENTS DUE TO THE HESITATION IN TRAFFIC.
>
> WHEN USING CRUISE CONTROL OUT ON THE

---

[94] NHTSA ID No. 11195860.

> EXPRESSWAY, THE CAR WILL NOT MAINTAIN
> ITS SET SPEED ON A DOWNHILL GRADE, IT GETS
> JERKY AND INCREASES SPEED AS MUCH AS 10-12
> MPH    UNLESS    I    RIDE    THE    BRAKE.
>
> I HAVE HAD IT BACK TO THE DEALER TWICE
> NOW, THE FIRST TIME THEY DID ALL THE
> UPDATES   ON   THE   COMPUTER   AND FUEL
> PUMP...ITS  JUST  AS  BAD  IF  NOT  WORSE.
>
> THE CAR IS NOT SAFE AND SHOULD HAVE A
> COMPLETE RECALL!!!
>
> THE NEXT QUESTIONS ASK FOR A SPECIFIC TIME
> AND DATE...THIS IS ONGOING AND HAS BEEN
> HAPPENING SINCE I PURCHASED THE CAR IN
> JANUARY.[95]

275.   On March 6, 2019, the owner of a 2019 Honda Pilot filed the following

complaint with NHTSA, expressly complaining about the dangerous lack of remedy

for his vehicle that exhibits the Fuel Pump Defect:

> I PURCHASED A NEW 2019 HONDA PILOT EX-L IN
> DECEMBER, 2018. I WAS RECENTLY EXITING AN
> OFF RAMP FROM AN INTERSTATE AND WHEN I
> PRESSED THE ACCELERATOR TO MERGE INTO
> TRAFFIC    THE    VEHICLE    HESITATED
> SIGNIFICANTLY AND THE CHECK ENGINE LIGHT
> STARTED FLASHING. I THEN CONTINUED A FEW
> MILES WHICH I HAD REMAINING TO MY HOUSE
> AND THE VEHICLE WOULD ACCELERATE VERY
> POORLY AND THE ENGINE WOULD SHAKE
> UNDER ACCELERATION. THE MANUAL STATES
> THAT A FLASHING LIGHT IS AN ENGINE MISFIRE.
> I STARTED THE VEHICLE ON MONDAY MORNING
> TO TAKE IT TO THE LOCAL HONDA DEALER AND

---

[95] NHTSA ID No. 11197366.

IT DROVE NORMALLY DOWN TO THE DEALER. AFTER CHECKING THE ENGINE COMPUTER THEY COULD FIND NO FAULT CODES FOR THE CHECK ENGINE LIGHT FLASHING THE DAY BEFORE. THEY GAVE ME BACK THE VEHICLE AND SAID THERE WAS NOTHING THEY COULD DO AT THIS TIME. I FEEL THAT THIS IS A VERY SERIOUS PROBLEM AND IT APPEARS THAT A FEW OTHER COMPLAINTS HAVE BEEN FILED FOR THIS SAME ISSUE. HAVING A VEHICLE THAT LOSES A SIGNIFICANT AMOUNT OF POWER CAN BE A SERIOUS SAFETY ISSUE AND I HIGHLY SUGGEST THAT HONDA LOOK INTO THIS MATTER CAREFULLY. THIS SHOULD NOT HAPPEN TO A BRAND NEW VEHICLE WITH 2,200 MILES OR ANY VEHICLE FOR THAT MATTER.[96]

## B. The 2020 Recall is Also Inadequate, and Risks Damaging the Fuel Pump Module and Other Vehicle Components

276.   Honda's 2020 Recall, initiated on May 28, 2020 and amended three times thereafter, covers 135,995 vehicles with admittedly defective Fuel Pumps.[97] The root cause of Honda's 2020 Recall is a Denso Fuel Pump with a plastic impeller made of unsuitable material which deforms due to fuel absorption.

277.   Honda's 2020 Recall fails to offer a timely and effective remedy for the Fuel Pump Defect.  Although Honda says it will replace the defective Fuel Pumps with improved ones, it fails to provide a timeline for such repairs, and, as described

---

[96] NHTSA Complaint ID No. 11184653.

[97] Exhibits C-G.

below, the repairs it has provided are inadequate and can lead to dangerous conditions.

278.  In July 2020, Honda issued a notification to owners and lessees of the Honda 2020 Recalled Vehicles, advising them that a "defect which relates to motor vehicle safety" exists in their Vehicles, namely a "fuel pump module with out of specification impellers" that may stop working.[98]  The July 2020 letter advises the owners and lessees to "call any authorized Honda dealer and make an appointment to have your vehicle's fuel pump assembly replaced for free."

279.  Like the 2019 Recall, the 2020 Recall fails to include other Honda manufactured vehicles equipped with the same defective Fuel Pump.  Honda admitted it limited its search criteria for the 2020 Recalled Vehicles to only those vehicles with impellers potentially affected by excessive exposure to solvent; however, as alleged in detail herein, Denso and Plaintiffs' Expert identify low-density impeller material as the main root cause of the Fuel Pump Defect—not excessive solvent exposure—and therefore the universe of Honda manufactured vehicles equipped with defective Fuel Pumps is much bigger than what Honda has told the public.

280.  As a result of Honda's actions and inactions, owners and lessees of the Class Vehicles have been and many still are unknowingly driving on roads and

---

[98] Exhibit I.

highways in potentially ticking time bombs while Honda knowingly exposes its customers, from whom it made millions of dollars from the sale of the Class Vehicles, to the risk of grave physical harm or even death.  Moreover, Class Members whose vehicles are not covered by the Recalls will not benefit from any effective adequate remedy Honda may implement.

281.   As was the case with the 2019 Recall, Defendants' supposed "remedy" for the 2020 Recall fails to adequately remedy the Fuel Pump Defect.  The proposed "fix" merely provides a bare-bones instruction to Honda dealers' auto repair technicians to remove the existing fuel pump module in the vehicle and to replace *only* the fuel pump motor in the module instead of replacing the entire fuel pump module (the "2020 Recall Repair") as is the industry norm.  Because of the risk of damage to the entire fuel pump module if only the fuel pump motor is removed and replaced, it is industry standard to replace the *entire* fuel pump module. Contrary to industry practice, the 2020 Recall Repair replaces only the *motor*, placing Plaintiffs and the Class at an increased risk of experiencing additional hazardous conditions as a result of technician error or due to degradation of other components of the fuel pump module.

282.   Upon information and belief, the 2020 Recall Repair originated from Denso, the manufacturer of the defective fuel pumps that gave rise to Honda's 2020 Recall.  Denso sells its fuel pumps to automobile manufacturers as part of a fuel

pump module. In a cost-savings effort, Denso provided only the defective fuel pump *motor*, and not the entire fuel pump *module*, for Honda's 2020 Recall Repair despite knowing that industry norms would require the replacement of the entire fuel pump module to adequately remedy the Fuel Pump Defect (assuming, of course, that the new fuel pump assembly functioned properly). Honda, fully aware that this 2020 Recall Repair would be entirely inadequate, and indeed would risk causing further damage to the fuel pump module and other component parts, decided to implement this insufficient remedy because it, like Denso, did not want to incur the costs of providing entire fuel pump modules, which would be more expensive than swapping out the fuel pump motors in the fuel pump modules in the Recalled Vehicles. Thus, Denso and Honda are equally responsible for the inadequate 2020 Recall Repair and share equal blame for the potential hazards it presents.

283.   The 2020 Recall Repair involves both the Fuel Pump and the fuel pump module, which houses the fuel pump. The Fuel Pump (i.e., the electric motor and impeller) is an internal component of the fuel pump module.  The fuel pump module is a complete package, hosting the pump, associated plumbing and the fuel gauge sending unit.  Figure 6 below is a photograph of the Denso fuel pump module used in Class Vehicles.

103



284.  As Figure 7 below demonstrates, the fuel pump module drops into the fuel tank through an access hole on the topside of the tank.  A retainer ring ensures that the flange and O-ring create a tight seal against the tank surface, preventing fuel escape.



285.  Figure 8 below depicts the component parts of a Denso fuel pump module.



286.  The fuel pump module's housing protects the fragile internal components that fit together like puzzle pieces within the module.

287.  As Figures 9 and 10 below demonstrate, the Denso fuel pump module is held together with plastic tabs and clips.





288.  Fuel exposure weakens these plastic tabs and clips depleting durability and elasticity.

289.  As Figure 11 below demonstrates, the fuel pump modules contain numerous small and fragile parts, such as O-rings, that require precise installation. Disassembling the fuel pump module exposes these critical components to contamination, dislocation and breakage, thereby affecting vehicle performance.



290.  Because of these concerns (and others), it is industry standard to replace the fuel pump module as a complete unit rather than remove and replace discrete failed internal components. Replacing the fuel pump module as a complete unit greatly reduces technician error frequency.

291.  However, as Honda's May 29, 2020 Service Bulletin[99] demonstrates, Honda ignored industry norms and instructed technicians to disassemble the fuel pump module to replace the fuel pump (i.e., the electric motor and impeller) when performing the "remedy" under the 2020 Recall.  Rather than replace the entire fuel pump module, Honda's 2020 Recall directs technicians to replace only the fuel pump motor, an extremely delicate process requiring the technician to disassemble the fuel pump module, remove the motor, replace the old motor with a new one, and then reassemble the fuel pump module.  This process involves bending tabs and clips, which in turn invite hairline cracks, breakage and incomplete catching of the tabs and clips that hold the fuel pump module together.  These common and likely labor errors create seal failure and resultant fuel leaks and/or fuel pressure loss due to cavitation[100] or recycling of fuel.

---

[99] Honda's May 20, 2020 Service Bulletin 20-043, instructing technicians as to how to perform the 2020 Recall Repair, is attached as Exhibit J.

[100] Cavitation is a phenomenon in which rapid changes of pressure in a liquid lead to the formation of small vapor-filled cavities in places where the pressure is relatively low.  When subjected to higher pressure, these cavities, called "bubbles" or "voids," collapse and can generate a shock wave that strong enough to damage component parts.

292. First, Honda's 2020 Recall Repair instructs technicians to remove the fuel pump module from the fuel tank and prepare it for disassembly.



293. Next, Honda instructs technicians to disassemble the fuel pump module to extract the Fuel Pump.

8.6.   Remove the fuel pump assembly from the fuel filter.

- Release the three clips at the base of the fuel pump assembly.
- Pull the fuel pump assembly out of the fuel filter.
- If the O-ring remains on the fuel filter, use a flat-tip screwdriver wrapped in protective tape to remove it. Make sure not to damage the O-ring seat section.



294.  Following removal of the recalled Fuel Pump, Honda instructs technicians to install a new one.  Once the new Fuel Pump is installed inside of the original fuel pump module, Honda instructs technicians to reassemble the fuel pump module and insert it into the fuel tank.

295.  Honda acknowledged the potential for the technician error component damage as a result of the 2020 Recall.  For example, Honda warned technicians against overextending the clamps as it "may damage them," and to "[t]ake care not to damage the O-ring seat section," and to "not pinch the O-ring during installation."

110

8.2.   Spread the wire harness clamps, and remove the wire harness.

**NOTES**

- Make sure not to damage the wire harness.
- Do not spread the clamps too wide. Spreading the clamps too wide may damage them.



8.5.   Remove the fuel filter assembly from the reservoir by releasing the three clips.

**NOTES**

- Do not spread the clips too wide. Spreading them too wide may damage them.
- If the O-ring remains on the fuel filter, use a flat-tip screwdriver wrapped in protective tape to remove it. Take care not to damage the O-ring seat section.
- The spring may slide off the sliding shaft. Retain this spring. It will be used during assembly.



296.  Despite acknowledging risk of component damage when performing

the 2020 Recall Repair, Honda failed to adequately train technicians on methods to

111

prevent such damage. Honda provided technicians with only bare bones replacement instructions. For example, Honda failed to train technicians on the complicated procedures required to adequately preserve tabs, clips, and other fragile components of the fuel pump module.  Honda expected technicians to develop their repair skills in the field, using Class Vehicles.

297.  In another example of the inadequacy of the 2020 Recall Repair, as Figure 12 below demonstrates, Honda instructed technicians to reuse fuel filters, ignoring a logical opportunity to replace worn, used fuel filters with new ones. This obvious cost-saving decision can lead to fuel filter contamination (especially in a shop environment), which in turn increases the risk of the fuel pump module clogging and the fuel not reaching the engine, potentially resulting in dangerous stalling events associated with the Fuel Pump Defect.

8.6.   Remove the fuel pump assembly from the fuel filter.

- Release the three clips at the base of the fuel pump assembly.
- Pull the fuel pump assembly out of the fuel filter.
- If the O-ring remains on the fuel filter, use a flat-tip screwdriver wrapped in protective tape to remove it. Make sure not to damage the O-ring seat section.



298.  Honda's 2020 Recall Repair procedure is consistent for substantially all Recalled Vehicles.

299.  Honda's 2020 Recall Repair not only deviates from industry norms, but it also departs from Honda's typical practice.  For example, outside of this Recall, customers who bring their vehicles to a technician for fuel pump repair typically receive a new fuel pump module. Specifically, recycling of original fuel pump module parts does not occur outside of this Recall.

300.  Moreover, the 2020 Recall Repair is woefully inadequate in the breadth of its application.  As Honda's October 21, 2020 Recall Quarterly Report[101] demonstrates, as of October 12, 2020, the 2020 Recall Repair had been

---

[101] Honda's October 21, 2020 Recall Quarterly Report 20V-314 is attached as Exhibit K.

administered to only 62,948 of the total 135,995 Honda 2020 Recalled Vehicles, and Honda was unable to contact 453 Class Members to inform them that their vehicles contained the defective Fuel Pumps.

301.  Honda's 2020 Recall Repair is inadequate because it also places Plaintiffs and Class Members in harm's way.  Rather than replacing the affected fuel pump module with a new fuel pump module, Honda opted for maximizing its profits over consumer safety. Plaintiffs and Class Members whose vehicles received the 2020 Recall Repair drive their Vehicles under the false assumption that their vehicles were adequately repaired.

302.  Further, because less than half of the Honda 2020 Recalled Vehicles have actually received the 2020 Recall Repair, more than half of the owners of such Vehicles (and the overwhelming majority of the Class) are continuing to operate their Class Vehicles despite the risk of injury due to the Fuel Pump Defect.

303.  The inadequacy of the 2020 Recall Repair is further demonstrated in multiple complaints filed with NHTSA by Class Members *after* the announcement of the 2020 Recall.  These complaints demonstrate that for far too many Class Members, the 2020 Recall either (a) did not adequately repair the Fuel Pump Defect; and/or (b) caused additional damage to their Vehicles.  Additionally, many Class Members indicated that while they had been notified of the 2020 Recall, they were unable to obtain the 2020 Recall Repair despite their best efforts.  Finally,

many Class Members were completely unaware of the existence of the 2020 Recall even months after its announcement, as indicated by their filing of complaints detailing their dangerous experiences of the Fuel Pump Defect.

304. For many of the Class Members, the 2020 Recall Repair caused more problems than it solved. On September 18, 2020, the owner of a 2019 Honda Civic submitted a complaint to NHTSA stating that he or she experienced a concerning stall and loss of motive power *after* the 2020 Recall Repair was performed on the vehicle:

> TL* THE CONTACT OWNS A 2019 HONDA CIVIC. THE CONTACT STATED WHILE DRIVING AT VARIOUS SPEEDS, THE VEHICLE JERKED, LOSS MOTIVE POWER, SWITCHED TO LIMP MODE WITH THE CHECK ENGINE WARNING LIGHT ILLUMINATED. THE CONTACT STATED THAT THE VEHICLE FAILED TO PROPERLY ACCELERATE WHILE IN LIMP MODE. AFTER STOPPING THE VEHICLE, THE CHECK ENGINGE WARNING LIGHT DISAPPEARED AND THE VEHICLE OPERATED NORMALLY. THE VEHICLE WAS TAKEN TO THE LOCAL DEALERS AUTONATION HONDA LOCATED AT 23551 MAGIC MOUNTAIN PKWY, VALENCIA, CA 91355, TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT THE FAILURE WAS CAUSED BY CONTAMINATED FUEL. AFTER DRAINING THE FUEL SYSTEM, THE CONTACT RETRIEVED THE VEHICLE HOWEVER, THE FAILURE RECURRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE CONTACT INDICATED THAT THE FAILURE OCCURRED AFTER THE VEHICLE WAS REPAIRED UNDER NHTSA CAMPAIGN NUMBER:

203V314000 (FUEL SYSTEM, GASOLINE) IN JULY
2020.  THE FAILURE MILEAGE WAS 29,000. [102]

305.   In a particularly terrifying example, on August 30, 2020, the owner of

a 2018 Honda HR-V reported to NHTSA that after initially being told the necessary

part was unavailable, he or she ultimately obtained the 2020 Recall Repair only to

immediately experience the overpowering smell of gasoline from a gas tank leak that

the dealership was unable to remedy, rendering the vehicle completely unsafe and

unfit to drive:

> RCVD RECALL NOTICE AT END OF JULY FOR
> FUEL PUMP MODULE WITHOUT SPECIFICATION
> IMEPLLERS. OVERTIME THESE IMPELLERS MAY
> ABSORB AN EXCESSIVE AMOUNT OF FUEL AND
> DEFORM. A DEFORMED IMPELLER MAY CAUSE
> THE FUEL PUMP TO STOP WORKING.
>
> DID NOT RECEIVE NOTIFICATION UNTIL THE
> END OF JULY 2020 WHEN THE RECALL WAS SET
> IN MAY 2020. DEALER WHERE I PURCHASED
> VEHCILE WAS UNAWARE OF THE RECALL AND
> CHECKED IN THE BEGINNING OF AUGUST
> SAYING THE PARTS WERE NOT YET RELEASED
> BY HONDA.
>
> FINALLY, ON 8/26/20 I CONTACTED CORPROATE
> WHO INDICATED THAT THE PART HAD BEEN
> RELEASED A FEW WEEKS PRIOR.
>
> DEALER PUT IN A NEW FUEL PUMP WHICH
> APPARENTLY FIXES THE PROBLEM BUT UPON
> PICKING IT UP THE INSIDE OF THE VEHICLE
> SMELLED VERY STRONG OF GASOLINE. THE

---

[102] NHTSA COMPLAINT ID No. 11359797.

HONDA MECHANIC REASSURED IT WAS JUST FUMES FROM THE REPAIR SINCE THEY ACCESS PUMP TO THE FUEL TANK FROM INSIDE THE VEHICLE. HOWEVER, ON THE ROUGHLY 20 MILE RIDE HOME THE SMELL OF GASOLINE GOT WORSE SO MUCH THAT WE HAD TO ROLL THE WINDOWS DOWN BECAUSE WE WERE GETTING A HEADACHE AND OVER TAKEN BY THE GASOLINE SMELL.

WE STOPPED AT A GAS STATION TO FILL THE VEHICLE TANK WHICH WAS DOWN TO ABOUT ¼ TANK.

WHEN THE GAS ATTENDANT FILLED THE TANK ALL THE GAS STARTED LEAKING OUT FROM UNDER THE CAR. CAR WAS PUSHED AWAY FROM THE PUMP. GAS CONTINUED TO POUR FROM UNDERNEATH AS A STEADY STREAM THEN AFTER ABOUT A HALF HOUR TO A DRIP. VEHICLE WAS TOWED BACK TO DEALER WHO THE NEXT DAY THOUGHT THE WING NUT TO HOLD THE PUMP GASKET LOOSENED AND ASSURED IT WAS FIXED.  THEY FILLED TH THANK DROVE IT, SAID IT WAS FINE. I LEFT IT OVERNIGHT, AND THE NEXT DAY THEY CHECKED THE VEHICLE AND SAW GASOLINE STILL LEAKING OUT FROM AN UNDETERMINED AREA UNDER THE VEHICLE. WHY WAS THE PART NOT RELEASED FOR SO LONG? HONDA REPAIR GARAGE HAS NOT YET DETERMINED WHERE THE LEAK IS AND WHAT IS DEFECTIVE AT THE TIME THIS IS WRITTEN 3 DAYS AFTER THE RECALL REPAIR. [103]

---

[103] NHTSA Complaint ID No. 11352182.

306.   In another example of the 2020 Recall Repair creating more problems than it solves, on October 6, 2020 the owner of 2018 Honda HR-V reported to NHTSA that after having the 2020 Recall Repair performed on his or her vehicle parking light and check warning lights remained illuminated:

> TL* THE CONTACT OWNS A 2018 HONDA HR-V. THE CONTACT STATED THAT WHILE OPERATING THE VEHICLE, THE PARKING LIGHT AND CHECK ENGINE WARNING LIGHTS REMAINED ILLUMINATED. THE VEHICLE WAS TAKEN TO THE LOCAL DEALER POHANKA HONDA LOCATED AT 1772 RITCHIE STATION CT, CAPITOL HEIGHTS, MD 20743 WHO DIAGNOSED THE VEHICLE AND INFORMED THE CONTACT THAT THE FAILURES WERE RELATED TO A PREVIOUS REPAIR PERFORMED UNDER THE NHTSA CAMPAIGN NUMBER: 20V314000 (FUEL SYSTEM). NO FURTHER INFORMATION WAS AVAILABLE. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURES. THE FAILURE MILEAGE WAS 33,000.[104]

307.   Even after the 2020 Recall was announced on May 28, 2020, several Class Members continued to experience the Fuel Pump Defect and were apparently not informed of the 2020 Recall.  For example, on June 19, 2020, the owner of a 2019 Acura RDX filed the following complaint with NHTSA expressly complaining about the dangerous lack of a recall remedy for his vehicle, and stating that his vehicle was already outside of warranty by 1200 miles on the odometer:

---

[104] NHTSA Complaint ID No 11363047.

> DRIVING FOR 15 MINUTES ENGINE STOPPED
> WHILE GOING UP A VERY BUSY BRIDGE ON I-10 -
> STARTED SHAKING AND FLASHING NO BRAKES
> NO STEERING CONTACT DEALER. COASTED TO
> CONSTRUCTION AREA ON TOP OF BRIDGE AS TO
> NOT BE HIT BY 18 WHEELERS. THE VEHICLE WAS
> OUT OF WARRANTY BY 1200 MILES ... THAT'S
> RIDICULOUS. [105]

308.   Likewise, on July 16, 2020, the owner of a 2019 Honda HR-V filed the following complaint with NHTSA specifically complaining about the danger of driving his vehicle due to the vehicle consistently stalling, with no reference to the 2020 Recall:

> CAR LOOSES ACCELERATION AT HIGH RATES OF
> SPEED WHILE DRIVING ON HIGHWAY. ON AT
> LEAST 4 OCCASIONS EVEN WITH MY FOOT ON
> THE GAS PEDAL IT JUST SLOWS TO UNSAFE
> LEVELS WHILE ATTEMPTING TO ENTER ON THE
> HIGHWAY. THIS PASSED SATURDAY WHILE IN
> THE FAST LANE IT JUST SLOWED TO 30 MPH
> WITH CARS SLAMMING ON BRAKES BEHIND AND
> TO THE RIGHT OF ME. [106]

309.   On September 23, 2020, the owner of a 2019 Honda Civic Hatchback reported that he or she experienced the Fuel Pump Defect, apparently unaware of the existence of the 2020 Honda Recall:

> THE VEHICLE QUIT RUNNING THREE TIMES IT
> ACTED LIKE A FUEL PUMP NO CHECK ENGINE

---

[105] NHTSA Complaint ID No. 11329712.

[106] NHTSA Complaint ID No. 11339712.

> LIGHT. CAME ON I WAS DRIVING ON A CITY
> STREET AND I HAD THE AIR ON.[107]

310.   Many Class Members reported being unable to obtain the 2020 Recall

Repair despite experiencing the Fuel Pump Defect, often because their dealership

informed them that Honda had failed to provide them with the necessary parts.  For

example, on July 2, 2020, the owner of a 2019 Honda Accord filed the following

complaint with NHTSA, expressly complaining about the dangerous lack of a recall

remedy, and stating the owner has been waiting nearly a month for any update from

Honda concerning replacement parts and estimated time of fix:

> HELLO, MY VEHICLE HAD TO BE TOWED INTO
> THE DEALER JUNE 12TH , MY FUEL PUMP DID
> FAIL , AND UNFORTUNATELY IS NOT FALLING
> UNDER THE RECALL NOTICE , I AM STILL
> WAITING TO THIS DAY JULY 2ND FOR AN ETA OR
> ANY TYPE OF UPDATES ON PARTS ON THIS
> VEHICLE FOR THE FUEL PUMP AND ALSO I
> WOULD LOVE TO KNOW OR UNDERSTAND HOW
> MY FUEL PUMP JUST RANDOMLY GOES OUT BUT
> ISNT FALLING UNDER THIS RECALL , PLEASE ID
> LOVE SOME ANSWERS OR SOME HELP.[108]

311.   Likewise, on August 13, 2020, the owner of a 2018 Honda Accord –

one of the Honda 2020 Recalled Vehicles – reported that after experiencing an

---

[107] NHTSA Complaint ID No. 11361120.
[108] NHTSA Complaint ID No. 11337203.

engine stall as a result of the Fuel Pump Defect, he was informed his vehicle was

not covered by the 2020 Recall:

> IN JANUARY, I MADE A RIGHT TURN INTO
> TRAFFIC AND THE CAR COMPLETELY STALLED
> ON ME AND STOP RUNNING. I PUT IT IN PARK
> AND RESTARTED IT. THIS WAS
>
> A VERY FRIGHTENING EXPERIENCE, AND I FELT
> LIKE I PUT MYSELF AND 2 OTHER PASSENGERS
> IN DANGER. I TOOK IT INTO MY DEALER COGGIN
> HONDA IN FORT
>
> PIERCE FLORIDA TO BE CHECKED. THEY FOUND
> NO OBVIOUS REASON FOR THIS STALL.
> SOMETIME LATER, I READ ABOUT THE RECALL
> ON THE FUEL PUMP THAT
>
> DESCRIBED MY EVENT EXACTLY AS I HAD
> EXPERIENCED IT. WHEN I CHECKED THE
> RECALL, MY VIN # [XXX] IS NOT INCLUDED IN
> THE RECALL.
>
> I HAVE CONTACTED MY DEALER AND YOUR
> PUBLIC RELATIONS THAT SAID THEY CAN NOT
> REPAIR MY CAR BECAUSE ITS NOT ON THE LIST.
> I HAVE SAFELY DRIVEN
>
> HONDAS FOR MANY YEARS BUT WITH THIS
> SITUATION I NO LONGER FEEL SAFE DRIVING
> THIS VEHICLE AND HESITATE TO TRADE IT IN
> FOR SOMEONE ELSE TO DRIVE.
>
> CAN YOU HELP ME AND GIVE MY DEALER
> PERMISSION TO REPAIR OR REPLACE THIS FUEL
> PUMP AT YOUR EXPENSE AS IT SHOULD BE ON
> THE RECALL LIST?[109]

---

[109] NHTSA Complaint ID No. 11348991.

312.   Similarly, on September 3, 2020, the owner of a 2019 Acura RDX filed the following complaint with NHTSA complaining that he or she was told there were no parts available from the manufacturer to perform the recall:

> I RECEIVED A RECALL NOTIFICATION ON MAY 28, 2020. I HAVE CALLED THREE TIMES SINCE
>
> JUNE 1, 2020 AND I AM BEING TOLD THAT THERE ARE NO PARTS FROM THE MANUFACTURER TO REPAIR THE RECALL. [110]

313.   On June 11, 2020, the owner of a 2019 Honda Civic filed the following complaint with NHTSA stating that part to do the 2020 Recall Repair was unavailable:

> TL * THE CONTACT OWNS A 2019 HONDA CIVIC. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 20V314000 (FUEL SYSTEM, GASOLINE) HOWEVER, THE PART TO DO THE RECALL REPARI WAS UNAVAILABLE. THE CONTACT STATED THAT THE MANUFACTURER EXCEEDED A REASONABL AMOUNT OF TIM FOR THERECALL REPAIR. THE MANUFACTURER WAS NOT MADE AWARE OF THE ISSUE.   THE CONTACT HAD NOT EXPERIENCED A FAILURE. VIN TOOL CONFIRMS PARTS NOT AVAILABLE. [111]

---

[110] NHTSA Complaint ID No. 11353017.
[111] NHTSA Complaint ID No. 11328320.

314.   Likewise, on September 19, 2020, the owner of a 2019 Honda Civic reported to NHTSA that he or she has attempted to obtain the 2020 Recall Repair for months but has been informed that the necessary part is unavailable:

ONCE I LEEARNED OF THE RECALL, I MAD AN APPOINTMNT IN MID-JULY.  WHN I WENT TO MY APPOINTMNT, TH ADVISOR WAS NOT THRE, THE PART WAS NOT ORDERED, AND A DIFFERENT ADVISOR SAID THAT THEY WOULD ORDER THE PART AND IT WOULD ARRIVE WITHIN A WEK. AFTER MORE THAN A WEEK, I CALLD TO CHECK WHAT WAS GOING ON AND THY SAID THE PART WAS STILL WAITING TO BE DELIVEERED TH FOLLOWING DAY AND I WOULD RECEIVE A PHONE CALL WHN IT ARRIVED.   I DID NOT RECEIVE ANY PHONE CALL OR NOTIFICATION THAT THE PART WAS IN TSTOCK TO BE INSTALLED. ABOUT A WEEK AFTER THAT, I RECEIVED A TEXT AND EMAIL STATING THAT THE WORK ON MY CAR (RECALL) WAS COMPLETED AND THEY WANTED MY FEEDBACK. SINCE I SHOWED UP FOR MY APPOINTMENT TO HAVE THE RECALL WORK COMPLETED, IT HAS BEEN MORE THAN TWO MONTHS AND I HAVE NOT RECEIVED ANY CALL OR NOTICE FROM THIS HONDA DEALERSHIP TO REMEDY THE SITUATION.  I CALLED THEM THIS PAST WEEK, LEFT A VOICEMAIL, SPOKE TO A DIFFERENT ADVISOR WHO COULD NOT TELL ME WHY I HAVE YET TO HAVE THE RECALL COMPLETED, AND SAID I WOULD RECEIVE A PHONE CALL FROM THE SECOND ADVISOR (THE ONE WHO ORDERED THE PART WHEN MY ADVISOR WAS NOT PRESENTE). I HAVE YET TO RECEIVE ANY COMMUNICATION FROM THIS

123

DEALERSHIP ABOUT THIS RECALL OR HOW TO CORRECT THIS SITUATION.[112]

315.    These complaints filed with NHTSA are mere examples of the vast number of consumers experiencing the Fuel Pump Defect and left without an adequate recall remedy.

316.    Therefore, Honda's 2019 and 2020 Recalls are inadequate and unconscionable.  They failed to promptly alert Class Members to the admittedly dangerous Fuel Pump Defect and provide them with a safe alternative, which inevitably will lead to more Fuel Pump failures, and possibly injury or death.  Both Recalls failed to adequately diagnose and repair the Fuel Pump Defect, which inevitably will lead to more Fuel Pump failures, and possibly injury or death. Egregiously, the 2020 Recall is not only an adequate remedy for the Fuel Pump Defect, it carries a substantial risk of causing *additional* damage to the fuel pump module and the Vehicle.   In addition, five months after the 2020 Recall was announced in May 2020, Honda dealers have performed the 2020 Recall Repair on less than half of the 2020 Recalled Vehicles. Moreover, both Recalls are also inadequate in scope, omitting hybrid versions and other models equipped with the same defective Fuel Pump.

---

[112] NHTSA Complaint ID No. 11359951..

317.   Honda's actions are deceitful, unconscionable, and expose Class Members to injury and death. In addition to these dangers, Honda's actions have deprived purchasers and lessees of the Class Vehicles of the benefit of their bargain.

318.   Moreover, even though Denso's Recall is broader than Honda's, it too fails to include all defective low-pressure Fuel Pumps.  Denso states the affected population of Fuel Pumps was manufactured between September 1, 2017 and October 6, 2018.  However, reports of faulty Fuel Pumps and problems associated with inoperative Fuel Pumps, such as vehicles stalling while driving, have been made by owners and lessees to NHTSA dating back to 2015, or earlier. Additionally, at least one other manufacturer that uses Denso's Fuel Pumps has recalled vehicles made as early as 2013 for the same Fuel Pump Defect involving Denso low pressure Fuel Pumps that were made with a lower density.  Denso's failure to timely, reasonably, and adequately identify the scope of the affected Fuel Pumps is unfair and unconscionable and exposes Plaintiffs and Class Members to extreme injury or even death.

## VII.   APPLICABLE WARRANTIES

319.   Honda sold and leased the Class Vehicles with written express warranties.

320.   For the Honda branded Class Vehicles, Honda offered a written express basic warranty covering Honda brand vehicles for 36 months or 36,000 miles

covering all components (except normal wear and tear).[113] Honda also offered a five

year or 60,000-mile powertrain warranty, which covers the Fuel Pump.[114]

321.   For the Acura branded Class Vehicles, Honda offered a written express

Limited Warranty of four years or 50,000 miles. Honda also offered a Powertrain

Warranty of six-years or 70,000.[115]

322.   Honda provides these warranties to buyers and lessees after the

purchase/lease of the Class Vehicles is completed; buyers and lessees have no pre-

sale/lease knowledge or ability to bargain as to the terms of the warranties.

323.   However, Honda admitted a breach of these warranties in the Recall

Report when it reported it did not have a repair or remedy for the defective Fuel

Pump. Class Members complained to dealers about the Fuel Pump Defect but did

not receive an adequate repair, breaching the express and implied warranties

provided by Honda.

## VIII.    HONDA HAD NOTICE OF THE DEFECT THROUGHOUT
##            THE RELEVANT PERIOD

324.   As alleged herein, the Fuel Pump Defect is a serious safety defect that

Honda has failed to repair, thus rendering the satisfaction of notice requirement

---

[113] https://automobiles.honda.com/accord-sedan# (last visited July 22, 2020) (applies to Honda branded vehicles).

[114] *Id.*

[115] https://owners.acura.com/Documentum/Warranty/Handbooks/2018_Acura_Warranty_Basebook_BWL06581_v1__FINAL_.pdf  (last visited July 22, 2020) (applies to all Acura branded vehicles).

futile. For example, several Plaintiffs have presented their vehicle for repair or inquired into the Recall repair only to be turned away and left waiting.

325.   In addition to other forms of notice alleged herein, Honda has notice of the Fuel Pump Defect by way of the numerous complaints filed against it directly and through its dealers, as well as complaints submitted to NHTSA and other fora, which, upon information and belief, it monitors. Honda also has notice of the Fuel Pump Defect from the thousands of warranty claims it admitted to receiving in relation to the Fuel Pump Defect.

326.   Moreover, as alleged in more detail herein, Honda had notice when Plaintiffs presented their vehicles to Honda for repair but were subsequently denied.

327.   Further, Honda was also notified of the Fuel Pump Defect by the individual Plaintiffs, who submitted letters to Honda describing the Fuel Pump Defect as follows:

- On July 31, 2020, Plaintiff Oliver Tucker submitted a letter to Honda via certified mail, stating that his 2016 Honda Accord suffers from the Fuel Pump Defect, and Honda's registered agent received this letter on August 3, 2020.

- On August 11, 2020, Plaintiff Sarah Ariaudo submitted a letter to Honda via certified mail, stating that her 2019 Acura RDX suffers from

the Fuel Pump Defect, and Honda's registered agent received this letter on August 12, 2020.

- On August 11, 2020, Plaintiff Denese Cosper submitted a letter to Honda via certified mail, stating that her 2016 Honda Fit EXL suffers from the Fuel Pump Defect, and Honda's registered agent received this letter on August 12, 2020.

- On August 11, 2020, Plaintiff Donald Hackman submitted a letter to Honda via certified mail, stating that his 2016 Acura TLX suffers from the Fuel Pump Defect, and Honda's registered agent received this letter on August 12, 2020.

- On August 11, 2020, Plaintiff Scott Lucas submitted a letter to Honda via certified mail, stating that his 2015 Acura TLX suffers from the Fuel Pump Defect, and Honda's registered agent received this letter on August 12, 2020.

- On August 11, 2020, Plaintiff Lashonda Walters-Kayode submitted a letter to Honda via certified mail, stating that her 2019 Honda CR-V suffers from the Fuel Pump Defect, and Honda's registered agent received this letter on August 12, 2020.

- On August 11, 2020, Plaintiff Michelle Welcher submitted a letter to Honda via certified mail, stating that her 2017 Honda Accord suffers

from the Fuel Pump Defect, and Honda's registered agent received this
letter on August 12, 2020.

- On August 11, 2020, Plaintiff Ken Kansky submitted a letter to Honda
  via certified mail, stating that his 2015 Honda Accord suffers from the
  Fuel Pump Defect, and Honda's registered agent received this letter on
  August 12, 2020.

328.   Finally, considering the allegations Plaintiffs set forth herein and
Honda's inability to remedy the Fuel Pump Defect, the remedies available under any
informal settlement procedure would be inadequate, and any requirement that
Plaintiffs and the Class Members resort to an informal dispute resolution procedure
and/or afford Honda a reasonable opportunity to cure its breach of warranties (when
it is currently unable to do so) is excused and thus deemed satisfied.

## IX.   FRAUDULENT OMISSION/CONCEALMENT ALLEGATIONS

329.   Absent discovery, Plaintiff is unaware of, and unable through
reasonable investigation to obtain, the true names and identities of those individuals
at Honda and Denso responsible for making false and misleading statements
regarding the Class Vehicles. Honda and Denso necessarily are in possession of all
of this information. Plaintiffs' claims arise out of Defendants' fraudulent
omission/concealment of the Fuel Pump Defect, despite their representations about
the quality, safety, and comfort of the Class Vehicles.

330.   Plaintiffs allege that at all relevant times, including specifically at the time they and Class Members purchased their Class Vehicle, Defendants knew, or were reckless in not knowing, of the Fuel Pump Defect; Defendants had a duty to disclose the Fuel Pump Defect based upon their exclusive knowledge; and Defendants never disclosed the Fuel Pump Defect to Plaintiffs or the public at any time or place in any manner other than a halfhearted, inadequate recall of a subset of the Class Vehicles.

331.   Plaintiffs make the following specific concealment/omission-based allegations with as much specificity as possible absent access to the information necessarily available only to Defendants:

a.    **Who**:  Defendants actively concealed and omitted the Fuel Pump Defect from Plaintiffs and Class Members while simultaneously touting the safety and dependability of the Class Vehicles, as alleged herein. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Defendants responsible for such decisions.

b.    **What**:  Defendants knew, or were reckless or negligent in not knowing, that the Class Vehicles contain the Fuel Pump Defect, as alleged herein. Defendants concealed and omitted the Fuel Pump Defect while making representations about the safety,

dependability, and other attributes of the Class Vehicles, as alleged herein.

c.    **When**:  Defendants concealed and omitted material information regarding the Fuel Pump Defect at all times while making representations about the safety and dependability of the Class Vehicles on an ongoing basis, and continuing to this day, as alleged herein. Defendants still have not disclosed the truth about the full scope of the Fuel Pump Defect in the Class Vehicles to anyone outside of their respective entities. Defendants have never taken any action to inform consumers about the true nature of the Fuel Pump Defect in Class Vehicles. And when consumers brought their vehicles to Honda complaining of the Fuel Pump failures, Honda denied any knowledge of or repair for the Fuel Pump Defect.

d.    **Where**:  Defendants concealed and omitted material information regarding the true nature of the Fuel Pump Defect in every communication they had with Plaintiffs and Class Members and made representations about the quality, safety, and comfort of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Defendants

disclosed the truth about the full scope of the Fuel Pump Defect in the Class Vehicles to anyone outside of their respective entities. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites.  There are channels through which Defendants could have disclosed the Fuel Pump Defect, including but not limited to, (1) point of sale communications; (2) the owner's manual; and/or (3) direct communication to Class Members through means such as state vehicle registry lists.

e.  **How**:  Defendants concealed and omitted the Fuel Pump Defect from Plaintiffs and Class Members and made representations about the quality, safety, dependability, and comfort of the Class Vehicles. Defendants actively concealed and omitted the truth about the existence, scope, and nature of the Fuel Pump Defect from Plaintiffs and Class Members at all times, even though it knew about the Fuel Pump Defect and knew that information about the Fuel Pump Defect would be important to a reasonable consumer, and Defendants promised in its marketing materials that Class Vehicles have qualities that they do not have.

132

      f.    **Why**:  Defendants actively concealed and omitted material information about the Fuel Pump Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles, and made representations about the quality, safety, durability, and comfort of the Class Vehicles. Had Defendants disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would not have paid as much for them.

## X.   TOLLING OF THE STATUE OF LIMITATIONS

### A. Continuing Act Tolling

332.  Beginning in 2013, Honda continuously marketed and sold Class Vehicles with the defective Fuel Pumps to unsuspecting customers.  Honda continuously represented the Class Vehicles as safe and dependable despite their propensity to lose fuel pressure, hesitate under acceleration and/or experience engine shutdown. Denso, the manufacturer of the defective Fuel Pumps, continuously marketed and sold the Fuel Pumps as safe and dependable despite knowing their impellers could deform due to excessive fuel absorption. By making these false

representations, and failing to disclose the existence of the Fuel Pump Defect in the Class Vehicles and thereby exposing occupants to risk of injury and death, Defendants engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Honda might seek to apply.

333. Pursuant to the TREAD Act, 49 U.S.C. § 30118, automobile manufacturers are required to report information regarding customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects. Honda owed a continuing duty to Plaintiffs and Class Members to disclose to any risks to life and limb that its products pose.  It continually breached that duty.

334.  Honda breached its duties to consumers by knowingly selling Class Vehicles with the defective Fuel Pumps on an ongoing basis.

335.  Honda's knowledge of the Fuel Pump Defect is evidenced by numerous NHTSA complaints by consumers, many of whom reported contacting Honda directly about the defective Fuel Pump.  Other NHTSA complaints reported taking their vehicles to Honda's dealers, who are agents of Honda and, on information and belief, report consumer complaints back to Honda.

336.  Thus, Defendants had continuing knowledge of the Fuel Pump Defect and the dangers it posed, yet continued to market and sell their products. Plaintiffs' and other Class Members' claims are not time barred.

## B.    Fraudulent Concealment Tolling

337.    Honda had a duty to disclose to Plaintiffs and the Class Members the true quality and nature of the Class Vehicles, that the Class Vehicles had a uniform defect; and that the Fuel Pump Defect requires repairs, poses a safety risk, and reduces the intrinsic and resale value of the affected vehicles.

338.    This duty arose, *inter alia*, under the TREAD Act, 49 U.S.C. § 30118.

339.    Denso also had a duty to disclose to Plaintiffs and the Class Members the true quality and nature of the Fuel Pumps, that the Fuel Pumps in the Class Vehicles are defective, and that the Fuel Pump Defect poses a safety risk.

340.    Honda knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Fuel Pump Defect, as alleged herein. Honda concealed and omitted the Fuel Pump Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

341.    Defendants knew, or were reckless or negligent in not knowing, that the Class Vehicles contain the Fuel Pump Defect, as alleged herein.

342.    Defendants together concealed and omitted to disclose the Fuel Pump Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

343.   Despite their knowledge of the Fuel Pump Defect, Defendants failed to disclose and concealed this material information from Plaintiffs and other Class Members, and instead continued to market the Class Vehicles as safe and durable.

344.   The purpose of Defendants' concealment of the Defective Fuel Pump was to prevent Plaintiffs and other Class Members from seeking redress.

345.   Plaintiffs and the other Class Members justifiably relied on Defendants to disclose the existence of dangerous defects, including the Fuel Pump Defect, in the Class Vehicles that they purchased or leased, because that defect was not discoverable by Plaintiffs and the other Class Members through reasonable efforts.

346.   Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior was ongoing.

## C.   Discovery Rule Tolling

347.   Through the exercise of reasonable diligence, Plaintiffs and other Class Members could not have discovered prior to Denso's Recall on April 27, 2020 and Honda's May 28, 2020 Recall that Defendants were concealing and misrepresenting the existence of the Fuel Pump Defect, which is installed in the Class Vehicles, and the risks it posed.

348.   Plaintiffs and the other Class Members could not have reasonably discovered, and could not have known of facts that would have caused a reasonable

person to suspect, that Defendants failed to disclose material information within their

knowledge about a dangerous defect to consumers worldwide.

## CLASS ACTION ALLEGATIONS

349.   Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and

23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all

others similarly situated.

350.   Plaintiffs seek to represent a class ("Nationwide Class") defined as:

> All current and former owners or lessees of a Class
> Vehicle (as defined herein) that was purchased or leased
> in the fifty States, the District of Columbia, Puerto Rico,
> and all other United States territories and/or possessions.

351.   Plaintiff Oliver ("Plaintiff") also seeks to represent a Multi-State

Consumer Protection class comprised of states' consumer protection statutes that do

not require reliance, but require scienter ("Multi-State Consumer Protection Class

One"), defined as:

> All current and former owners or lessees of a Class
> Vehicle (as defined herein) that was purchased or leased
> in Alabama, Colorado, Connecticut, Minnesota, West
> Virginia, New Jersey, New Mexico, South Dakota, and
> Utah.

352.   Plaintiff Welcher ("Plaintiff") seeks to represent a Multi-State

Consumer Protection class comprised of states' consumer protection statutes that do

not require either reliance or scienter ("Multi-State Consumer Protection Class

Two"), defined as:

137

> All current and former owners or lessees of a Class
> Vehicle (as defined herein) that was purchased or leased
> in Illinois, Delaware, Florida, Hawaii, Idaho, Kansas,
> Kentucky, Louisiana, Maine, Massachusetts, Missouri,
> Montana, Nebraska, New York, Ohio, Oklahoma, Oregon,
> Rhode Island, South Carolina, Tennessee, Vermont,
> Washington, West Virginia, and Wisconsin.

353.   Plaintiff Oliver also seeks to represent a Multi-State Strict Liability

class comprised of states that recognize applicable exceptions to the economic loss

doctrine ("Multi-State Strict Liability Class"), defined as:

> All current or former owners or lessees of a Class Vehicle
> (as defined herein) that was purchased or leased in
> Alabama, Alaska, Arkansas, California, Colorado,
> Georgia, Illinois, Iowa, Kansas, Louisiana, Maryland,
> Massachusetts, Michigan, Montana, New Hampshire,
> New Jersey, Ohio, Oregon, Rhode Island, Utah, Virginia,
> Washington, and West Virginia.

354.   Plaintiff Oliver also seeks to represent a Multi-State Negligent Recall

class comprised of states that recognize applicable exceptions to the economic loss

doctrine ("Multi-State Negligent Recall Class"), defined as:

> All current or former owners or lessees of a Class Vehicle
> (as defined herein) that was purchased or leased in
> Alabama, Alaska, Arkansas, California, Colorado,
> Georgia, Illinois, Iowa, Kansas, Louisiana, Maryland,
> Massachusetts, Michigan, Montana, New Hampshire,
> New Jersey, Ohio, Oregon, Rhode Island, Utah, Virginia,
> Washington, and West Virginia.

355.   In addition, and in the alternative to the above, Plaintiffs seek to

represent individual Statewide classes.

356.   Plaintiff Tucker seeks to represent an Alabama statewide class (the "Alabama Class") defined as follows:

> All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Alabama.

357.   Plaintiff Sarah Ariaudo seeks to represent a California statewide class (the "California Class") defined as follows:

> All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of California.

358.   Plaintiff Michelle Welcher seeks to represent an Illinois statewide class (the "Illinois Class") defined as follows:

> All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Illinois.

359.   Plaintiff Lashonda Walters-Kayode seeks to represent a Louisiana statewide class (the "Louisiana Class") defined as follows:

> All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Louisiana.

360.   Plaintiff Scott Lucas seeks to represent a Maryland statewide class (the "Maryland Class") defined as follows:

> All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Maryland.

361.   Plaintiff Kenneth Kansky seeks to represent a Massachusetts statewide class (the "Massachusetts Class") defined as follows:

> All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Massachusetts.

362.   Plaintiff Denese Cosper seeks to represent a North Carolina statewide class (the "North Carolina Class") defined as follows:

> All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of North Carolina.

363.   Plaintiff Donald Hackman seeks to represent an Ohio statewide class (the "Ohio Class") defined as follows:

> All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Ohio.

364.   Excluded from the Statewide Classes, Multi-State Classes and Nationwide Classes (together, "Classes") are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend definitions of the Classes, and to add additional classes and sub-classes, as appropriate, during the course of this litigation.

365. This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

366. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While Plaintiffs are informed and believe that there are not less than at least approximately 200,000 members of the Classes, the precise number of Class Vehicles is unknown to Plaintiffs, but may be ascertained from Honda's books and records. Nationwide, Multi-State and Statewide Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

367. **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

      a. whether Defendants engaged in the conduct alleged herein;

      b. whether Defendants' alleged conduct violates applicable law;

c. whether Defendants designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

d. whether Defendants made false or misleading statements about the quality, safety and characteristics of the Class Vehicles and/or the Fuel Pumps;

e. whether the Class Vehicles contain the Fuel Pump Defect;

f. whether Defendants had actual or implied knowledge about the Fuel Pump Defect;

g. whether Defendants failed to disclose the Fuel Pump Defect to Plaintiffs and the other members of the Classes;

h. whether Defendants' omissions and concealment regarding the quality, safety and characteristics of the Class Vehicles and/or the Fuel Pumps were likely to deceive members of the Multi-State Consumer and Statewide Classes in violation of the state consumer protection statutes alleged herein;

i. whether Honda breached its express warranties with respect to the Class Vehicles;

j. whether Honda breached its implied warranties with respect to the Class Vehicles;

k. whether the members of the Classes overpaid for their Class Vehicles as a result of the defect alleged herein;

l. whether the members of the Classes are entitled to damages, restitution, disgorgement, statutory damages, exemplary damages, equitable relief, and/or other relief; and

m. the amount and nature of relief to be awarded to Plaintiffs and the other members of the Classes.

368. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Classes because Plaintiffs and the members of the Classes purchased or leased Class Vehicles that contain defective Fuel Pumps, as described herein. Neither Plaintiffs nor the other members of the Classes would have purchased the Class Vehicles, or would not have paid as much as they did for the Class Vehicles, had they known of the Fuel Pump Defect. Plaintiffs and the other members of the Classes suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other members of the Classes.

369. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representative because their interests do not conflict with the interests of the other members of the Classes that they seek to

represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automotive litigation, and Plaintiffs intend to prosecute this action vigorously.  The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

370.  **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide, Multi-State and Statewide Class Members as a whole.

371.  **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the others members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the other members of the Classes to individually seek redress for Defendants' wrongful conduct.  Even if these Class Members could afford individual litigation, the court system could not. Individual litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast,

144

the class action device, as intended by Congress, presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### A. Claims Brought on Behalf of the Multi-State Classes

#### COUNT 1
#### VIOLATIONS OF ALABAMA'S DECEPTIVE TRADE PRACTICES ACT ALA. CODE §§ 8-19-1 ET SEQ., AND MATERIALLY IDENTICAL STATE STATUTES
(On behalf of the Multi-State Consumer Protection Class One)
(As to all Defendants)

372.   Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

373.   Plaintiff brings this claim on behalf of the other members of the Multi-State Consumer Protection Class (the "Class," for purposes of this Count),

374.   The foregoing acts, conduct and omission of Defendants constitute unfair, unconscionable, deceptive, or unlawful acts or business practices in violation of at least the following state consumer protection statutes:

    a.   **Ala. Code §§ 8-19-1 *et seq.***

    b.   **Colo. Rev. Stat. §§ 6-1-101 *et seq.***

    c.   **Conn. Gen. Stat. §§ 42-110a *et seq.***

    d.   **Minn. Stat. §§ 8.31 *et seq.* and Minn. Stat. §§ 325F.68 *et seq.***

    e.   **Nev. Rev. Stat. §§ 598.0903 *et seq.***

    f.   **N.J. Stat. Ann. §§ 56:8-1** *et seq.*

    g.   **N.M. Stat. §§ 57-12-1** *et seq.*

    h.   **S.D. Codified Laws §§ 37-24-1** *et seq.*

    i.   **Utah Code Ann. §§ 13-11-1** *et seq.*

375.   The Alabama Deceptive Trade Practices Act, Ala. Code. § 8-19-5, prohibits "[e]ngaging in . . . unconscionable, false, or deceptive act[s] or practice[s] in business, commerce, or trade."

376.   By the conduct described in detail above and incorporated herein, Defendants engaged in deceptive trade practices.

377.   Defendants' omissions regarding the Fuel Pump Defect, described above, which causes the Fuel Pump to prematurely fail, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

378.   Defendants intended for Plaintiff and the other Class Members to rely on the omissions regarding the Fuel Pump Defect.

379.   Plaintiff and the other Class Members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described Fuel Pump Defect, as evidenced by Plaintiff and the other Class Members' purchases of Class Vehicles.

146

380.    Had Defendants disclosed all material information regarding the Fuel Pump Defect to Plaintiff and the other Class Members, Plaintiff and the other Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

381.    Defendants' omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

382.    Honda was provided notice of the Fuel Pump Defect, as alleged in detail herein. Honda has not remedied its violation.

383.    Further, Honda has refused to provide an adequate and timely warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile.  Customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repairs.

384.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff and the other Class Members have suffered ascertainable loss and actual damages. Plaintiff and the other Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Fuel Pump Defect been disclosed. Plaintiff and the other Class Members also suffered diminished value of their vehicles. Plaintiff and the other Class Members are entitled to recover actual

damages, attorneys' fees and costs, and all other relief allowed under Ala. Code. §§
8-19-1, *et seq*.

### COUNT 2
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE
### BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. 505/1, ET SEQ.,
### AND MATERIALLY IDENTICAL STATE STATUTES
(On behalf of the Multi-State Consumer Protection Class Two)
(As to all Defendants)

385.    Plaintiff Michelle Welcher ("Plaintiff" for purposes of this Count)
incorporates by reference the allegations set forth in the preceding paragraphs as
though fully set forth herein.

386.    Plaintiff brings this cause of action on behalf of Multi-State Consumer
Protection Class Two ("Class" for purposes of this Count).

387.    The foregoing acts, conduct and omission of Defendants constitute
unfair, unconscionable, deceptive, or unlawful acts or business in violation of at
least the following state consumer protection statutes:

    a.  **Illinois 815 Ill. Comp. Stat. 505/1 through 505/12**

    b.  **Delaware Del. Code Ann. Title 6, §§ 2511 through 2527, §§ 2580
through 2584**

    c.  **Florida Fla. Stat. §§ 501.201 through 501.213**

    d.  **Hawaii Haw. Rev. Stat. §§ 480-1 through 480-24**

    e.  **Idaho Code Ann. §§ 48-601 through 48-619**

148

f. **Kansas Kan. Stat. Ann. §§ 50-623 through 50-640, and §§ 50-675(a) through 50-679(a)**

g. **Kentucky Ky. Rev. Stat. Ann. §§ 367.110 through 367.990**

h. **Louisiana La. Rev. Stat. Ann. §§ 51:1401 through 51:1420**

i. **Maine Me. Rev. Stat. Ann. tit. 5, §§ 205A through 214**

j. **Massachusetts Mass. Gen. Laws Ann. Ch. 93A, §§ 1 through 11**

k. **Missouri Mo. Rev. Stat. §§ 407.010 through 407.307**

l. **Montana Mont. Code Ann. §§ 30-14-101 through 30-14-157**

m. **Nebraska Neb. Rev. Stat. §§ 59-1601 through 59-1623**

n. **New York N.Y Gen. Bus. Law §§ 349, 350**

o. **Ohio Rev. Code Ann. §§ 1345.01 through 1345.13**

p. **Oklahoma Okla. Stat. tit. 15, §§ 751 through 763**

q. **Oregon Or. Rev. Stat. §§ 646.605 through 646.656**

r. **Rhode Island R.I. Gen. Laws §§ 6-13.1-1 through 6-13.1-27**

s. **South Carolina S.C. Code Ann. §§ 39-5-10 through 39-5-160**

t. **Tennessee Tenn. Code Ann. §§ 47-18-101 through 47-18-125**

u. **Vermont Vt. Stat. Ann. tit. 9, §§ 2451 through 2480(g)**

v. **Washington Wash. Rev. Code §§ 19.86.010 through 19.86.920**

w. **West Virginia W. Va. Code §§ 46A-6-101 through 46A-6-110**

x. **Wisconsin Wis. Stat. § 100.18, §§ 100.20 through 100.264**

388.   The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits unfair or deceptive acts or practices in connection with any trade or commerce, including, among other things, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact … whether any person has in fact been misled, deceived, or damaged thereby." The Act also prohibits suppliers from representing that their goods are of a particular quality or grade they are not.

389.   The conduct of Defendants, as set forth herein, constitutes unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/2. The prohibited conduct includes, but is not limited to, their manufacture and sale of Class Vehicles, failure to disclose and remedy the Fuel Pump Defect in Class Vehicles, and misrepresentations and/or omissions regarding the safety and reliability of Class Vehicles.

390.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

391.   Defendants have successor liability for the deceptive or unfair acts or practices of Defendants.

392.   Defendants' actions impact the public interest because Plaintiff and the other Illinois Class Members were injured in exactly the same way as hundreds of

thousands of others purchasing and/or leasing Class Vehicles as a result of Defendants' generalized course of deception.

393.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.

394.   Plaintiff and the other Illinois Class Members suffered ascertainable loss as a result of Defendants' conduct. Plaintiff and the other Illinois Class Members were injured and suffered economic damages as a result of such conduct.

395.   Plaintiff and the other Illinois Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and Class Vehicles have suffered a diminution in value as a result of the conduct described herein.

396.   Defendants knew that Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use. The Fuel Pump Defect is in each Class Vehicle at purchase or lease but may have not been discovered by putative Class Members until months, or years, after the purchase. Indeed, Defendants knew, or should have known, well in advance of the Recall that Class Vehicles contained the Fuel Pump Defect which presents a substantial danger of bodily injury or death.

397.   Defendants were under a duty to Plaintiff and the other Illinois Class Members to disclose the defective nature of Class Vehicles and/or associated repair costs because Defendants were in a superior position to know the true state of facts

about the Fuel Pump Defect in Class Vehicles and Plaintiff and the other Illinois Class Members could not reasonably have been expected to learn or discover that their vehicles had a dangerous safety defect until it manifested.

398.    In failing to disclose the defective nature of the Class Vehicles prior to January 29, 2019, Defendants knowingly and intentionally concealed material facts and breached their duty by not doing so.

399.    A reasonable consumer would have considered the facts Defendants concealed or did not disclose to Plaintiff and the other Illinois Class Members to be material in deciding whether to purchase or lease Class Vehicles or pay less for them. Had Plaintiff and the other Illinois Class Members known of the defective nature of Class Vehicles, they would not have purchased or leased said vehicles or would have paid less for them.

400.    Plaintiff and the other Illinois Class Members are reasonable consumers who do not expect their vehicles to suddenly accelerate, decelerate, or stall without warning and while underway.

401.    As a result of Defendants' conduct, Plaintiff and the other Illinois Class Members were harmed and suffered actual damages in that Class Vehicles experienced and will continue to experience the Fuel Pump Defect and the resultant effects therefrom.

402.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and the other Illinois Class Members suffered and will continue to suffer actual damages. Had Defendants disclosed the true nature and/or danger in their vehicles, Plaintiff and the other Illinois Class Members would not have been misled into purchasing or leasing Class Vehicles or would have paid significantly less to do so.

403.    Defendants had notice of their conduct as alleged herein.

404.    Defendants are liable to Plaintiff and the other Illinois Class Members for damages in amounts to be proven at trial, including attorneys' fees recoverable pursuant to 815 Ill. Comp. Stat. 505/1, *et seq.*

405.    Plaintiff and the other Illinois Class Members also seek punitive damages against Defendants because their conduct was wanton, willful and malicious.

406.    Pursuant to 815 Ill. Comp. Stat. 505/7, Plaintiff requests that this Court enter an order enjoining Defendants from continuing their unfair and/or deceptive practices as alleged herein.

**COUNT 3**
**VIOLATIONS OF THE ILLINOIS UNIFORM DECEPTIVE TRADE**
**PRACTICES ACT, 815 ILL. COMP. STAT. 510/1, ET SEQ., AND**
**MATERIALLY IDENTICAL STATE STATUTES**
(On behalf of the Multi-State Consumer Protection Class Two)
(As to all Defendants)

153

407.   Plaintiff Michelle Welcher ("Plaintiff" for purposes of this Count) incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

408.   Plaintiff brings this cause of action on behalf of the Multi-State Consumer Protection Class Two ("Class" for purposes of this Count).

409.   The foregoing acts, conduct and omission of Defendants constitute unfair, unconscionable, deceptive, or unlawful acts or business under the same States' consumer protection statutes as set forth in Paragraph 337, above.

410.   The Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2(a) sets forth that:

411.   A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: … causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; … represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; … advertises goods or services with intent not to sell them as

advertised; … [or] engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

412.   As described above, Class Vehicles sold or leased to Plaintiff and the other Illinois Class Members were not of the particular standard, quality, grade or characteristic represented by Defendants.

413.   Defendants have successor liability for the deceptive or unfair acts or practices of Defendants.

414.   Defendants had notice of their conduct as alleged herein.

415.   Plaintiff and the other Illinois Class Members are persons damaged as a result of Defendants' conduct alleged above. 815 Ill. Comp. Stat. 510/3 provides that the Court may enter injunctive relief to prevent Defendants from continuing to engage in the deceptive conduct alleged, and to assess costs and attorneys' fees against Defendants upon finding that they willfully engaged in a deceptive trade practice.

**COUNT 4**
**STRICT PRODUCT LIABILITY**
(On Behalf of the Multi-State Strict Product Liability Class)
(As to all Defendants)

416.   Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

417.   Plaintiff brings this claim on behalf of other members of the Multi-State Strict Product Liability Class (the "Class," for purposes of this Count).

418. By placing an unreasonably dangerous product in the streak of commerce, Defendants are strictly liable in at least the following states:

    a. **Alabama**

    b. **Alaska**

    c. **Arkansas**

    d. **California**

    e. **Colorado**

    f. **Georgia**

    g. **Illinois**

    h. **Iowa**

    i. **Kansas**

    j. **Louisiana**

    k. **Maryland**

    l. **Massachusetts**

    m. **Michigan**

    n. **Montana**

    o. **New Hampshire**

    p. **New Jersey**

    q. **Ohio**

    r. **Oregon**

s. **Rhode Island**

t. **Utah**

u. **Virginia**

v. **Washington**

w. **West Virginia**

419.  Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

420.  Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

421.  The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner.  Plaintiff and Class Members have not misused or materially altered the Class Vehicles or Fuel Pumps.  The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

422.  The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

423.   The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiff, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

424.   Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses.  Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

425.   Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

426.   The Fuel Pump Defect causes damage to property other than the product, including damage to other components of the Class Vehicles including the high-pressure fuel pump, the fuel injectors, and the engine mounts.

427.   As a direct and proximate result of Defendants' actions as described herein, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

**COUNT 5**
**NEGLIGENT RECALL/UNDERTAKING**
(On Behalf of the Multi-State Negligent Recall Class)
(As to Honda)

158

428.   Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

429.   Plaintiff brings this Count individually and on behalf of the other members of the Multi-State Negligent Recall Class (the "Class," for purposes of this Count).

430.   By not acting prudent, Honda is liable for breaching a duty of care in the following states:

      a. **Alabama**

      b. **Alaska**

      c. **Arkansas**

      d. **California**

      e. **Colorado**

      f. **Georgia**

      g. **Illinois**

      h. **Iowa**

      i. **Kansas**

      j. **Louisiana**

      k. **Maryland**

      l. **Massachusetts**

      m. **Michigan**

    n.  **Montana**

    o.  **New Hampshire**

    p.  **New Jersey**

    q.  **Ohio**

    r.  **Oregon**

    s.  **Rhode Island**

    t.  **Utah**

    u.  **Virginia**

    v.  **Washington**

    w. **West Virginia**

431.   Prior to the events that made the basis of this action, Honda designed, engineered, tested, validated, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

432.   On January 29, 2019 and again on May 28, 2020, Honda initiated a voluntary recall of the Recalled Vehicles.  Honda's recall was voluntary and not initiated by NHTSA.

433.   Honda owed a duty to use reasonable care to Plaintiff and Class Members based on its undertaking of the Recall.

434.   As described above, among other things, Honda breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing

to adequately diagnose and remedy the Fuel Pump Defect and notify Plaintiff and the Class to stop driving their Class Vehicles.  Honda's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

435.   For the reasons set for the above, Honda knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

436.   The Fuel Pump Defect damages property other than the Fuel Pump.

437.   As a direct and proximate result, Plaintiff and the other Class Members have been and continue to be damaged in an amount to be determined at trial.

**B. Claims Brought on Behalf of the Statewide Classes**

### i.  ALABAMA CLASS

### COUNT 6
### VIOLATIONS OF ALABAMA'S DECEPTIVE TRADE PRACTICES ACT
### ALA. CODE §§ 8-19-1 ET SEQ.
(Individually and on behalf of the Alabama Class)
(As to all Defendants)

438.   Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

439.   Plaintiff brings this claim individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

440. The Alabama Deceptive Trade Practices Act, Ala. Code. § 8-19-5, prohibits "[e]ngaging in . . . unconscionable, false, or deceptive act[s] or practice[s] in business, commerce, or trade."

441. By the conduct described in detail above and incorporated herein, Defendants engaged in deceptive trade practices.

442. Defendants' omissions regarding the Fuel Pump Defect, described above, which causes the Fuel Pump to prematurely fail, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

443. Defendants intended for Plaintiff and the other Class Members to rely on the omissions regarding the Fuel Pump Defect.

444. Plaintiff and the other Class Members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described Fuel Pump Defect, as evidenced by Plaintiff and the other Class Members' purchases of Class Vehicles.

445. Had Defendants disclosed all material information regarding the Fuel Pump Defect to Plaintiff and the other Class Members, Plaintiff and the other Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

446.   Defendants' omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

447.   Honda was provided notice of the Fuel Pump Defect as alleged in detail herein. Honda has not remedied its breach.

448.   Further, Honda has refused to provide an adequate and timely warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile.  Customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repairs.

449.   As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff and the other Class Members have suffered ascertainable loss and actual damages. Plaintiff and the other Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Fuel Pump Defect been disclosed. Plaintiff and the other Class Members also suffered diminished value of their vehicles. Plaintiff and the other Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Ala. Code. §§ 8-19-1, *et seq.*

## COUNT 7
## STRICT PRODUCT LIABILITY
(Individually and on behalf of the Alabama Class)
(As to all Defendants)

450.   Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

451.   Plaintiff brings this claim individually and on behalf of other members of the Alabama Class (the "Class," for purposes of this Count).

452.   Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

453.   Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

454.   The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner.   Plaintiff and Class Members have not misused or materially altered the Class Vehicles or Fuel Pumps.   The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

455.   The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

456.   The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of

providing safe and reliable transportation and places Plaintiff, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

457.   Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses.  Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

458.   Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

459.   The Fuel Pump Defect causes damage to property other than the product, as explained in more detail above.

460.   As a direct and proximate result of Defendants' actions as described herein, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

**COUNT 8**
**BREACH OF EXPRESS WARRANTY**
**ALA. CODE §§ 7-2-313 AND 7-2A-210**
(Individually and on behalf of the Alabama Class)
(As to Honda)

461.   Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

165

462.   Plaintiff brings this claim individually and on behalf of the other members of the Alabama Class (the "Class" for purposes of this Count).

463.   Honda is a merchant with respect to the Class Vehicles.

464.   In its written express warranties, Honda expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

465.   Honda's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased or leased their Class Vehicles.

466.   Honda breached its express warranty to repair defective parts in the Class Vehicles. Honda admittedly has not repaired the Class Vehicles' Fuel Pump Defect.

467.   Honda was provided notice of the Fuel Pump Defect as alleged in detail herein. Honda has not remedied its breach.

468.   Further, Honda has refused to provide an adequate and timely warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile.  Customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repairs.

469.   The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members

whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

470.   Accordingly, recovery by Plaintiff and the other Class Members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

471.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Honda improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class Members were therefore induced to purchase or lease the Honda Vehicles under false pretenses.

472.   As a direct and proximate result of Honda's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT 9
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## ALA. CODE §§ 7-2-314 AND 7-2A-314
(Individually and on behalf of the Alabama Class)
(As to Honda)

473.   Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

474.   Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

167

475.   Honda is a merchant with respect to motor vehicles under Ala. Code § § 7-2-104 and 7-2A-103.

476.   Pursuant to Ala. Code §§ 7-2-314 and 7-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

477.   The Class Vehicles do not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Fuel Pump Defect which causes the Class Vehicles' Fuel Pump to prematurely fail.

478.   Honda was provided notice of the Fuel Pump Defect as alleged in detail herein. Honda has not remedied its breach.

479.   Further, Honda has refused to provide an adequate and timely warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repair.

480.   Plaintiff and the other Class Members suffered injuries due to the defective nature of the Class Vehicles and Honda's breach of the warranty of merchantability.

481.   As a direct and proximate result of Honda's breach of the warranty of merchantability, Plaintiff and the other Class Members have been damaged in an amount to be proven at trial.

## COUNT 10
## NEGLIGENT RECALL/UNDERTAKING
(Individually and on behalf of the Alabama Class)
(As to Honda)

482.   Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

483.   Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

484.   Prior to the events that made the basis of this action, Honda designed, engineered, tested, validated, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

485.   On January 29, 2019, and again on May 28, 2020, Honda initiated a voluntary recall of the Recalled Vehicles.  Honda's recall was voluntary and not initiated by NHTSA.

486.   Honda owed a duty to use reasonable care to Plaintiff and Class Members based on its undertaking of the Recall.

487.   As described above, among other things, Honda breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to adequately diagnose and remedy the Fuel Pump Defect and notify Plaintiff and

169

the Class to stop driving their Class Vehicles.  Honda's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

488.   For the reasons set for the above, Honda knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

489.   The Fuel Pump Defect damages property other than the Fuel Pump.

490.   As a direct and proximate result, Plaintiff and the other Class Members have been and continue to be damaged in an amount to be determined at trial.

**COUNT 11**
**FRAUDULENT OMISSION**
(Individually and on behalf of the Alabama Class)
(As to all Defendants)

491.   Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

492.   Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

493.   Defendants were aware of the Fuel Pump Defect within the Class Vehicles when they marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

494.   Having been aware of the Fuel Pump Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Fuel Pump Defect, Defendants had a duty

to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

495.  Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

496.  For the reasons set forth above, the Fuel Pump Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

497.  In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles.

498.  Had Plaintiff and the other members of the Class known of the Fuel Pump Defect within the Class Vehicles, they would have not have purchased the Class Vehicles or would have paid less for the Class Vehicles.

499.  Through its omissions regarding the Fuel Pump Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other members of the Class to purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

500.  As a direct and proximate result of Defendants' omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not

have purchased the Class Vehicles at all if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

### ii.  CALIFORNIA CLASS

**COUNT 12**
**VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT,**
**CAL. CIV. CODE §§ 1750, ET SEQ.**
(Individually and on behalf of the California Class)
(As to all Defendants)

501.   Plaintiff Ariaudo ("Plaintiff" for purposes of this Count) incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

502.   Plaintiff brings this cause of action on behalf of herself and on behalf the California Class ("Class" for purposes of this Count).

503.   Defendants are "persons" as defined by California Civil Code § 1761(c).

504.   Plaintiff and the California Class Members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased Class Vehicles for personal, family, or household use.

505.   The sale of the Class Vehicles to Plaintiff and the putative Class Members is a "transaction" as defined by California Civil Code § 1761(e).

506.    Defendants' acts and practices, which were intended to result, and which did result, in the sale of the Class Vehicles, violate § 1770 of the Consumers Legal Remedies Act ("CLRA") for at least the following reasons:

   a.   Defendants represented that the Class Vehicles have characteristics, uses or benefits which they do not have;

   b.   Defendants advertised their goods with intent to not sell them as advertised;

   c.   Defendants represented that their products are of a particular standard, quality, or grade when they are not; and

   d.   Defendants represented that their goods have been supplied in accordance with a previous representation when they have not.

507.    By failing to disclose and concealing the defective nature of the Class Vehicles from Plaintiffs and the prospective Class Members, Defendants violated California Civil Code § 1761(a), as they represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles and their engine components were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5), (7), (9), and (16).

508.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

173

509.   Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use. The Fuel Pump Defect is in each of the Class Vehicles at purchase or lease but may have not been discovered by putative Class Members until months, or years, after the purchase. Indeed, Defendants knew, or should have known, well in advance of the Recall that the Class Vehicles contained the Fuel Pump Defect which presents a substantial danger of bodily injury or death.

510.   As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Fuel Pump Defect, Plaintiff and the California Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

511.   Defendants were under a duty to Plaintiff and the California Class Members to disclose the defective nature of the Class Vehicles and/or associated repair costs because Defendants were in a superior position to know the true state of facts about the Fuel Pump Defect in the Class Vehicles and Plaintiff and California Class Members could not reasonably have been expected to learn or discover that their vehicles had a dangerous safety defect until it manifested.

512.    In failing to disclose the defective nature of the Class Vehicles prior to January 2019, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

513.    A reasonable consumer would have considered the facts Defendants concealed or did not disclose to Plaintiff and the California Class Members to be material in deciding whether to purchase or lease the Class Vehicles or pay less for them. Had Plaintiff and the California Class Members known of the defective nature of the Class Vehicles, they would not have purchased or leased said vehicles or would have paid less for them.

514.    Plaintiff and the California Class Members are reasonable consumers who do not expect their vehicles to suddenly accelerate, decelerate, or stall without warning and while underway. This is the reasonable and objective consumer expectation relating to consumer automobiles.

515.    As a result of Defendants' knowing and intentional concealment of Fuel Pump Defect, Plaintiff and the California Class Members were harmed and suffered actual damages in that the Class Vehicles experienced and will continue to experience the Fuel Pump Defect and the resultant effects therefrom.

516.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and California Class Members suffered and will continue to suffer actual damages. Had Defendants disclosed the true nature and/or danger in

their vehicles, Plaintiff and members of the California Class would not have been misled into purchasing the Class Vehicles or would have paid significantly less for them.

517.   Plaintiff, on behalf of herself and all other similarly situated California consumers, and as appropriate, on behalf of the general public of the State of California, seek injunctive relief prohibiting Defendants from continuing these unlawful practices pursuant to California Civil Code § 1782(a)(2), and such other equitable relief, including restitution of either (1) the full purchase or lease price paid by customers who purchased a Class Vehicle, or (2) a portion of the purchase or lease price paid by customers who purchased or leased a Class Vehicle reflecting the difference in value as compared to a vehicle without the defect.

518.   Plaintiff only seeks injunctive relief for purposes of this Count, therefore notice is not required.

## COUNT 13
## STRICT PRODUCT LIABILITY
(Individually and on Behalf of the California Class)
(As to all Defendants)

519.   Plaintiff Ariaudo ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

520.   Plaintiff brings this claim individually and on behalf of other members of the California Class (the "Class," for purposes of this Count).

521.   Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

522.   Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

523.   The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner.  Plaintiff and Class Members have not misused or materially altered the Class Vehicles or Fuel Pumps.  The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

524.   The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

525.   The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiff, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

526.   Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses.  Such alternative

designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

527.   Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

528.   The Fuel Pump Defect causes damage to property other than the product, as explained in more detail above.

529.   As a direct and proximate result of Defendants' actions as described herein, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

**COUNT 14**
**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT**
**CAL. CIV. CODE §§ 1790, ET SEQ.**
(Individually and on Behalf of the California Class)
(As to Honda)

530.   Plaintiff Ariaudo ("Plaintiff" for purposes of this Count) incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

531.   Plaintiff brings this cause of action on behalf of herself and on behalf of a California Class ("Class" for purposes of this Count).

178

532.   Plaintiff is a buyer as Civil Code section 1791, subdivision (b), defines the term "buyer."

533.   The Class Vehicles are consumer goods, as Civil Code section 1791, subdivision (a), defines the term "consumer good." The Class Vehicles are new motor vehicles, as Civil Code section 1793.22, subdivision (e)(2), defines the term "new motor vehicle."

534.   Honda was, at all times relevant hereto, the manufacturer, distributor, warrantor, lessor, and/or seller of the Class Vehicles. Honda knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

535.   Plaintiffs leased Class Vehicles from Honda and Honda provided Plaintiff and California Class Members with a standard express written warranty covering the Class Vehicles which states, in part, that:

Honda: Basic Coverage is 36 months/36,000 miles, whichever occurs first, from the date of first use and covers all components other than normal wear and maintenance items. This warranty covers repairs and adjustments needed to correct defects in materials or workmanship or any part supplied by Honda, subject to exceptions.

Powertrain Coverage is 60 months/60,000 miles, whichever occurs first, from the date of first use and includes engine, transmission/transaxle, front-wheel-drive system and rear-wheel drive system.

Acura: The Basic Warranty coverage is for 48 months or 50,000 miles, whichever occurs first.

The Powertrain Warranty is for 72 months or 70,000 miles, whichever occurs first. Except for the situations listed on the Basic Warranty page,

this warranty covers repairs needed to fix defects in materials or workmanship of any component listed below:

ENGINE

Cylinder block and head and all internal parts, timing belt and cover, flywheel, oil pan, water pump, fuel pump, engine mounts, engine control computer, seals and gaskets …

536.   Honda is unable to conform Class Vehicles to its express warranty as it has no fix for the Fuel Pump Defect. Honda is only prepared to temporarily replace Plaintiffs' Class Vehicles with ones of inferior quality while insisting that they continue to make full lease payments on Class Vehicles they cannot safely operate and ones that cannot be made to conform to Honda's express warranty.

537.   Plaintiff and the California Class Members were harmed because they purchased or leased the Class Vehicles and paid the full purchase or lease price of those vehicles but were unable to use such Class Vehicles due to the Fuel Pump Defect. Temporary loaner vehicles to be provided to Plaintiff and California Class Members are not of the same quality as the Class Vehicles purchased or leased and Plaintiff and the Class Members suffered substantial economic injury and other harm as they were deprived of the benefit of the bargain that they struck with Honda.

538.   Honda's failure to equip the Class Vehicles with an appropriate and reliable fuel pump, and failure to repair the Fuel Pump Defect such that the Class

Vehicles conform to the express warranty, is a substantial factor in Plaintiff's and California Class Members' harm.

539.    Honda is unable to conform the Class Vehicles to the express warranties despite being afforded a reasonable opportunity to do so. Honda will not replace the Class Vehicles or refund the purchase price and/or lease payments. Rather, Honda insists that Plaintiff and California Class Members continue making payments on inoperable Class Vehicles.

540.    Since being informed of the defect in the Class Vehicles, neither Plaintiff nor Class Members have been able to safely drive their Class Vehicles as the Fuel Pump Defect is likely to cause death or serious injury if it fails while the Class Vehicles are being operated.

541.    Under the Song-Beverly Consumer Warranty Act, all express warranties are accompanied by the implied warranty of merchantability, which may not be disclaimed by the manufacturer or retail seller.

542.    Honda provided Plaintiff and the California Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they are sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, among other things, the Class Vehicles suffered

from an inherent defect at the time of sale and thereafter are not fit for their particular purpose of providing safe and reliable transportation.

543.   Honda impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (1) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (2) a warranty that the Class Vehicles would be fit for their intended use while they were being operated.

544.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the California Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective.

545.   Honda's breach of express and implied warranties was willful and has deprived Plaintiff and the California Class Members of the benefit of their bargain.

546.   Honda has had multiple reasonable opportunities to cure the breach, but either cannot or will not do so due to conditions reasonably within its control. Pursuant to the Song-Beverly Consumer Warranty Act, if the manufacturer is unable to conform a new motor vehicle to the express warranty, then the manufacturer shall promptly replace the vehicle with one that conforms to the express warranty or

reimburse the buyer. Honda has done neither despite being informed that the Class Vehicles are defective and do not conform to applicable warranties.

547.   Honda's breach of express and implied warranties was willful and has deprived Plaintiff and the California Class Members of the benefit of their bargain.

548.   Honda had notice of its breach as alleged herein.

549.   As a direct and proximate cause of Honda's breach of express and implied warranties, Plaintiff and the California Class Members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiff and the California Class Members, who are entitled to recover under section 1794 of the act, including civil penalties, actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other such relief the Court deems appropriate.

## COUNT 15
## VIOLATION OF THE FALSE ADVERTISING LAW
## CALIFORNIA BUS. & PROF. CODE §§ 17500, ET SEQ.
(Individually and on behalf of the California Class)
(As to Honda)

550.   Plaintiff Ariaudo ("Plaintiff" for purposes of this Count) incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

551.   Plaintiff brings this cause of action on behalf of herself and on behalf California Class ("Class" for purposes of this Count).

183

552.    Honda has benefitted from intentionally selling and leasing at an unjust profit defective Class Vehicles at artificially inflated prices due to the concealment of the Fuel Pump Defect, and Plaintiffs and other California Class Members overpaid for their Class Vehicles.

553.    Honda publicly disseminated advertising and promotional material that was designed and intended to convey to the public that the Class Vehicles were safe, reliable, and operated as consumers would expect the Class Vehicles to operate.

554.    Honda was aware, or should have been aware, of the Fuel Pump Defect at the time Plaintiff and California Class Members purchased or leased the Class Vehicles.

555.    However, Honda negligently or intentionally made representations in its advertisements, and, due to issues it was aware of, did not sell the Class Vehicles that conformed to the representations and promises in the publicly disseminated advertisements.

556.    Honda unjustly received and retained benefits from Plaintiff and the other California Class Members.

557.    It is inequitable and unconscionable for Honda to retain these benefits.

558.    Because Honda wrongfully concealed their misconduct, Plaintiff and California Class Members were not aware of the facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

559.   Honda knowingly accepted the unjust benefits of its wrongful conduct.

560.   Honda had notice of conduct as alleged herein.

561.   As a result of Honda's misconduct, Plaintiff and California Class Members suffered an injury-in-fact and lost money and/or property in an amount to be proven at trial.

## COUNT 16
## VIOLATION OF THE UNFAIR COMPETITION LAW
## CAL. CIV. CODE §§ 17200, ET SEQ.
(Individually and on behalf of the California Class)
(As to all Defendants)

562.   Plaintiff Ariaudo ("Plaintiff" for purposes of this Count) incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

563.   Plaintiff brings this cause of action on behalf of herself and on behalf the California Class ("Class" for purposes of this Count).

564.   As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value in connection with the purchase or lease of their Class Vehicles. Additionally, as a result of the Fuel Pump Defect, Plaintiff and members of the California Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

565.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

566.   Plaintiff and members of the California Class are reasonable consumers who do not expect their vehicles to suffer from sudden acceleration, deceleration, and stalling without warning.

567.   Defendants knew the Class Vehicles suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

568.   In failing to disclose the Fuel Pump Defect, Defendants' knowingly or intentionally concealed material facts and breached their duty not to do so.

569.   Defendants were under a duty to Plaintiff and members of the California Class to disclose the Fuel Pump Defect because Defendants were in a superior position to know the true state of facts about the safety defect and Plaintiff and members of the California Class could not reasonably have been expected to learn or discover that the Class Vehicles had a dangerous safety defect until it manifested.

570.   A reasonable consumer would have considered the facts Defendants concealed or did not disclose to Plaintiff and members of the California Class to be important in deciding whether to purchase or lease the Class Vehicles or pay less for

them. Had Plaintiff and members of the California Class known of the Fuel Pump Defect in the Class Vehicles, they would not have purchased or leased the vehicles or would have paid less for them.

571.    Defendants continued to conceal the defective nature of the Class Vehicles even after consumers began to report problems. Defendants continue to cover up and conceal the true nature of the Fuel Pump Defect.

572.    Defendants' acts, conduct, and practices were fraudulent, in that they constituted business practices and acts that were likely to deceive reasonable members of the public. Defendants' acts, conduct, and practices were fraudulent because they are immoral, unethical, oppressive, unscrupulous, and/or are substantially injurious to consumers.

573.    Defendants' acts, conduct, and practices were unfair in that they constituted business practices and acts the utility of which does not outweigh the harm to consumers. Defendants' business acts and practices were further unfair in that they offend established public policy, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

574.    A business practice is unlawful if it is forbidden by any law. Defendants' acts, conduct, and practices were unlawful, in that they constituted:

     e.  Violations of the California Consumers Legal Remedies Act;

     f.  Violations of the Song-Beverly Consumer Warranty Act;

     g.  Violations of the False Advertising Law;

187

h.  Violations of Magnuson-Moss Consumer Warranty Act; and

i.  Violations of the express and implied warranty provisions of California Commercial Code sections 2313 and 2314.

575.   By its conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

576.   Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

577.   As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiff and members of the California Class have suffered and will continue to suffer actual damages.

578.   Defendants had notice of their conduct as alleged herein.

579.   Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and members of the California Class pursuant to §§ 17203 and 17204 of the California Business & Professions Code. Plaintiff and members of the Classes also seek injunctive relief as deemed appropriate by the Court.

**COUNT 17**
**NEGLIGENT RECALL/UNDERTAKING**
(Individually and on Behalf of the California Class)
(As to Honda)

580.   Plaintiff Ariaudo ("Plaintiff" for purposes of this Count) incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

581.   Plaintiff brings this cause of action on behalf of herself and on behalf a California Class ("Class" for purposes of this Count).

582.   Prior to the events made the basis of this action, Honda designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

583.   On January 29, 2019 Honda initiated a voluntary recall of the Recalled Vehicles. Honda's recall was voluntary and not initiated by NHTSA. The Recall was expanded and amended in the May 28, 2020 Second Recall, and three times thereafter.

584.   Honda owed a duty to use reasonable care to Plaintiff and Class Members based on its undertaking of the Recall.

585.   As described above, Honda breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiff and the Class of the Fuel Pump Defect, failing to direct Class Members to stop driving their Class Vehicles, and failing to offer Class Members a free loaner vehicle of comparable make, model, or value as their Class Vehicles until Honda is able to devise a remedy that is safe and dependable (if ever) and implement it in each Class

Vehicle. Honda's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

586.    For the reasons set for the above, Honda knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

587.    As a direct and proximate result, Plaintiff and the other Class Members have been and continue to be damaged in an amount to be determined at trial.

## COUNT 18
## FRAUDULENT OMISSION
(Individually and on Behalf of the California Class)
(As to all Defendants)

588.    Plaintiff Ariaudo ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

589.    Plaintiff brings this claim individually and on behalf of the California Class ("Class" for purposes of this Count).

590.    Defendants were aware of the Fuel Pump Defect within the Class Vehicles when the Class Vehicles were marketed and sold to Plaintiff and the other members of the Class.

591.    Having been aware of the Fuel Pump Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Fuel Pump Defect, Defendants had a duty

to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

592. Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

593. For the reasons set forth above, the Fuel Pump Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

594. In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles.

595. Had Plaintiff and the other members of the Class known of the Fuel Pump Defect within the Class Vehicles, they would have not purchased or leased the Class Vehicles or would have paid less for the Class Vehicles.

596. Through their omissions regarding the Fuel Pump Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase or lease a Class Vehicle that they otherwise would not have purchased or leased, or pay more for a Class Vehicle than they otherwise would have paid.

597. As a direct and proximate result of Defendants' omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not

have purchased or leased the Class Vehicles at all if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

### iii.  ILLINOIS CLASS

**COUNT 19**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. 505/1, ET SEQ.**
(Individually and on Behalf of the Illinois Class)
(As to all Defendants)

598.   Plaintiff Michelle Welcher ("Plaintiff" for purposes of this Count) incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

599.   Plaintiff brings this cause of action on behalf of herself and on behalf of the Illinois Class ("Class" for purposes of this Count).

600.   The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits unfair or deceptive acts or practices in connection with any trade or commerce, including, among other things, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact … whether any person has in fact been misled, deceived, or damaged thereby." The Act also prohibits suppliers from representing that their goods are of a particular quality or grade they are not.

601.   The conduct of Defendants, as set forth herein, constitutes unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/2. The prohibited conduct includes, but is not limited to, their manufacture and sale of Class Vehicles, failure to disclose and remedy the Fuel Pump Defect in Class Vehicles, and misrepresentations and/or omissions regarding the safety and reliability of Class Vehicles.

602.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

603.   Defendants have successor liability for the deceptive or unfair acts or practices of Defendants.

604.   Defendants' actions impact the public interest because Plaintiff and the other Illinois Class Members were injured in exactly the same way as hundreds of thousands of others purchasing and/or leasing Class Vehicles as a result of Defendants' generalized course of deception.

605.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.

606.   Plaintiff and the other Illinois Class Members suffered ascertainable loss as a result of Defendants' conduct. Plaintiff and the other Illinois Class Members were injured and suffered economic damages as a result of such conduct.

607.    Plaintiff and the other Illinois Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and Class Vehicles have suffered a diminution in value as a result of the conduct described herein.

608.    Defendants knew that Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use. The Fuel Pump Defect is in each of lass Vehicles at purchase or lease but may have not been discovered by putative Class Members until months, or years, after the purchase. Indeed, Defendants knew, or should have known, well in advance of the Recall that Class Vehicles contained the Fuel Pump Defect which presents a substantial danger of bodily injury or death.

609.    Defendants were under a duty to Plaintiff and the other Illinois Class Members to disclose the defective nature of Class Vehicles and/or associated repair costs because Defendants were in a superior position to know the true state of facts about the Fuel Pump Defect in Class Vehicle and Plaintiff and the other Illinois Class Members could not reasonably have been expected to learn or discover that their vehicles had a dangerous safety defect until it manifested.

610.    In failing to disclose the defective nature of the Class Vehicles prior to January 29, 2019, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

611.    A reasonable consumer would have considered the facts Defendants concealed or did not disclose to Plaintiff and the other Illinois Class Members to be material in deciding whether to purchase or lease Class Vehicles or pay less for them. Had Plaintiff and the other Illinois Class Members known of the defective nature of Class Vehicles, they would not have purchased or leased said vehicles or would have paid less for them.

612.    Plaintiff and the other Illinois Class Members are reasonable consumers who do not expect their vehicles to suddenly accelerate, decelerate, or stall without warning and while underway.

613.    As a result of Defendants' conduct, Plaintiff and the other Illinois Class Members were harmed and suffered actual damages in that Class Vehicles experienced and will continue to experience the Fuel Pump Defect and the resultant effects therefrom.

614.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and the other Illinois Class Members suffered and will continue to suffer actual damages. Had Defendants disclosed the true nature and/or danger in its vehicles, Plaintiff and the other Illinois Class Members would not have been misled into purchasing or leasing Class Vehicles or would have paid significantly less to do so.

615.    Defendants had notice of their conduct as alleged herein.

616.   Defendants are liable to Plaintiff and the other Illinois Class Members for damages in amounts to be proven at trial, including attorneys' fees recoverable pursuant to 815 Ill. Comp. Stat. 505/1, *et seq*.

617.   Plaintiff and the other Illinois Class Members also seek punitive damages against Defendants because their conduct was wanton, willful and malicious.

618.   Pursuant to 815 Ill. Comp. Stat. 505/7, Plaintiff request that this Court enter an order enjoining Defendants from continuing its unfair and/or deceptive practices as alleged herein.

## COUNT 20
## STRICT PRODUCT LIABILITY
(Individually and on Behalf of the Illinois Class)
(As to all Defendants)

619.   Plaintiff Welcher ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

620.   Plaintiff brings this claim individually and on behalf of other members of the Illinois Class (the "Class," for purposes of this Count).

621.   Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

622.   Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

623.   The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner.   Plaintiff and Class Members have not misused or materially altered the Class Vehicles or Fuel Pumps.  The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

624.   The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

625.   The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiff, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

626.   Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses.  Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

627.   Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

628.   The Fuel Pump Defect causes damage to property other than the product, as explained in more detail above.

629.   As a direct and proximate result of Defendants' actions as described herein, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

630.

**COUNT 21**
**VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE**
**PRACTICES ACT,**
**815 ILL. COMP. STAT. 510/1, ET SEQ.**
(Individually and on Behalf of the Illinois Class)
(Against all Defendants)

631.   Plaintiff Michelle Welcher ("Plaintiff" for purposes of this Count) incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

632.   Plaintiff brings this cause of action on behalf of herself and on behalf of the Illinois Class ("Class" for purposes of this Count).

633.   The Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2(a) sets forth that:

> A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: … causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; … represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; … advertises goods or services with intent not to sell them as advertised; … [or] engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

634. As described above, Class Vehicles sold or leased to Plaintiff and the other Illinois Class Members were not of the particular standard, quality, grade or characteristic represented by Defendants.

635. Defendants have successor liability for the deceptive or unfair acts or practices of Defendants.

636. Defendants had notice of their conduct as alleged herein.

637. Plaintiff and the other Illinois Class Members are persons damaged as a result of Defendants' conduct alleged above. 815 Ill. Comp. Stat. 510/3 provides that the Court may enter injunctive relief to prevent Defendants from continuing to engage in the deceptive conduct alleged, and to assess costs and attorneys' fees against Defendants upon finding that it willfully engaged in a deceptive trade practice.

**COUNT 22**
**BREACH OF EXPRESS WARRANTY**
**810 ILL. COMP. STAT. 5/2-213**
(Individually and on Behalf of the Illinois Class)
(Against Honda)

638.   Plaintiff Michelle Welcher ("Plaintiff" for purposes of this Count) incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

639.   Plaintiff brings this cause of action on behalf of herself and on behalf of the Illinois Class ("Class" for purposes of this Count).

640.   Honda was, at all times relevant hereto, the manufacturer, distributor, warrantor, seller, and/or lessor of Class Vehicles. Honda knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

641.   Honda was, at all times relevant hereto, a merchant with respect to motor vehicles.

642.   Plaintiff purchased a Class Vehicle from Honda and Honda provided Plaintiff and other Illinois Class Members with a standard express written warranty covering the Class Vehicles which states, in part, that:

> Honda: Basic Coverage is 36 months/36,000 miles, whichever occurs first, from the date of first use and covers all components other than normal wear and maintenance items. This warranty covers repairs and adjustments needed to correct defects in materials or workmanship or any part supplied by Honda, subject to exceptions.

200

Powertrain Coverage is 60 months/60,000 miles, whichever occurs first, from the date of first use and includes engine, transmission/transaxle, front-wheel-drive system and rear-wheel drive system.

Acura: The Basic Warranty coverage is for 48 months or 50,000 miles, whichever occurs first.

The Powertrain Warranty is for 72 months or 70,000 miles, whichever occurs first. Except for the situations listed on the Basic Warranty page, this warranty covers repairs needed to fix defects in materials or workmanship of any component listed below:

ENGINE

Cylinder block and head and all internal parts, timing belt and cover, flywheel, oil pan, water pump, fuel pump, engine mounts, engine control computer, seals and gaskets …

643.   "Express warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." 810 ILCS 5/2-313.

644.   Honda made the above warranties in advertisements and in uniform statements to the public and consumers of Class Vehicles. These affirmations and promises were part of the basis of the bargain between Honda, on the one hand, and Plaintiff and the other Illinois Class Members, on the other.

645.   Honda is unable to conform Class Vehicles to its express warranty as it has no fix for the Fuel Pump Defect. Honda is only prepared to temporarily replace Plaintiff's Class Vehicles with ones of inferior quality while insisting that she

continue to make full lease payments on Class Vehicles she cannot safely operate and ones that cannot be made to conform to Honda's express warranty.

646.   Plaintiff and the other Illinois Class Members were harmed because they purchased or leased the Class Vehicles and paid the full purchase or lease price of those vehicles but were unable to use such Class Vehicles due to the Fuel Pump Defect. Temporary loaner vehicles to be provided to Plaintiff and the other Illinois Class Members are not of the same quality as the Class Vehicles purchased or leased and Plaintiff and the other Illinois Class Members suffered substantial economic injury and other harm as they were deprived of the benefit of the bargain that they struck with Honda.

647.   Honda's failure to equip the Class Vehicles with an appropriate and reliable fuel pump, and failure to repair the Fuel Pump Defect such that Class Vehicles conform to the express warranty, is a substantial factor in Plaintiff's and the other Illinois Class Members' harm. At the time that Honda warranted and sold and/or leased Class Vehicles, it knew that they did not conform to the express warranties and were inherently defective, and Honda wrongfully misrepresented and/or concealed material facts regarding Class Vehicles from Plaintiffs and the other Illinois Class Members.

648.   Honda is unable to conform the Class Vehicles to the express warranties despite being afforded a reasonable opportunity to do so. Honda will not

replace Class Vehicles or refund the purchase price and/or lease payments. Rather, Honda insists that Plaintiffs and the other Illinois Class Members continue making payments on inoperable Class Vehicles.

649.     Since being informed of the Fuel Pump Defect in the Class Vehicles, neither Plaintiff nor the other Illinois Class Members have been able to safely drive their Class Vehicles as the Fuel Pump Defect is likely to cause death or serious injury if it fails while the Class Vehicles are being operated.

650.     At all times relevant to this action, Honda falsely represented the safety characteristics of Class Vehicles in breach of its express warranties.

651.     Honda had notice of its breach as alleged herein.

652.     As a direct and proximate cause of Honda's breach of express warranties, Plaintiff and the other Illinois Class Members sustained damages and other losses in an amount to be determined at trial.

## COUNT 23
## BREACH OF IMPLIED WARRANTY
(Individually and on Behalf of the Illinois Class)
(Against Honda)

653.   Plaintiff Michelle Welcher ("Plaintiff" for purposes of this Count) incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

654.   Plaintiff brings this cause of action on behalf of herself and on behalf of the Illinois Class ("Class" for purposes of this Count).

655.   Class Vehicles are "goods" within the meaning of 810 ILCS 5/2-314(2).

656.   Honda is a "merchant" within the meaning of 810 ILCS 5/2-314(1) with respect to Class Vehicles.

657.   A warranty that goods shall be merchantable and fit for ordinary purposes for which such goods are used is implied in a contract for their sale if the seller is a merchant of goods of that kind.

658.   Honda was, at all times relevant hereto, the manufacturer, distributor, warrantor, seller, and/or lessor of Class Vehicles. Honda knew or had reason to know of the specific use for which Class Vehicles were purchased or leased.

659.   Honda provided Plaintiff and the other Illinois Class Members with an implied warranty that Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they are sold.

660.   Class Vehicles, however, are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, among other things, they suffered from an inherent defect at the time of sale and thereafter are not fit for their particular purpose of providing safe and reliable transportation.

661.   Honda impliedly warranted that Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things, a warranty that Class Vehicles: (1) manufactured, supplied, distributed, and/or sold by

Hondas were safe and reliable for providing transportation; and (2) would be fit for their intended use while they were being operated.

662.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the other Illinois Class Members with reliable, durable, and safe transportation. Instead, Class Vehicles are defective.

663.   Honda's breach of implied warranties was willful and has deprived Plaintiff and the other Illinois Class Members of the benefit of their bargain.

664.   Honda has had multiple reasonable opportunities to cure the breach, but either cannot or will not do so due to conditions reasonably within its control.

665.   Honda has received timely notice of the breach.

666.   As a direct and proximate cause of Honda's breach of implied warranties, Plaintiff and the other Illinois Class Members sustained damages and other losses in an amount to be determined at trial.

## COUNT 24
## NEGLIGENT RECALL/UNDERTAKING
(Individually and on Behalf of the Illinois Class)
(Against Honda)

667.   Plaintiff Michelle Welcher ("Plaintiff" for purposes of this Count) incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

668.   Plaintiff brings this cause of action on behalf of herself and on behalf of the Illinois Class ("Class" for purposes of this Count).

669.   Honda owed a duty to Plaintiff and the other Illinois Class Members to provide a vehicle that conformed to its publicly disseminated representations, warranties, and promotional information given to Plaintiff and the other Illinois Class Members at the time of their respective transactions.

670.   Honda harmed Plaintiff and the other Illinois Class Members by negligently designing, testing, engineering, and incorporating the Fuel Pump into Class Vehicles.

671.   Honda's negligence was a substantial and necessary factor in causing Plaintiff and the other Illinois Class Members harm, and it was foreseeable by Honda that Plaintiff and the other Illinois Class Members would be harmed by negligently designing, testing, engineering, and incorporating the Fuel Pump into Class Vehicles.

672.   On January 29, 2019, Honda initiated a voluntary recall of the Recalled Vehicles. Honda's recall was voluntary and not initiated by NHTSA. The Recall was expanded and amended in the May 28, 2020 Second Recall.

673.   As described above, Honda breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiff and the other members of the Classes of the Fuel Pump Defect, failing to direct Plaintiff

and the other Illinois Class Members to stop driving their Class Vehicles, and failing to offer Plaintiff and the other Illinois Class Members free loaner vehicles of comparable value to their Class Vehicles until Honda is able to devise a repair that works (if ever) and implement it in each Class Vehicle. Honda's failure to do so continues to expose Plaintiff and the other Illinois Class Members to the risk of injury and death.

674. For the reasons set for the above, Honda knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

675. As a direct and proximate result of Honda's negligence, Plaintiff and the other Illinois Class Members have been damaged in an amount to be determined at trial.

**COUNT 25**
**FRAUDULENT OMISSION**
(Individually and on Behalf of the Illinois Class)
(As to all Defendants)

676. Plaintiff Michelle Welcher ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

677. Plaintiff brings this Count individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

678.   Defendants were aware of the Fuel Pump Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

679.   Having been aware of the Fuel Pump Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Fuel Pump Defect, Defendants had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

680.   Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

681.   For the reasons set forth above, the Fuel Pump Defect comprises material information with respect to the sale or lease of the Class Vehicles.

682.   In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles.

683.   Had Plaintiff and the other members of the Class known of the Fuel Pump Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

684.   Through its omissions regarding the Fuel Pump Defect, Defendants intended to induce, and did induce, Plaintiff and the other members of the Class to

either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

685.   As a direct and proximate result of Defendants' omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

### iv.  LOUISIANA CLASS

### COUNT 26
### VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### LA. REV. STAT. ANN. §§ 51:1401 ET SEQ.
(Individually and on behalf of the Louisiana Class)
(As to all Defendants)

686.  Plaintiff Walters-Kayode ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

687.  This Count is brought on behalf of Plaintiff and the Louisiana Class ("Class" for the purposes of this Count) for violation of Louisiana's Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et. seq.* ("UTPA"), which prohibits, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. § 51:1405(A).

688.   The foregoing acts, conduct and omission of Defendants constitute unfair, unconscionable, deceptive, or unlawful acts or business practices in violation of Louisiana's UTPA.

689.   Defendants' design, engineering, testing, manufacture, distribution, marketing, advertising, labeling, and sale of the Class Vehicles constitutes "commerce" as defined by La. Rev. Stat. Ann. § 51:1402(10).

690.   Defendants' conduct violates UTPA because Defendants engaged in the deceptive acts and practices described above and those acts and/or omissions possessed the tendency or capacity to mislead, or created the likelihood of deception in the minds of consumers and the public at large and did so deceive them with respect to the true qualities and characteristics of the Class Vehicles.

691.   Defendants' deceptive conduct and its false and misleading statements about Class Vehicle and Fuel Pump safety and dependability and omissions regarding the Fuel Pump Defect, which causes the Fuel Pumps to prematurely fail, are facts that a reasonable person would have considered material in deciding whether or not to purchase or lease (or how much they were willing to pay to purchase or lease) the Class Vehicles.

692.   Defendants' acts and practices are unfair because they offend the public policy of the state of Louisiana and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

693.  Defendants' acts and practices described above were directed at Plaintiff and the public at large and were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiffs and members of the Class who justifiably acted or relied to their detriment upon Defendants' misrepresentations and omissions of fact, as evidenced by Plaintiff and the other Class Members' leasing and purchasing of Class Vehicles.

694.  Had Defendants disclosed all material information regarding the Fuel Pump Defect to Plaintiff and the other Class Members, Plaintiff and the other Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

695.  Defendants' unfair and deceptive acts and practices, and/or misrepresentations and omissions, have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

696.  Honda also engaged in unfair and deceptive conduct by issuing a defective Recall that provides no remedy for the Fuel Pump Defect, does not notify Class Members about the Fuel Pump Defect, does not instruct consumers to stop driving the dangerous Class Vehicles, does not notify consumers and offer them free loaner vehicles of comparable make, model, or value as their own Class Vehicles to

enable them to cease driving their dangerous Class Vehicles until a remedy is available and can be implemented.

697.   Denso also engaged in unfair and deceptive conduct by manufacturing and placing in the stream of commerce a Fuel Pump it knew, or should have known, was materially defective and posed substantial risk to the drivers and passengers of the Class Vehicles and other motorists.

698.   As a direct and proximate result of Defendants' deceptive commercial practices, Plaintiff and the other Class Members have suffered ascertainable loss and actual damages. Plaintiff and the other Class Members would not have purchased or leased the Class Vehicles or would have paid less for them had Defendants disclosed the truth about the Fuel Pump Defect. Plaintiff and the other Class Members also suffered diminished value of their vehicles and other losses.

699.   As a direct and proximate result of Defendants' unfair and deceptive commercial practices, Plaintiff and the other Class Members were harmed by Honda's inadequate Recall, described above, including Defendants' failure to notify them of the Fuel Pump Defect, failure to direct them to stop driving their Class Vehicles, and failure to offer Class Members a free loaner vehicle of comparable make, model, or value as their Class Vehicles until Defendants are able to devise a remedy that that is safe and dependable (if ever) and implement it in each Class

Vehicle. Defendants' failure to do so continues to expose Plaintiff and the Class to the risk of serious injury and death.

700.   La. Rev. Stat. Ann. § 51:1409(A) provides that "[i]f the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained."  La. Rev. Stat. Ann. § 51:1409(A) further provides that, "[i]n the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs."

701.   Defendants' violation of UDTPA was willful and Defendants refusal to conform the vehicles to the warranties, and to reimburse consumers for their reasonable losses which result from Defendant's acts and omissions is unwarranted. Defendants knowingly and willfully marketed the Class Vehicles as safe and dependable all the while knowing they were not; admit in the Recall Reports the fact of the Fuel Pump Defect, the approximate 1000 warranty claims and more than 170 field reports it received about the Fuel Pump Defect, and that the Fuel Pump Defect poses a serious risk of injury rendering the Class Vehicles unsafe; and the facts of the defect Recall are incontrovertible. Defendants, through their willful and knowing deceptive acts and practices, as detailed above, have willfully and knowingly exposed Plaintiff and the Class to the risk of serious injury and death, and continue to do so by virtue of having issued the deficient Recall.

702.    Defendants had notice of their conduct as alleged herein.

703.    As a direct and proximate result of Defendants' conduct in violation of UTPA, Plaintiff and the members of the Class have been injured in an amount to be proven at trial and are entitled to treble damages under La. Rev. Stat. Ann.§ 51:1409. Because Defendants' violation of UTPA was willful and they unreasonably refused to conform the Class Vehicles to the warranties and reimburse Class Vehicle owners and lessees for their pecuniary losses Plaintiff and members of the Class are further entitled to attorney's fees under La. Rev. Stat. Ann. § 51:1409. Plaintiff and members of the Class respectfully request any additional restitution applicable under La. Rev. Stat. Ann. §§ 51:1401, *et seq*.

## COUNT 27
## BREACH OF EXPRESS WARRANTY
## LA. CIVIL CODE CH. 7, ART. 2744, *ET SEQ.*; LA. STAT. ANN. §§ 51:1941 *ET SEQ.*
(Individually and on behalf of the Louisiana Class)
(Against Honda)

704.    Plaintiff Walters-Kayode ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

705.    Plaintiff brings this claim individually and on behalf of the other members of the Louisiana Class (the "Class" for purposes of this Count).

706.    Honda is a merchant with respect to the Class Vehicles.

707.   In its written express warranties, Honda expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

708.   Honda's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased or leased their Class Vehicles.

709.   Honda breached its express warranty to repair defective parts in the Class Vehicles. Honda admittedly has not repaired the Class Vehicles' Fuel Pump Defect.

710.   Honda knew that it was unable to provide adequate remedy under the warranty. Honda was provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge. Honda has not remedied its breach.

711.   Further, Honda has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. Customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repairs.

712.   The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members

whole and because Honda has failed and/or has refused to adequately provide effective remedies within a reasonable time.

713.    Accordingly, recovery by Plaintiff and the other Class Members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

714.    Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Honda improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class Members were therefore induced to purchase or lease the Honda Vehicles under false pretenses.

715.    Honda had notice of its breach as alleged herein.

716.    As a direct and proximate result of Honda's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT 28
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/
## WARRANTY AGAINST REDHIBITORY DEFECTS
## LA. CIVIL CODE ART. 2520, 2524, 2475.
(Individually and on behalf of the Louisiana Class)
(Against Honda)

717.    Plaintiff Walters-Kayode ("Plaintiff" for purposes of this Count) incorporates and references each allegation as if fully set forth herein.

216

718.   Plaintiff Walters-Kayode brings this Count individually and on behalf of the Louisiana Class.

719.   The Honda Defendants were at all times "merchants" with respect to motor vehicles. Honda manufactured and sold the defective Class Vehicles to Plaintiff and the other Class Members.

720.   A warranty that the Honda Class Vehicles were in merchantable condition and fit for their ordinary and intended purpose for which vehicles are used is implied by law.

721.   The Class Vehicles are defective because they have a defective Fuel Pump, which may result in Fuel Pumps failing prematurely, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants.

722.   These defects existed at the time the Class Vehicles left the control of Honda.

723.   Based upon these defects, Honda has failed to meet the expectations of a reasonable consumer. The Class Vehicles have failed in their ordinary, intended use, because they suffer from the Fuel Pump Defect, causing Fuel Pumps to potentially fail to deploy in a crash event, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants.

724.   Honda had notice of its breach as alleged herein.

217

725.   The above-described defects in the Class Vehicles were the direct and proximate cause of economic damages to Plaintiff and the other Class Members.

**COUNT 29**
**FRAUDULENT OMISSION**
(Individually and on behalf of the Louisiana Class)
(As to all Defendants)

726.   Plaintiff Walters-Kayode ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

727.   Plaintiff brings this Count individually and on behalf of the other members of the Louisiana Class (the "Class," for purposes of this Count).

728.   Defendants were aware of the Fuel Pump Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other Class Members.

729.   Having been aware of the Fuel Pump Defect, and having known that Plaintiff and the other Class Members could not have reasonably been expected to know of this defect, Defendants had a duty to disclose the Fuel Pump Defect to Plaintiff and the other Class Members in connection with the sale or lease of the Class Vehicles.

730.   Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other Class Members in connection with the sale or lease of the Class Vehicles.

218

731.   For the reasons set forth above, the Fuel Pump Defect in the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

732.   In purchasing or leasing the Class Vehicles, Plaintiff and the other Class Members reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles. Had Plaintiff and the other Class Members known of the Fuel Pump Defect in the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

733.   Through their omissions regarding the Fuel Pump Defect in the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other Class Members to purchase or lease a Class Vehicle that they otherwise would not have purchased, or to pay more for a Class Vehicle than they otherwise would have paid.

734.   As a direct and proximate result of Defendants' omissions, Plaintiff and the other Class Members either paid too much for the Class Vehicles or would not have purchased the Class Vehicles if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 30**
**NEGLIGENT RECALL/UNDERTAKING**
(Individually and on behalf of the Louisiana class)
(As to Honda)

735.   Plaintiff Walters-Kayode ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

736.   Plaintiff brings this Count individually and on behalf of the other members of the Louisiana Class (the "Class," for purposes of this Count).

737.   Prior to the events made the basis of this action, Honda designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

738.   On January 29, 2019 Honda initiated a voluntary recall of the Recalled Vehicles. Honda's recall was voluntary and not initiated by NHTSA. Honda initiated a Second Recall on May 28, 2020 Second Recall.

739.   Honda owed a duty to use reasonable care to Plaintiff and Class Members based on its undertaking of the Recall.

740.   As described above, Honda breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiff and the Class of the Fuel Pump Defect, failing to direct Class Members to stop driving their Class Vehicles, and failing to offer Class Members a free loaner vehicles of comparable make, model, or value as their Class Vehicles until Honda is able to devise a repair that works (if ever) and implement it in each Class Vehicle. Honda's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

741.   For the reasons set for the above, Honda knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

742.   As a direct and proximate result, Plaintiff and the other Class Members have been and continue to be damaged in an amount to be determine at trial.

## COUNT 31
## STRICT PRODUCT LIABILITY
(Individually and on behalf of the Louisiana Class)
(As to all Defendants)

743.   Plaintiff Walters-Kayode ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

744.   Plaintiff brings this claim individually and on behalf of other members of the Louisiana Class (the "Class," for purposes of this Count).

745.   Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

746.   Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

747.   The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner. Plaintiff and Class Members have not misused or materially altered the Class Vehicles or Fuel Pumps. The Class Vehicles and Fuel

Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

748.   The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

749.   The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiff, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

750.   Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses. Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

751.   Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

752.   As a result of Defendants' actions as described herein, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

### v.  MARYLAND CLASS

### COUNT 32
### VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
### MD. CODE ANN., COM. LAW §§ 13-101, ET SEQ.
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

753.   Plaintiff Scott Lucas ("Plaintiff" for purposes of this Count) incorporates by reference each paragraph as if fully set forth herein.

754.   Plaintiff brings this claim individually and on behalf of the other members of the Maryland Class (the "Class," for purposes of this Count).

755.   The Maryland Consumer Protection Act ("MCPA") prohibits "any [f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." Md. Code Ann., Com. Law § 13-301(1). The MCPA also prohibits any "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods." Md. Code Ann., Com. Law § 13-301(9),(9)(i).

756.   Plaintiff and the Maryland Class are "consumers" within the meaning of the MCPA. Md. Code Ann., Com. Law § 13-101(c).

757.   Each Defendant is a "person" as used in the MCPA. Md. Code Ann., Com. Law § 13-101(h).

758.   The Class Vehicles are "consumer good[s]" within the meaning of the MCPA. Md. Code Ann., Com. Law § 13-101(d).

759.   By the conduct described in detail above and incorporated herein, Defendants engaged in deceptive trade practices.

760.   Plaintiff notified Honda of the Fuel Pump Defect in the Class Vehicles when he brought his Class Vehicle into a dealer after experiencing problems as a result of the Defect. Honda was also provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

761.   Defendants' omissions regarding the Fuel Pump Defect, described above, which causes the Fuel Pump to prematurely fail, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

762.   Defendants intended for Plaintiff and the other Class Members to rely on the omissions regarding the Fuel Pump Defect.

763.   Plaintiff and the other Class Members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described Fuel

Pump Defect, as evidenced by Plaintiff and the other Class Members' purchases of Class Vehicles.

764.    Had Defendants disclosed all material information regarding the Fuel Pump Defect to Plaintiff and the other Class Members, Plaintiff and the other Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

765.    Defendants' omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

766.    Defendants' actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as hundreds of thousands of other consumers by Defendants' deceptive acts and practices as described herein.

767.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff and the other Class Members have suffered ascertainable loss and actual damages. Plaintiff and the other Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Fuel Pump Defect been disclosed. Plaintiff and the other Class Members also suffered diminished value of their vehicles.

768.    Defendants had notice of their conduct as alleged herein.

769.   Pursuant to Md. Code Ann., Com. Law § 13-408, Plaintiff and the Maryland Class seek actual damages, attorneys' fees, and any other just and proper relief available under the MCPA, Md. Code Ann., Com. Law § 13-301, *et seq*.

## COUNT 33
## STRICT PRODUCT LIABILITY
(Individually and on Behalf of the Maryland Class)
(As to all Defendants)

770.   Plaintiff Lucas ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

771.   Plaintiff brings this claim individually and on behalf of other members of the Maryland Class (the "Class," for purposes of this Count).

772.   Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

773.   Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonably dangerous Fuel Pump.

774.   The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner. Plaintiff and Class Members have not misused or materially altered the Class Vehicles or Fuel Pumps. The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

226

775. The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

776. The Fuel Pump Defect causes the Class Vehicles to malfunction. The Fuel Pump Defect also causes the Class Vehicles to be sold in a condition not contemplated by the ultimate consumer which is dangerous to an extent beyond that which would be anticipated by the ordinary consumer with ordinary knowledge as to their characteristics.

777. The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiff, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

778. Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses. Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

779.    Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

780.    As a result of Defendants' actions as described herein, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT 34
## BREACH OF EXPRESS WARRANTY
## MD. CODE ANN., COM. LAW § 2-313
(Individually and on behalf of the Statewide Class)
(As to Honda)

781.    Plaintiff Lucas ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

782.    Plaintiff brings this claim individually and on behalf of the other members of the Maryland Class (the "Class" for purposes of this Count).

783.    Honda is a merchant with respect to the Class Vehicles.

784.    In its written express warranties, Honda expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

785.    Honda's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased or leased their Class Vehicles.

786.   Honda breached its express warranty to repair defective parts in the Class Vehicles. Honda admittedly has not repaired the Class Vehicles' Fuel Pump Defect.

787.   Plaintiff notified Honda of the Fuel Pump Defect in the Class Vehicles when he brought it in to a dealer after his Class Vehicle failed due to the Fuel Pump Defect in 2018. Honda knew that it was unable to provide adequate remedy under the warranty. Honda was also provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge. Honda has not remedied its breach.

788.   Further, Honda has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repairs.

789.   The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members whole and because Honda has failed and/or has refused to adequately provide effective remedies within a reasonable time.

790.   Accordingly, recovery by Plaintiff and the other Class Members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

791.    Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Honda improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class Members were therefore induced to purchase or lease the Honda Vehicles under false pretenses.

792.    Honda had notice of its breach as alleged herein.

793.    As a direct and proximate result of Honda's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT 35
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## MD. CODE ANN., COM. LAW §§ 2-314
(Individually and on behalf of the Statewide Class)
(As to Honda)

794.    Plaintiff Lucas ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

795.    Plaintiff brings this Count individually and on behalf of the other members of the Maryland Class (the "Class," for purposes of this Count).

796.    Honda is a "merchant" and each Class Vehicle is a "good" as defined in Maryland's Commercial Law governing the implied warranty of merchantability. Md. Code, Com. Law §§ 2-104(1), 2-105(1).

797.   Pursuant to Md. Code §§ 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

798.   By placing the Class Vehicles in the stream of commerce, Honda impliedly warranted that the Class Vehicles are safe, and that all claims in their advertising and marketing of the Class Vehicles were true.

799.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale or lease and at all times thereafter, the Class Vehicles were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Fuel Pump Defect which causes the Class Vehicles' Fuel Pump to prematurely fail, which can cause the engine to run rough, and the vehicle to stall while being driven or become inoperable.

800.   Further, Honda has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repair.

801.   Plaintiff and the other Class Members suffered injuries due to the defective nature of the Class Vehicles and Honda's breach of the warranty of merchantability.

802.   At all times that Honda warranted and sold the Class Vehicles, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Class Vehicles, and instead continued to issue false warranties, and continued to insist the products were safe. The Class Vehicles were defective when Honda delivered them to their resellers, dealers, and distributors which sold the Class Vehicles, and the Class Vehicles were therefore still defective when they reached Plaintiff and the Class.

803.    Honda's resellers, dealers, and distributors are intermediaries between Honda and consumers. These intermediaries sell Class Vehicles to consumers and are not, themselves, consumers of Class Vehicles, and therefore have no rights against Honda with respect to Plaintiff's and all other Class Members' acquisition of Class Vehicles. Honda's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

804.    Plaintiff and each Class Members' acquisition of the Class Vehicles suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Honda, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class Members

are intended third-party beneficiaries of contracts between Honda and their resellers, authorized dealers, and, specifically, of Honda's implied warranties.

805.   Honda had notice of its breach as alleged herein.

806.   As a direct and proximate result of Honda's breach of implied warranties of merchantability, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

**COUNT 36**
**NEGLIGENT RECALL/UNDERTAKING**
(Individually and on behalf of the Statewide Class)
(As to Honda)

807.   Plaintiff Lucas ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

808.   Plaintiff brings this Count individually and on behalf of the other members of the Maryland Class (the "Class," for purposes of this Count).

809.   Prior to the events made the basis of this action, Honda designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

810.   On January 29, 2019 Honda initiated a voluntary recall of the Recalled Vehicles. Honda's recall was voluntary and not initiated by NHTSA. The Recall was expanded and amended in the May 28, 2020 Second Recall.

811.   Honda owed a duty to use reasonable care to Plaintiff and Class Members based on its undertaking of the Recall.

233

812.   As described above, Honda breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiff and the Class of the Fuel Pump Defect, failing to direct Class Members to stop driving their Class Vehicles, and failing to offer Class Members a free loaner vehicles of comparable make, model, or value as their Class Vehicles until Honda is able to devise a repair that works (if ever) and implement it in each Class Vehicle. Honda's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

813.   For the reasons set for the above, Honda knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

814.   As a direct and proximate result, Plaintiff and the other Class Members have been and continue to be damaged in an amount to be determine at trial.

**COUNT 37**
**FRAUDULENT OMISSION**
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

815.   Plaintiff Lucas ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

816.   Plaintiff brings this Count individually and on behalf of the other members of the Maryland Class (the "Class," for purposes of this Count).

817.   Defendants were aware of the Fuel Pump Defect within the Class Vehicles when they marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

818.   Having been aware of the Fuel Pump Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Fuel Pump Defect, Defendants had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

819.   Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

820.   For the reasons set forth above, the Fuel Pump Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

821.   In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles.

822.   Had Plaintiff and the other members of the Class known of the Fuel Pump Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

823.   Through their omissions regarding the Fuel Pump Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

824.   As a direct and proximate result of Defendants' omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

### v.   MASSACHUSETTS CLASS

### COUNT 38
### VIOLATIONS OF MASSACHUSETTS REGULATION OF BUSINESS PRACTICE AND CONSUMER PRACTICE ACT
### MASS. GEN. LAWS ANN. CH. 93A, §§ 1, ET. SEQ.
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

825.   Plaintiff Kenneth Kansky ("Plaintiff" for purposes of this Count) incorporates by reference each paragraph as if fully set forth herein.

826.   Plaintiff brings this claim individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

827.   The Massachusetts Regulation of Business Practice and Consumer Practice Act ("MCPA") prohibits "[u]nfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ann. Ch. 93A § 2(a). Defendants' willful, knowing, and deceptive conduct fall squarely within the prohibited acts of Mass. Gen. Laws Ch. 93A § 2(a).

828.   Plaintiff and the Massachusetts Class are "person[s]" within the meaning of the MCPA. Mass. Gen. Laws Ann. Ch. 93A, § 1(a).

829.   Each Defendant is a "person[s]" as used in the MCPA. Mass. Gen. Laws Ann. Ch. 93A, § 1(a).

830.   Defendants engaged in "Trade" or "Commerce" as defined in Mass. Gen. Laws Ann. Ch. 93A § 1(b) including: "[t]he advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security as defined in subparagraph (k) of section four hundred and one of chapter one hundred and ten A, and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth." Mass. Gen. Laws Ann. Ch. 93A § 1(b).

831.   By the conduct described in detail above and incorporated herein, Defendants engaged in deceptive trade practices.

832.   Honda was provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

833.   Defendants' omissions regarding the Fuel Pump Defect, described above, which causes the Fuel Pump to prematurely fail, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

834.   Defendants intended for Plaintiff and the other Class Members to rely on the omissions regarding the Fuel Pump Defect.

835.   Plaintiff and the other Class Members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described Fuel Pump Defect, as evidenced by Plaintiff and the other Class Members' purchases of Class Vehicles.

836.   Had Defendants disclosed all material information regarding the Fuel Pump Defect to Plaintiff and the other Class Members, Plaintiff and the other Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

837.   Defendants' omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

838.   Defendants' actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as hundreds of thousands of other consumers by Defendants' deceptive acts and practices as described herein.

839.   As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff and the other Class Members have suffered ascertainable loss and actual damages. Plaintiff and the other Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Fuel Pump Defect been disclosed. Plaintiff and the other Class Members also suffered diminished value of their vehicles.

840.   Defendants had notice of their conduct as alleged herein.

841.   Pursuant to Mass Gen. Laws Ann. Ch. 93A, §§ 1, *et. seq*., Plaintiff and the Massachusetts Class seek actual damages, double or treble damages of such actual damages, attorneys' fees, and any other just and proper relief available under the MCPA.

## COUNT 39
## STRICT PRODUCT LIABILITY
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

842.   Plaintiff Kansky ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

239

843.   Plaintiff brings this claim individually and on behalf of other members of the Massachusetts Class (the "Class," for purposes of this Count).

844.   Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

845.   Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

846.   The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner. Plaintiff and Class Members have not misused or materially altered the Class Vehicles or Fuel Pumps. The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

847.   The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

848.   The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiff, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

849.   Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses. Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

850.   Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

851.   As a result of Defendants' actions as described herein, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

**COUNT 40**
**BREACH OF EXPRESS WARRANTY**
**MASS. GEN. LAWS ANN. CH. 106, § 2-313**
(Individually and on behalf of the Statewide Class)
(As to Honda)

852.   Plaintiff Kansky ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

853.   Plaintiff brings this claim individually and on behalf of the other members of the Massachusetts Class ("Class" for the purposes of this Count).

854.   Honda is a "merchant" and the Class Vehicles are "goods" as defined in Mass. Gen. Laws Ann. Ch. 106, §§ 2-104 and 2-105.

855.   Pursuant to Mass. Gen. Laws Ann. Ch. 106, § 2-313(1)(a), "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

856.   In its written express warranties, Honda expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

857.   Honda's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased or leased their Class Vehicles.

858.   Honda breached its express warranty to repair defective parts in the Class Vehicles. Honda admittedly has not repaired the Class Vehicles' Fuel Pump Defect.

859.   Further, Honda has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair, as Plaintiff has, due to the Fuel Pump failure have been denied adequate repairs.

860.   The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members

whole and because Honda has failed and/or has refused to adequately provide effective remedies within a reasonable time.

861.   Accordingly, recovery by Plaintiff and the other Class Members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

862.   Also, as alleged in more detail herein, at the time that Honda warranted and sold or leased the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Honda improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class Members were therefore induced to purchase or lease the Class Vehicles under false pretenses.

863.   Honda had notice of its breach as alleged herein.

864.   As a direct and proximate result of Honda's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT 41
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## MASS. GEN. LAWS ANN. CH. 106, § 2-314
(Individually and on behalf of the Statewide Class)
(As to Honda)

865.   Plaintiff Kansky ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

866.   Plaintiff brings this claim individually and on behalf of the other members of the Massachusetts Class ("Class" for the purposes of this Count).

867.   Honda is a "merchant" and the Class Vehicles are "goods" as defined in Mass. Gen. Laws Ann. Ch. 106, §§ 2-104 and 2-105.

868.   Pursuant to Mass. Gen. Laws Ann. Ch. 106, § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the sale or lease of the product. Honda impliedly warranted that the Class Vehicles were of a merchantable quality.

869.   By placing the Class Vehicles in the stream of commerce, Honda impliedly warranted that the Class Vehicles are safe, and that all claims in their advertising and marketing of the Class Vehicles were true.

870.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale or lease and at all times thereafter, the Class Vehicles were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Fuel Pump Defect which causes the Class Vehicles' Fuel Pump to prematurely fail, which can cause the engine to run rough, and the vehicle to stall while being driven or become inoperable.

871.   Further, Honda has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair, as Plaintiff has, due to the Fuel Pump failure have been denied adequate repair.

872.   Plaintiff and the other Class Members suffered injuries due to the defective nature of the Class Vehicles and Honda's breach of the warranty of merchantability.

873.   At all times that Honda warranted and sold the Class Vehicles, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Class Vehicles, and instead continued to issue false warranties, and continued to insist the products were safe. The Class Vehicles were defective when Honda delivered them to their resellers, dealers, and distributors which sold the Class Vehicles, and the Class Vehicles were therefore still defective when they reached Plaintiff and the Class.

874.   Honda's resellers, dealers, and distributors are intermediaries between Honda and consumers. These intermediaries sell Class Vehicles to consumers and are not, themselves, consumers of Class Vehicles, and therefore have no rights against Honda with respect to Plaintiff and all other Class Members' acquisition of

Class Vehicles. Honda's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

875.   Plaintiff and each Class member's acquisition of the Class Vehicles suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Honda, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class Members are intended third-party beneficiaries of contracts between Honda and their resellers, authorized dealers, and, specifically, of Honda's implied warranties.

876.   Honda had notice of its breach as alleged herein.

877.   As a direct and proximate result of Honda's breach of implied warranties of merchantability, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

**COUNT 42**
**NEGLIGENT RECALL/UNDERTAKING**
(Individually and on behalf of the Statewide Class)
(As to Honda)

878.   Plaintiff Kansky ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

879.   Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

246

880.   Prior to the events made the basis of this action, Honda designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

881.   On January 29, 2019 Honda initiated a voluntary recall of the Recalled Vehicles. Honda's recall was voluntary and not initiated by NHTSA. The Recall was expanded and amended in the May 28, 2020 Second Recall.

882.   Honda owed a duty to use reasonable care to Plaintiff and Class Members based on its undertaking of the Recall.

883.   As described above, Honda breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiff and the Class of the Fuel Pump Defect, failing to direct Class Members to stop driving their Class Vehicles, and failing to offer Class Members a free loaner vehicles of comparable make, model, or value as their Class Vehicles until Honda is able to devise a repair that works (if ever) and implement it in each Class Vehicle. Honda's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

884.   For the reasons set for the above, Honda knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

885.   As a direct and proximate result, Plaintiff and the other Class Members have been and continue to be damaged in an amount to be determine at trial.

**COUNT 43**
**FRAUDULENT OMISSION**
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

886.   Plaintiff Kansky ("Plaintiff" for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

887.   Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

888.   Defendants were aware of the Fuel Pump Defect within the Class Vehicles when the Class Vehicles were marketed and sold to Plaintiff and the other members of the Class. Despite being aware of the fuel pump issue

889.   Having been aware of the Fuel Pump Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Fuel Pump Defect, Defendants had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

890.   Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles. Such information was not publicly available until January 29, 2019, well after Defendants

knew of the Fuel Pump Defect and breached their duty to disclose it to owners and lessees of the Class Vehicles.

891.   For the reasons set forth above, the Fuel Pump Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

892.   In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles. Plaintiff's and members of the Class reasonably relied on Defendant's representations and omissions because Defendants were in a superior position to know the true qualities of the Class Vehicles and Defendants have a duty to field merchantable vehicles into the stream of commerce.

893.   Plaintiff and members of the Class could not have discovered the Fuel Pump Defect through the exercise of reasonable diligence and Defendants concealed that fact from them at the time of purchase or lease.

894.   Had Plaintiff and the other members of the Class known of the Fuel Pump Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

895.   As a result of withholding material information regarding the Fuel Pump Defect, Defendants realized unjustifiable profits as they sold more Class

Vehicles, and at a higher price, than they would have had they disclosed the truth about the Fuel Pump Defect.

896.   Through their omissions regarding the Fuel Pump Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

897.   As a direct and proximate result of Defendants' omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial. Plaintiff and the other members of the Class have also suffered damages resulting from loss of use, diminished value, increased transactional costs and other losses to be proved at trial.

### vi.   NORTH CAROLINA CLASS

### COUNT 44
### VIOLATIONS OF NORTH CAROLINA'S UNFAIR AND DECPETIVE TRADE PRACTICES ACT N.C.G.S. §§ 75-1.1, et. seq.
(Individually and on behalf of the North Carolina Class)
(As to all Defendants)

898.   Plaintiff Denese Cosper ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

899. This Count is brought on behalf of Plaintiff and the North Carolina Class ("Class" for the purposes of this Count) for violation of North Carolina's Unfair and Deceptive Trade Practices Act N.C.G.S. §§ 75-1.1, *et. seq.* ("UDTPA"), which prohibits, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C.G.S. § 75-1.1(a).

900. Defendants' design, engineering, testing, manufacture, distribution, marketing, advertising, labeling, and sale of the Class Vehicles constitutes "commerce" as defined by N.C.G.S. § 75-1.1(b).

901. Defendants' conduct violates UDTPA because Defendants engaged in the deceptive acts and practices described above and those acts and/or omissions possessed the tendency or capacity to mislead, or created the likelihood of deception in the minds of consumers and the public at large and did so deceive them with respect to the true qualities and characteristics of the Class Vehicles.

902. Defendants' deceptive conduct and its false and misleading statements about Class Vehicle and Fuel Pump safety and dependability and omissions regarding the Fuel Pump Defect, which causes the Fuel Pumps to prematurely fail, are facts that a reasonable person would have considered material in deciding whether or not to purchase or lease (or how much they were willing to pay to purchase or lease) the Class Vehicles.

903.   Defendants' acts and practices are unfair because they offend the public policy of the state of North Carolina and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

904.  Defendants' acts and practices described above were directed at Plaintiff and the public at large and were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiffs and members of the Class who justifiably acted or relied to their detriment upon Defendants' misrepresentations and omissions of fact, as evidenced by Plaintiff and the other Class Members' leasing and purchasing of Class Vehicles.

905.   Had Defendants disclosed all material information regarding the Fuel Pump Defect to Plaintiff and the other Class Members, Plaintiff and the other Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

906.  Defendants' unfair and deceptive acts and practices, and/or misrepresentations and omissions, have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

907.   Honda also engaged in unfair and deceptive conduct by issuing a defective Recall that provides no remedy for the Fuel Pump Defect, does not notify Class Members about the Fuel Pump Defect, does not instruct consumers to stop

driving the dangerous Class Vehicles, does not notify consumers and offer them free loaner vehicles of comparable make, model, or value as their own Class Vehicles to enable them to cease driving their dangerous Class Vehicles until a remedy is available and can be implemented.

908.   Denso also engaged in unfair and deceptive conduct by manufacturing and placing in the stream of commerce a Fuel Pump it knew, or should have known, was materially defective and posed substantial risk to the drivers and passengers of the Class Vehicles and other motorists.

909.   As a direct and proximate result of Defendants' deceptive commercial practices, Plaintiff and the other Class Members have suffered ascertainable loss and actual damages. Plaintiff and the other Class Members would not have purchased or leased the Class Vehicles or would have paid less for them had Defendants disclosed the truth about the Fuel Pump Defect. Plaintiff and the other Class Members also suffered diminished value of their vehicles and other losses.

910.   As a direct and proximate result of Defendants' unfair and deceptive commercial practices, Plaintiff and the other Class Members were harmed by Honda's inadequate Recall, described above, including Defendants' failure to notify them of the Fuel Pump Defect, failure to direct them to stop driving their Class Vehicles, and failure to offer Class Members a free loaner vehicle of comparable make, model, or value as their Class Vehicles until Defendants are able to devise a

remedy that that is safe and dependable (if ever) and implement it in each Class Vehicle. Defendants' failure to do so continues to expose Plaintiff and the Class to the risk of serious injury and death.

911.   N.C.G.S. § 75-16 provides that "if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict." N.C.G.S. § 75-16.1(a) further provides that, "the presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party," upon a finding that, "The party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter."

912.   Defendants' violation of UDTPA was willful and Defendants refusal to conform the vehicles to the warranties, and to reimburse consumers for their reasonable losses which result from Defendant's acts and omissions is unwarranted. Defendants knowingly and willfully marketed the Class Vehicles as safe and dependable all the while knowing they were not; admit in the Recall Reports the fact of the Fuel Pump Defect, the thousands of warranty claims and more than 60 field technical reports it received about the Fuel Pump Defect, and that the Fuel Pump Defect poses a serious risk of injury rendering the Class Vehicles unsafe; and the facts of the defect Recall are incontrovertible. Defendants, through their willful and knowing deceptive acts and practices, as detailed above, have willfully and

knowingly exposed Plaintiff and the Class to the risk of serious injury and death, and continue to do so by virtue of having issued the deficient Recall.

913.  Defendants had notice of their conduct as alleged herein.

914.  As a direct and proximate result of Defendants' conduct in violation of UDTPA, Plaintiff and the members of the Class have been injured in an amount to be proven at trial and are entitled to treble damages under N.C.G.S. § 75-16. Because Defendants' violation of UDTPA was willful and they unreasonably refused to conform the Class Vehicles to the warranties and reimburse Class Vehicle owners and lessees for their pecuniary losses Plaintiff and members of the Class are further entitled to attorney's fees under N.C.G.S. § 75-16.1.

**COUNT 45**
**STRICT PRODUCT LIABILITY**
(Individually and on Behalf of the North Carolina Class)
(As to all Defendants)

915.  Plaintiff Cosper ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

916.  Plaintiff brings this claim individually and on behalf of other members of the North Carolina Class (the "Class," for purposes of this Count).

917.  Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

918.   Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

919.   The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner. Plaintiff and Class Members have not misused or materially altered the Class Vehicles or Fuel Pumps. The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

920.   The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

921.   The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiff, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

922.   Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses. Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

923.   Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

924.   As a result of Defendants' actions as described herein, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

**COUNT 46**
**BREACH OF EXPRESS WARRANTY**
**N.C.G.S. § 25-2-313**
(Individually and on Behalf of the North Carolina Class)
(As to Honda)

925.   Plaintiff Cosper ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

926.   Plaintiff brings this claim individually and on behalf of the other members of the North Carolina Class ("Class" for the purposes of this Count).

927.   Honda is and was at all relevant times a merchant with respect to the Class Vehicles.

928.   Pursuant to N.C.G.S. § 25-2-313(A)(1), "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

929.   In its written express warranties, Honda expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

930.   Honda's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased or leased their Class Vehicles.

931.   Honda breached its express warranty to repair defective parts in the Class Vehicles. Honda admittedly has not repaired the Class Vehicles' Fuel Pump Defect.

932.   Further, Honda has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair, as Plaintiff has, due to the Fuel Pump failure have been denied adequate repairs.

933.   The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members whole and because Honda has failed and/or has refused to adequately provide effective remedies within a reasonable time.

934.    Accordingly, recovery by Plaintiff and the other Class Members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

935.    Also, as alleged in more detail herein, at the time that Honda warranted and sold or leased the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Honda improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class Members were therefore induced to purchase or lease the Class Vehicles under false pretenses.

936.    Honda had notice of its breach as alleged herein.

937.    As a direct and proximate result of Honda's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT 47
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### N.C.G.S. § 25-2-314
(Individually and on Behalf of the North Carolina Class)
(As to Honda)

938.    Plaintiff Cosper ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

939.    Plaintiff brings this claim individually and on behalf of the other members of the North Carolina Class ("Class" for the purposes of this Count).

259

940.   Honda is a "merchant" and the Class Vehicles are "goods" as defined in N.C.G.S. §§ 25-2-104 and 2-105.

941.   Pursuant to N.C.G.S. § 25-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the sale or lease of the product. Honda impliedly warranted that the Class Vehicles were of a merchantable quality.

942.   By placing the Class Vehicles in the stream of commerce, Honda impliedly warranted that the Class Vehicles are safe, and that all claims in their advertising and marketing of the Class Vehicles were true.

943.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale or lease and at all times thereafter, the Class Vehicles were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Fuel Pump Defect which causes the Class Vehicles' Fuel Pump to prematurely fail, which can cause the engine to run rough, and the vehicle to stall while being driven or become inoperable.

944.   Further, Honda has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty

repair, as Plaintiff has, due to the Fuel Pump failure have been denied adequate repair.

945.   Plaintiff and the other Class Members suffered injuries due to the defective nature of the Class Vehicles and Honda's breach of the warranty of merchantability.

946.   At all times that Honda warranted and sold the Class Vehicles, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Class Vehicles, and instead continued to issue false warranties, and continued to insist the products were safe. The Class Vehicles were defective when Honda delivered them to their resellers, dealers, and distributors which sold the Class Vehicles, and the Class Vehicles were therefore still defective when they reached Plaintiff and the Class.

947.   Honda's resellers, dealers, and distributors are intermediaries between Honda and consumers. These intermediaries sell Class Vehicles to consumers and are not, themselves, consumers of Class Vehicles, and therefore have no rights against Honda with respect to Plaintiff and all other Class Members' acquisition of Class Vehicles. Honda's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

948.   Plaintiff and each Class member's acquisition of the Class Vehicles suffices to create privity of contract between Plaintiff and all other members of the

Class, on the one hand, and Honda, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class Members are intended third-party beneficiaries of contracts between Honda and their resellers, authorized dealers, and, specifically, of Honda's implied warranties.

949.   Honda had notice of its breach as alleged herein.

950.   As a direct and proximate result of Honda's breach of implied warranties of merchantability, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

**COUNT 48**
**NEGLIGENT RECALL/UNDERTAKING**
(Individually and on behalf of the North Carolina Class)
(As to Honda)

951.   Plaintiff Cosper ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

952.   Plaintiff brings this Count individually and on behalf of the other members of the North Carolina Class (the "Class," for purposes of this Count).

953.   Prior to the events made the basis of this action, Honda designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

954.   On January 29, 2019 Honda initiated a voluntary recall of the Recalled Vehicles. Honda's recall was voluntary and not initiated by NHTSA. The Recall was expanded and amended in the May 28, 2020 Second Recall.

955.   Honda owed a duty to use reasonable care to Plaintiff and Class Members based on its undertaking of the Recall.

956.   As described above, Honda breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiff and the Class of the Fuel Pump Defect, failing to direct Class Members to stop driving their Class Vehicles, and failing to offer Class Members a free loaner vehicles of comparable make, model, or value as their Class Vehicles until Honda is able to devise a repair that works (if ever) and implement it in each Class Vehicle. Honda's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

957.   For the reasons set for the above, Honda knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

958.   As a direct and proximate result, Plaintiff and the other Class Members have been and continue to be damaged in an amount to be determine at trial.

## COUNT 49
## FRAUDULENT OMISSION
(Individually and on behalf of the North Carolina Class)
(As to all Defendants)

959.   Plaintiff Cosper ("Plaintiff" for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

960.   Plaintiff brings this Count individually and on behalf of the other members of the North Carolina Class (the "Class," for purposes of this Count).

961.   Defendants were aware of the Fuel Pump Defect within the Class Vehicles when the Class Vehicles were marketed and sold to Plaintiff and the other members of the Class. Despite being aware of the fuel pump issue

962.   Having been aware of the Fuel Pump Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Fuel Pump Defect, Defendants had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

963.   Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles. Such information was not publicly available until January 29, 2019, well after Defendants knew of the Fuel Pump Defect and breached their duty to disclose it to owners and lessees of the Class Vehicles.

964.   For the reasons set forth above, the Fuel Pump Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

965.   In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Defendants to disclose known material defects with

respect to the Class Vehicles. Plaintiff's and members of the Class reasonably relied on Defendant's representations and omissions because Defendants were in a superior position to know the true qualities of the Class Vehicles and Defendants have a duty to field merchantable vehicles into the stream of commerce.

966.   Plaintiff and members of the Class could not have discovered the Fuel Pump Defect through the exercise of reasonable diligence and Defendants concealed that fact from them at the time of purchase or lease.

967.   Had Plaintiff and the other members of the Class known of the Fuel Pump Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

968.   As a result of withholding material information regarding the Fuel Pump Defect, Defendants realized unjustifiable profits as they sold more Class Vehicles, and at a higher price, than they would have had they disclosed the truth about the Fuel Pump Defect.

969.   Through their omissions regarding the Fuel Pump Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

970.   As a direct and proximate result of Defendants' omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial. Plaintiff and the other members of the Class have also suffered damages resulting from loss of use, diminished value, increased transactional costs and other losses to be proved at trial.

### vii.   OHIO CLASS

### COUNT 50
### VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
### OHIO REV. CODE ANN. §§ 1345.01, ET SEQ.
(Individually and on Behalf of the Ohio Class)
(As to all Defendants)

971.   Plaintiff Donald Hackman ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

972.   Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

973.   Defendants, Plaintiff, and the other Class Members are "persons" within the meaning of Ohio Rev. Code Ann. § 145.01(B). Defendants are a "supplier" as defined by Ohio Rev. Code Ann. § 1345.01(c).

974.   Plaintiff and the other Class Members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D), and their purchase and lease of the

Class Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

975.   Ohio Rev. Code Ann. § 1345.02 prohibits unfair or deceptive acts or practices in connection with consumer transactions, such as those described herein.

976.   In the course of Defendants' business, Defendants violated the Ohio Consumer Sales Practices Act ("CSPA") by selling Class Vehicles with the Fuel Pump Defect that may result in Fuel Pumps failing prematurely, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants, or negligently concealing or suppressing material facts concerning the Fuel Pump Defect in the Class Vehicles.

977.   Further, as a result of placing a defective product into the stream of commerce, Defendants have breached their implied warranty in tort, which is an unfair and deceptive act, as defined in Ohio Rev. Code Ann. § 1345.09(B).

978.   Defendants have committed unfair and deceptive acts in violation of the Ohio CSPA by knowingly placing into the stream of commerce the Class Vehicles with the Fuel Pump Defect.

979.   Moreover, Defendants have committed an unfair and deceptive act by knowingly concealing the Fuel Pump Defect in the Class Vehicles and failing to inform Plaintiff and the other Class Members of this defect.

980.     The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Defendants as detailed in this Complaint, including, but not limited to, the failure to honor both its express and implied warranties; and the concealment and/or non-disclosure of a substantial defect, constitute deceptive practices in violations of the CSPA. These cases include, but are not limited to:

j.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

k.   *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

l.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

m.   *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

n.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

o.   *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

p.   *Cranford v. Joseph Airport Honda, Inc.* (OPIF #10001586);

q.   *Brown v. Spears* (OPIF #10000403);

r.   *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

s.  *Mosley v. Performance Mitsubishi AKA Automanage* (OPIF #10001326); and

t.  *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524).

981.   Defendants' unfair or deceptive acts or practices were likely to, and did, in fact, deceive consumers, including Plaintiff and the other Class Members, about the true reliability, dependability, efficiency, and quality of the Class Vehicles.

982.   Plaintiff and the other Class Members suffered ascertainable loss and actual damages as a direct result of Defendants' concealment of and failure to disclose material information, namely, the Fuel Pump Defect. Plaintiff and the other Class Members who purchased or leased the Class Vehicles would not have done so, or would have paid significantly less, if the true nature of the Class Vehicles had been disclosed. Plaintiff and the other Class Members also suffered diminished value of their vehicles.

983.   Defendants had notice of their conduct as alleged herein.

984.   Defendants are liable to Plaintiff and the other Class Members for compensatory damages, injunctive/equitable relief, and attorneys' fees pursuant to Ohio Rev. Code Ann. § 1345.09.

## COUNT 51
## STRICT PRODUCT LIABILITY
(Individually and on behalf of the Ohio Class)
(As to all Defendants)

269

985.   Plaintiff Hackman ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

986.   Plaintiff brings this claim individually and on behalf of other members of the Ohio Class (the "Class," for purposes of this Count).

987.   Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

988.   Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

989.   The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner. Plaintiff and Class Members have not misused or materially altered the Class Vehicles or Fuel Pumps. The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

990.   The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

991.   The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of

providing safe and reliable transportation and places Plaintiff, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

992.   Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses. Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

993.   Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

994.   As a result of Defendants' actions as described herein, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

**COUNT 52**
**BREACH OF EXPRESS WARRANTY**
**OHIO REV. CODE ANN. §§ 1302.26 AND 1310.17**
(Individually and on behalf of the Ohio class)
(As to Honda)

995.   Plaintiff Hackman ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

996.   Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

997.   Honda is a merchant with respect to the Class Vehicles.

998.   In their written express warranty, Defendants expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.

999.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased or leased their Class Vehicles equipped with the defective Fuel Pumps.

1000.  Honda breached the express warranty to repair defects in materials and workmanship within the Class Vehicles. Honda has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

1001.  Honda was notified of its breach and the Fuel Pump Defect when Plaintiff Hackman brought his Class Vehicle into the Honda dealership complaining of the vehicle's hesitation and stalling, yet Honda dismissed Plaintiff's complaints and concerns without providing a remedy. Honda was also provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

1002.  Furthermore, the limited warranty of repair fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members whole and because Honda has failed and/or have refused to adequately provide effective remedies within a reasonable time.

1003. Accordingly, recovery by Plaintiff and the other Class Members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

1004. Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Honda improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1005. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Honda's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Class Members' remedies would be insufficient to make Plaintiff and the other Class Members whole.

1006. Honda had notice of its breach as alleged herein.

1007. As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

273

## COUNT 53
## BREACH OF IMPLIED WARRANTY
(Individually and on behalf of the Ohio class)
(As to Honda)

1008. Plaintiff Hackman ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

1009. Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

1010. Honda manufactured and sold the defective Class Vehicles to Plaintiff and the other Class Members.

1011. The Class Vehicles are defective because they have a defective Fuel Pump, which may result in Fuel Pumps failing prematurely, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants.

1012. These defects existed at the time the Class Vehicles left the control of Honda.

1013. Based upon these defects, Honda has failed to meet the expectations of a reasonable consumer. The Class Vehicles have failed in their ordinary, intended use, because they suffer from the Fuel Pump Defect, causing Fuel Pumps to potentially fail to deploy in a crash event, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants.

1014. Honda had notice of its breach as alleged herein.

1015. The above-described defects in the Class Vehicles were the direct and proximate cause of economic damages to Plaintiff and the other Class Members.

## COUNT 54
## NEGLIGENT RECALL/UNDERTAKING
(Individually and on behalf of the Ohio class)
(As to Honda)

1016. Plaintiff Hackman ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

1017. Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

1018. Prior to the events made the basis of this action, Honda designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

1019. On January 29, 2019 Honda initiated a voluntary recall of the Recalled Vehicles. Honda's recall was voluntary and not initiated by NHTSA. The Recall was expanded and amended in the May 28, 2020 Second Recall.

1020. Honda owed a duty to use reasonable care to Plaintiff and Class Members based on its undertaking of the Recall.

1021. As described above, Honda breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiff and the Class of the Fuel Pump Defect, failing to direct Class Members to stop driving their Class Vehicles, and failing to offer Class Members a free loaner vehicles of

comparable make, model, or value as their Class Vehicles until Honda is able to devise a repair that works (if ever) and implement it in each Class Vehicle. Honda's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

1022. For the reasons set for the above, Honda knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

1023. As a direct and proximate result, Plaintiff and the other Class Members have been and continue to be damaged in an amount to be determine at trial.

**COUNT 55**
**FRAUDULENT OMISSION**
(Individually and on behalf of the Ohio class)
(As to all Defendants)

1024. Plaintiff Hackman ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

1025. Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

1026. Defendants were aware of the Fuel Pump Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other Class Members.

1027. Having been aware of the Fuel Pump Defect, and having known that Plaintiff and the other Class Members could not have reasonably been expected to

276

know of this defect, Defendants had a duty to disclose the Fuel Pump Defect to Plaintiff and the other Class Members in connection with the sale or lease of the Class Vehicles.

1028. Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other Class Members in connection with the sale or lease of the Class Vehicles.

1029. For the reasons set forth above, the Fuel Pump Defect in the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

1030. In purchasing or leasing the Class Vehicles, Plaintiff and the other Class Members reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles. Had Plaintiff and the other Class Members known of the Fuel Pump Defect in the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

1031. Through their omissions regarding the Fuel Pump Defect in the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other Class Members to purchase or lease a Class Vehicle that they otherwise would not have purchased, or to pay more for a Class Vehicle than they otherwise would have paid.

1032. As a direct and proximate result of Defendants' omissions, Plaintiff and the other Class Members either paid too much for the Class Vehicles or would not

have purchased the Class Vehicles if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

### C. Claims Brought on Behalf of the Nationwide Class

**COUNT 56**
**BREACH OF EXPRESS WARRANTY ALA. CODE §§ 7-2-313 AND 7-2A-210, AND MATERIALLY IDENTICAL STATE STATUTES**
(Individually and on behalf of the Nationwide Class)
(As to Honda)

1033. Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

1034. Plaintiff brings this claim individually and on behalf of the other members of the Nationwide Class (the "Class" for purposes of this Count).

1035. Honda is a merchant with respect to the Class Vehicles.

1036. In its written express warranties, Honda expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

1037. Honda's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased or leased their Class Vehicles.

1038. Honda breached its express warranty to repair defective parts in the Class Vehicles. Honda admittedly has not repaired the Class Vehicles' Fuel Pump Defect.

1039.   Honda was provided notice of the Fuel Pump Defect as alleged in detail herein. Honda has not remedied its breach.

1040.   Further, Honda has refused to provide an adequate and timely warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile.  Customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repairs.

1041.   The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1042.   Accordingly, recovery by Plaintiff and the other Class Members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

1043.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Honda improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class Members were therefore induced to purchase or lease the Honda Vehicles under false pretenses.

1044. As a direct and proximate result of Honda's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

**COUNT 57**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**ALA. CODE §§ 7-2-314 AND 7-2A-314, AND MATERIALLY IDENTICAL**
**STATE STATUES**
(Individually and on behalf of the Statewide Class)
(As to Honda)

1045. Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

1046. Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

1047. Honda is a merchant with respect to motor vehicles under Ala. Code § § 7-2-104 and 7-2A-103.

1048. Pursuant to Ala. Code §§ 7-2-314 and 7-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

1049. The Class Vehicles do not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.

Specifically, the Class Vehicles suffer from the Fuel Pump Defect which causes the Class Vehicles' Fuel Pump to prematurely fail.

1050. Honda was provided notice of the Fuel Pump Defect as alleged in detail herein. Honda has not remedied its breach.

1051. Further, Honda has refused to provide an adequate and timely warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repair.

1052. Plaintiff and the other Class Members suffered injuries due to the defective nature of the Class Vehicles and Honda's breach of the warranty of merchantability.

1053. As a direct and proximate result of Honda's breach of the warranty of merchantability, Plaintiff and the other Class Members have been damaged in an amount to be proven at trial.

**COUNT 58**
**COMMON LAW FRAUDULENT OMISSION/CONCEALMENT**
(Individually and on Behalf of the Nationwide Class)
(As to Honda and Denso)

1054. Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

1055. Plaintiff brings this claim individually and on behalf of the Nationwide Class ("Class" for purposes of this Count).

1056. Defendants were aware of the Fuel Pump Defect within the Class Vehicles when the Class Vehicles were marketed and sold to Plaintiff and the other members of the Class.

1057. Having been aware of the Fuel Pump Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Fuel Pump Defect, Defendants had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

1058. Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

1059. For the reasons set forth above, the Fuel Pump Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

1060. In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles.

1061. Had Plaintiff and the other members of the Class known of the Fuel Pump Defect within the Class Vehicles, they would have not purchased or leased the Class Vehicles or would have paid less for the Class Vehicles.

1062. Through their omissions regarding the Fuel Pump Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase or lease a Class Vehicle that they otherwise would not have purchased or leased, or pay more for a Class Vehicle than they otherwise would have paid.

1063. As a direct and proximate result of Defendants' omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased or leased the Class Vehicles at all if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 59**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**15 U.S.C. §§ 2301, et seq.**
(Individually and on behalf of the Nationwide Class)
(As to Honda)

1064. Plaintiff Oliver ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

1065. Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

1066. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332 (a) and (d).

1067. Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

1068. Honda is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

1069. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1070. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

1071. In its express written warranties, Honda expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects become apparent during the warranty period.

1072. Honda's warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

1073. With respect to Class Members' purchases or leases of the Class Vehicles, the terms of Honda's written warranties and implied warranty became part of the basis of the bargain between Honda and Plaintiff and other Class Members.

1074. Honda breached the implied warranty of merchantability. Without limitation, the Class Vehicles have Fuel Pumps that prematurely fail, as described above, which renders the Class Vehicles unmerchantable.

1075. Honda breached its express warranties by not offering a functioning repair for the defective Fuel Pump in the Class Vehicles as evidenced by Honda's own admission in the Recall Report that it has not identified a remedy.

1076. Further, Honda has refused to provide an adequate and timely warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, Class Members report Fuel Pump failure to their dealer, but Honda has failed to repair the defect.

1077. At the time of sale or lease of each Class Vehicle, Honda knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Fuel Pump Defect.

1078. The amount in controversy of Plaintiff' individual claims exceed the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of costs and interest, computed on the basis of all claims to be determined in this lawsuit.

1079. Plaintiff, individually and on behalf of the Class Members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief against Defendants as set forth below:

1.  Certifying the proposed Nationwide, Multi-State and Statewide Classes;

2.  Appointing Plaintiffs as the Class representatives and their undersigned counsel as Class counsel;

3.  Ordering Defendants to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other Class Members, as allowable by law;

4.  Enjoining Defendants from continuing the unfair business practices alleged in this Complaint;

5.  Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

6.  Ordering Defendants to pay attorneys' fees and costs of suit;

7.  Awarding injunctive relief requiring Honda to promptly and fully inform Class Members of the Fuel Pump Defect and its associated dangers and instructing such Class Members to cease driving their vehicles, and ordering Honda to provide free loaner vehicles of comparable make, model, or value to the Class Vehicle each Class member owns or leases until a remedy for the Fuel Pump Defect is installed in the Class Vehicles; and

8.     Granting such additional relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial on all issues so triable.

Dated:  October 29, 2020

/s/ W. Daniel "Dee" Miles, III
W. Daniel "Dee" Miles, III
Demet Basar (*pro hac vice*)
H. Clay Barnett, III
J. Mitch Williams
Lydia Keaney Reynolds*
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com
Demet.Basar@BeasleyAllen.com
Clay.Barnett@BeasleyAllen.com
Mitch.williams@Beasleyallen.com
Lydia.Reynolds@BeasleyAllen.com

Adam J. Levitt (*pro hac vice*)
John E. Tangren*
Daniel R. Ferri*
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com

*Counsel for Plaintiffs and Proposed
Interim Class Counsel*

287

Timothy G. Blood (*pro hac vice*)
**BLOOD HURST & O'REARDON, LLP**
501 West Broadway, Suite 1490
San Diego, California  92101
Telephone:  619-338-1100
tblood@bholaw.com

*Additional counsel for Plaintiffs*

*\*pro hac vice* forthcoming